# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. <u>04-60001-CR-COOKE (s) (s) (s) (s) (s)</u>
18 U.S.C. § 956(a)(1)
18 U.S.C. § 371
18 U.S.C. § 2339A
18 U.S.C. § 922(g)(5)(B)
18 U.S.C. § 1001(a)
18 U.S.C. § 1621(1)
18 U.S.C. § 1505
18 U.S.C. § 924(d)(1)
18 U.S.C. § 2
21 U.S.C. § 853

**UNITED STATES OF AMERICA**

**v.**

**ADHAM AMIN HASSOUN,**
    a/k/a "Abu Sayyaf,"
**MOHAMED HESHAM YOUSSEF,**
    a/k/a "Abu Turab,"
**KIFAH WAEL JAYYOUSI,**
    a/k/a "Abu Mohamed,"
**KASSEM DAHER,**
    a/k/a "Abu Zurr," and
**JOSE PADILLA,**
    a/k/a "Ibrahim,"
    a/k/a "Abu Abdullah the Puerto Rican,"
    a/k/a "Abu Abdullah Al Mujahir,"

          **Defendants.**



FILED by _____ D.C.
MAG. SEC.

NOV 1 7 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

---

## SUPERSEDING INDICTMENT

The Grand Jury charges that:

## INTRODUCTION

At times material to this Superseding Indictment:

1.   There existed a radical Islamic fundamentalist movement dedicated to the establishment of a pure Islamic state ("Caliphate") governed by strict Islamic law ("Sharia"). Followers and supporters of this movement adhered to a radical Salafist ideology that encouraged and promoted "violent jihad" to be waged by "mujahideen" using physical force and violence to oppose governments, institutions, and individuals that did not share their view of Islam.

2.   As used in this Superseding Indictment, the terms "violent jihad" or "jihad" include planning, preparing for, and engaging in, acts of physical violence, including murder, maiming, kidnapping, and hostage-taking.   The term "mujahideen" means warriors engaged in violent jihad.

## VIOLENT JIHAD GROUPS

3.   Groups espousing this radical Salafist ideology included the Islamic Group of Egypt, a/k/a "Gama'a al-Islamiyya," a/k/a "IG," a/k/a "AGAI;" the Egyptian Islamic Jihad, a/k/a "Islamic Jihad," a/k/a "al-Jihad," a/k/a "EIJ;" al-Qaeda; and violent jihad groups in other countries, including Afghanistan, Algeria, Bosnia, Chechnya, Lebanon, Libya, and Somalia. These groups engaged in acts of physical violence, including murder, maiming, kidnapping, and hostage-taking in waging violent jihad.

## VIOLENT JIHAD SUPPORT CELLS

4.   The physical violence committed by these jihad groups was supported and facilitated by a network of smaller groups or cells operating within the United States and in other countries, including Canada, Austria, Denmark, Italy, and the United Kingdom.   These support cells engaged in, among other things, propaganda, fund-raising, recruiting personnel, and providing other physical assets necessary to wage violent jihad.

2

## NORTH AMERICAN SUPPORT CELL

5.   The defendants, along with other individuals, operated and participated in a North American support cell that sent money, physical assets, and mujahideen recruits to overseas conflicts for the purpose of fighting violent jihad.  This North American support cell supported and coordinated with other support networks and mujahideen groups waging violent jihad.  The defendants followed and supported Sheikh Omar Abdel Rahman, an influential and high-ranking member of certain violent jihad groups.

6.   Mohamed Zaky, a/k/a "Abu Omar" (hereinafter "Zaky"), an unindicted coconspirator, was also a follower and supporter of Sheikh Omar Abdel Rahman.  In the early 1990's, Zaky founded and operated within the United States, and elsewhere, at least three Islamic organizations, the Islamic Center of the Americas, Save Bosnia Now, and the American Worldwide Relief Organization.  Until his death in 1995, Zaky used these organizations to promote violent jihad.

7.   **KIFAH WAEL JAYYOUSI, a/k/a "Abu Mohamed"** (hereinafter "**JAYYOUSI**"), while a resident of San Diego, California, founded the American Islamic Group, and after Zaky died, operated the American Worldwide Relief Organization.  Through the American Islamic Group, **JAYYOUSI** published The Islam Report, a newsletter that promoted violent jihad as a religious obligation, delivered information on violence committed by mujahideen, and solicited donations to support mujahideen operations and mujahideen families.  **JAYYOUSI** actively recruited mujahideen fighters and raised funds for violent jihad.

8.   **ADHAM AMIN HASSOUN a/k/a "Abu Sayyaf"** (hereinafter "**HASSOUN**"), a resident of Broward County, Florida, was the East Coast representative of the American Islamic Group and the American Worldwide Relief Organization.  **HASSOUN** assisted in distributing

3

The Islam Report and fund-raising for violent jihad on behalf of the American Worldwide Relief Organization. **HASSOUN** also served as the North American distributor of Nida'ul Islam, an Islamic magazine promoting violent jihad. **HASSOUN** worked with **JAYYOUSI** and others in actively recruiting mujahideen fighters and raising funds for violent jihad.

9. **KASSEM DAHER, a/k/a "Abu Zurr"** (hereinafter "**DAHER**"), resided in LeDuc, Canada. **DAHER** was affiliated with the Canadian Islamic Association, and communicated and coordinated with mujahideen field commanders and violent jihad leaders overseas. **DAHER** worked with **JAYYOUSI, HASSOUN,** and others in actively recruiting mujahideen fighters and raising funds for violent jihad.

10. **MOHAMED HESHAM YOUSSEF, a/k/a "Abu Turab"** (hereinafter "**YOUSSEF**"), resided in Broward County, Florida, and elsewhere. **YOUSSEF** was recruited by the North American support cell to participate in violent jihad, and traveled overseas for that purpose.

11. **JOSE PADILLA, a/k/a "Ibrahim," a/k/a "Abu Abdullah the Puerto Rican," a/k/a "Abu Abdullah Al Mujahir"** (hereinafter "**PADILLA**"), resided in Broward County, Florida, and elsewhere. **PADILLA** was recruited by the North American support cell to participate in violent jihad, and traveled overseas for that purpose.

## COUNT 1

### (Conspiracy to Murder, Kidnap, and Maim Persons in a Foreign Country)

Paragraphs 1 through 11 of this Superseding Indictment are realleged and incorporated herein by reference.

4

12. Beginning at a time uncertain, but no later than in or about October 1993, and continuing until on or about November 1, 2001, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**ADHAM AMIN HASSOUN,**
a/k/a "Abu Sayyaf,"
**MOHAMED HESHAM YOUSSEF,**
a/k/a "Abu Turab,"
**KIFAH WAEL JAYYOUSI,**
a/k/a "Abu Mohamed,"
**KASSEM DAHER,**
a/k/a "Abu Zurr," and
**JOSE PADILLA,**
a/k/a "Ibrahim,"
a/k/a "Abu Abdullah the Puerto Rican,"
a/k/a "Abu Abdullah Al Mujahir,"

at least one of whom having been within the jurisdiction of the United States, did knowingly and willfully combine, conspire, confederate, and agree with others, known and unknown to the Grand Jury, to commit at any place outside the United States, acts that would constitute murder, that is, the unlawful killing of human beings with malice aforethought, kidnapping, and maiming if committed in the special maritime and territorial jurisdiction of the United States, and did commit one or more acts within the jurisdiction of the United States, to effect the purpose and object of the conspiracy.

**PURPOSE AND OBJECT OF THE CONSPIRACY**

13. It was a purpose and object of the conspiracy to advance violent jihad, including supporting, and participating in, armed confrontations in specific locations outside the United States, and committing acts of murder, kidnapping, and maiming, for the purpose of opposing existing governments and civilian factions and establishing Islamic states under Sharia.

5

## MANNER AND MEANS OF THE CONSPIRACY

14.  The manner and means by which the defendants and their coconspirators sought to accomplish the purpose and object of the conspiracy included the following:

a.  Members of the conspiracy would and did recruit, and attempt to recruit, mujahideen warriors who would engage in violent jihad.

b.  Members of the conspiracy would and did solicit and raise monies to support and train mujahideen warriors who would engage in violent jihad.

c.  Members of the conspiracy would and did transfer monies from places inside the United States to places outside the United States to support violent jihad.

d.  Members of the conspiracy would and did provide communications equipment and other physical assets to individuals and groups engaged in violent jihad.

e.  Members of the conspiracy would and did publish statements advocating violent jihad to encourage, induce, and persuade others to support and engage in violent jihad.

f.  Members of the conspiracy would and did seek support and training to serve as mujahideen warriors who would engage in violent jihad.

g.  Members of the conspiracy would and did use humanitarian, educational, and other non-governmental organizations to cover, conceal, and disguise their support of violent jihad.

h.  Members of the conspiracy would and did utilize codes and other techniques to cover, conceal, and disguise their true identities and activities.

6

## OVERT ACTS

In furtherance of the conspiracy and to effect its purpose and object, at least one of the coconspirators committed, or caused to be committed, at least one of the following overt acts within the United States, in the Southern District of Florida, and elsewhere:

15. In or about October 1993, **JAYYOUSI** opened a bank account in the name of the "Islamic Group."

16. On or about June 13, 1994, **HASSOUN** caused to be issued a $1,000 check to **JAYYOUSI** with the memo line stating, "support for the person."

17. On or about February 4, 1995, **JAYYOUSI** and **DAHER** discussed setting up a for-profit business to fund jihad, "[T]his business, the profit generated from this business will be for the brothers, I mean we have to support the mujahideen brother," and **DAHER** then described his organization, the Canadian Islamic Association, as a "cover, I mean it's very good."

18. On or about March 21, 1995, **HASSOUN** participated in a coded conversation with **JAYYOUSI** and **DAHER**, in which **HASSOUN** stressed that "we have a number of people active in the field," and then stated, "All of us are in a chain, if one link of the chain is separated, the movement will not function," and that this concept is particularly important in the field of "tourism."

19. On or about June 25, 1995, **DAHER** participated in a coded conversation with **HASSOUN** and **JAYYOUSI**, in which **DAHER** reported, "Our friend in the first region . . . Has opened up a football court over there . . . because there are matches . . . he wants only to give training for the game."

20. On or about July 25, 1995, **HASSOUN** caused to be issued an $8,000 check to the Canadian Islamic Association with the memo line stating, "for tourism."

21.   On or about August 2, 1995, **HASSOUN** caused to be issued a $5,000 check to the American Worldwide Relief Organization with the memo line stating, "for brothers."

22.   On or about August 31, 1995, **HASSOUN** caused to be issued a $3,000 check to the "Canadian I. Association" with the memo line stating, "for tourism and tourist."

23.   On or about January 16, 1996, **HASSOUN** participated in a coded conversation with **YOUSSEF**, in which **YOUSSEF** indicated that he was looking for "work" in "an area that was a little active."

24.   On or about February 16, 1996, **HASSOUN** caused to be issued a $600 check to **JAYYOUSI** with the memo line stating, "Chechnya."

25.   On or about February 17, 1996, **YOUSSEF** departed the United States for Egypt.

26.   On or about April 17, 1996, **PADILLA** obtained his United States passport in Miami, Florida.

27.   On or about May 23, 1996, **HASSOUN** participated in a coded conversation with Unindicted Coconspirator #1, who was in Lebanon, in which **HASSOUN** asked if Unindicted Coconspirator #1 had a way to "get something over to the soccer team in Chechnya or Bosnia."

28.   On or about May 30, 1996, **HASSOUN** and **YOUSSEF**, who was in Egypt, discussed their intention to "prepare" **PADILLA** and send him to Egypt.

29.   On or about June 2, 1996, **HASSOUN** participated in a conversation with an individual about **HASSOUN's** plans to deliver a sermon on Chechnya for the purpose of raising funds for Chechnya.

30.   On or about June 8, 1996, **HASSOUN** participated in a coded conversation with **DAHER**, who was in Canada, about Afghanistan, in which they discussed "the ones who want to go out and smell the air."

8

31.  On or about June 11, 1996, **HASSOUN** participated in a coded conversation with **JAYYOUSI** about **YOUSSEF** being someone who wants to "get some fresh air . . . and find a route for himself."

32.  On or about June 16, 1996, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, and told him the "deal" would be completed within the month, and **YOUSSEF** responded, "[B]y God, I am ready."

33.  On or about June 30, 1996,  **YOUSSEF**, who was in Egypt, participated in a coded conversation with **HASSOUN**, and told **HASSOUN** that while he (**YOUSSEF**) was busy studying the Koran, this study was not his purpose and that he was waiting for the "trade" to take its "natural" course.

34.  On or about September 1, 1996, **YOUSSEF**, who was in Egypt, told **HASSOUN** that he was "ready for the . . . uh . . . the trade immediately," and **HASSOUN** responded, "By Allah, there is . . . there is trade in . . . uh . . . in Somalia. . . . [G]et ready, get organized, and go down there . . . to see. . . . [W]e'll open up a market over there."

35.  On or about September 2, 1996, **HASSOUN** participated in a conversation with **JAYYOUSI**, who asked **HASSOUN** to look for an "opportunity for us to come and visit . . . for Chechnya."

36.  On or about September 30, 1996, **HASSOUN** caused to be issued a $2,000 check to **DAHER** with the memo line stating, "one for Bosnia one for Libya."

37.  On or about October 23, 1996, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, in which he told **YOUSSEF** to go to Ogaden to "smell fresh air."

38.  On or about October 25, 1996, **HASSOUN** told **YOUSSEF**, who was in Egypt, to "go to the area that I told you about . . . brothers have arrived there . . . and God willing, you will

go uh . . . start a company with them. . . . And forget about the worldly brides and the worldly home, okay?"

39.   On or about November 30, 1996, Unindicted Coconspirator #1, calling from Turkey, participated in a conversation with an individual in the United States, and told the individual to instruct **HASSOUN** not to talk over the phone about these matters, "not even in code . . . tourism and such."

40.   On or about December 31, 1996, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, in which **HASSOUN** reported that "56 brothers got married" in Somalia, and asked **YOUSSEF** to get news about Somalia.

41.   On or about January 26, 1997, **HASSOUN** participated in a conversation with Unindicted Coconspirator #1 about jihad in Ogaden, Ethiopia, in which **HASSOUN** reported that "58 brothers died . . . the attack was repelled but the Americans used their airplanes . . . and were bombarding them . . . so the situation was very harmful to the brothers, but thanks to God, they will be repaid two-fold," and that, with regard to fund-raising, "whatever we collect we will be sending over there . . . a few emirs have called specifically concerning the subject . . . emirs of certain war fronts ask for such."

42.   On or about January 26, 1997, **HASSOUN** participated in a coded conversation with **DAHER** and another individual, in which **HASSOUN** reported, "Because they are playing football in Somalia. . . . it's heating up a lot, so we're sending . . . uh . . . uniforms . . . and . . . uh . . . sneakers for football over there."

43.   On or about January 31, 1997, **HASSOUN** caused to be issued a $2,000 check to **DAHER** with the memo line stating, "Somalia."

10

44.  On or about April 6, 1997, **YOUSSEF**, who was in Egypt, left a coded message for **HASSOUN**, indicating that **YOUSSEF** needed to confirm things before "we go on the picnic, God willing."

45.  On or about April 6, 1997, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, and discussed another "brother" who was "going on a picnic," and when **HASSOUN** asked if **YOUSSEF** would be going with this "brother," **YOUSSEF** responded that he planned to join a group of possibly ten others who were going "to smell fresh air and to eat cheese."

46.  On or about June 7, 1997, **HASSOUN** participated in a coded conversation with **DAHER** regarding the "brothers" in Lebanon, in which **DAHER** confirmed that they had bought "the zucchini and such," and that after the "wedding" there would be "very good things."

47.  On or about July 9, 1997, **HASSOUN** participated in a coded conversation with **DAHER** and another individual regarding Lebanon, in which **DAHER** advised **HASSOUN** that "green goods" were "needed urgently."

48.  On or about July 28, 1997, **HASSOUN** participated in a conversation with **PADILLA** and asked **PADILLA** if he was "ready," and **PADILLA** replied that "it's gonna happen soon."

49.  On or about February 10, 1998, **HASSOUN** participated in a coded conversation with **DAHER**, in which they discussed that the $3,500 that they had sent to Lebanon was used to buy "zucchini."

50.  On or about June 17, 1998, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, about **HASSOUN** sending $5,000 to fund the travel for five "partners."

11

51.  On or about June 21, 1998, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, about 20 "other partners" and **HASSOUN** wiring **YOUSSEF** money via the Thomas Cooke wire transfer company in Cairo.

52.  On or about June 22, 1998, **HASSOUN** caused to be issued a $5,000 check to cash with **YOUSSEF's** name on the memo line, and then used the funds to purchase an official check from Barnett Bank payable to **YOUSSEF**.

53.  On or about June 24, 1998, **HASSOUN** caused to be sent a $5,000 Western Union wire transfer to **YOUSSEF** in Cairo, Egypt.

54.  On or about June 24, 1998, **YOUSSEF**, who was in Egypt, called **HASSOUN**, who reported that the funds were available.

55.  On or about July 7, 1998, **YOUSSEF** called **HASSOUN** from Albania en route "to the inside," and **HASSOUN** promised to wire $5,000 to him.

56.  On or about July 18, 1998, **YOUSSEF** called **HASSOUN** on a satellite telephone, and reported that he had entered Kosovo under bombing from the Serbs, and **HASSOUN** told **YOUSSEF** that he was sending $5,000 with **PADILLA**.

57.  On or about July 18, 1998, **HASSOUN** participated in a coded conversation with an individual, in which he reported that **YOUSSEF** was "playing football yesterday and they had casualties," and **HASSOUN** asked the individual, "[A]re you ready?"

58.  On or about July 28, 1998, **HASSOUN** participated in a coded conversation with an individual, and described **YOUSSEF's** activities in Kosovo as "tourism completely."

59.  On or about July 29, 1998, **HASSOUN** participated in a coded conversation with an individual, in which **HASSOUN** reported that he was "concentrating on the matter of this new area which has opened up" and had "some loved ones that have gone there."

12

60. On or about August 3, 1998, **HASSOUN** caused to be issued a $1,300 check to cash with the memo line stating, "Kosovo."

61. On or about August 10, 1998, **YOUSSEF**, who was in Egypt, called **HASSOUN**, and participated in a coded conversation about "the joint venture that they had formed," including the fact that "seventy got completely married," that they all "ran into ambushes, well-organized and well-prepared ambushes," and that "[s]ports equipment" was used "to launch an attack on the other team."

62. On or about August 17, 1998, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, in which **HASSOUN** agreed to send **PADILLA** to him.

63. On or about August 18, 1998, **HASSOUN** caused to be issued a $5,000 check to Global Relief Foundation (hereinafter "GRF") with the memo line stating, "Kosovo."

64. On or about August 28, 1998, **HASSOUN** participated in a conversation with an individual, and attempted to solicit a donation for **PADILLA's** travel, to which the individual agreed, and stated that he had already contributed "to his cause" in the past.

65. On or about September 5, 1998, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, and advised him that **PADILLA** would be arriving on Sunday, and that **YOUSSEF** should meet **PADILLA** at the airport.

66. On or about September 5, 1998, **PADILLA** flew from the Southern District of Florida to Cairo, Egypt.

67. On or about October 20, 1998, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, and inquired about the welfare of **PADILLA**.

68. On or about February 8, 1999, **HASSOUN** participated in a conversation with an individual, and stated that he provides financial support to **YOUSSEF** and **PADILLA**, and

expressed the importance of **YOUSSEF** "[having] cash . . . So he is always comfortable, and [keeping] it on the side until further notice" for the purpose of supporting **PADILLA** and "some brothers who would like . . . to follow Ibrahim's [**PADILLA's**] example as well."

69.  On or about February 8, 1999, **HASSOUN** participated in a three-way conversation with **YOUSSEF** and **PADILLA**, who were in Egypt, in which **HASSOUN** asked **PADILLA** about the progress of his studies and if he still had money.

70.  On or about April 5, 1999, **HASSOUN** caused to be issued a $3,000 check to GRF with the memo line stating, "Kosovo."

71.  On or about April 15, 1999, **HASSOUN** caused to be issued a $600 check to GRF with the memo line stating, "to support Kosovo."

72.  On or about July 25, 1999, **HASSOUN** participated in a coded conversation with **PADILLA**, who was in Egypt, in which **PADILLA** reported that he had requested "an army jacket, a book bag, and a sleeping bag" because there "was a rumor here that the door was open somewhere."

73.  On or about July 25, 1999, **HASSOUN** participated in a coded conversation with an individual, in which **HASSOUN** discussed a plan to give money to the individual so that the individual's wife can withdraw the money in Egypt to give to **PADILLA**.

74.  On or about August 1, 1999, **HASSOUN** caused to be issued a $1,000 check to an individual with **PADILLA's** name on the memo line.

75.  On or about August 13, 1999, **HASSOUN** caused to be issued a $4,400 check to an individual with the memo line stating, "50 Dagastan."

76.  On or about October 1, 1999, **HASSOUN** caused to be issued a $2,500 check to GRF with the memo line stating, "Tourism, Propaganda, Chechnya."

77. On or about October 17, 1999, **HASSOUN** participated in a coded conversation with **PADILLA**, who was in Egypt, in which **HASSOUN** told **PADILLA** that he must "prepare [himself] financially" so that **PADILLA** can "move . . . to some close area."

78. On or about October 20, 1999, **HASSOUN** caused to be issued a $2,500 check to GRF with the memo line stating, "from Al Iman in Chechnya."

79. On or about November 15, 1999, **JAYYOUSI** participated in a conversation with Unindicted Coconspirator #2 regarding raising funds for "the brothers," to which **JAYYOUSI** stated that they were transferring some funds through GRF.

80. On or about January 20, 2000, **HASSOUN** caused to be issued a $2,000 check to GRF with the memo line stating, "Chechnya."

81. On or about April 10, 2000, **HASSOUN** participated in a conversation with **PADILLA**, who was in Egypt, in which they discussed the possibility of **PADILLA** traveling to Yemen, but **PADILLA** indicated that he needed "a recommendation to connect [him] with the good brothers, with the right faith."

82. On or about May 6, 2000, **JAYYOUSI** participated in a conversation with Unindicted Coconspirator #2, in which **JAYYOUSI** said that he would try to wire Unindicted Coconspirator #2 more money, and that Unindicted Coconspirator #2 should use $3,000 for travel.

83. On or about July 24, 2000, **PADILLA** filled out a "Mujahideen Data Form" in preparation for violent jihad training in Afghanistan.

84. On or about September 3, 2000, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, who indicated that he would be traveling "there at Usama's and .

. . Khattab's company," and that **PADILLA** "is a little farther south by . . . he is supposed to be at Usama's . . . to go to Kh . . . to go a little farther north."

85.   On or about September 3, 2000, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, and **YOUSSEF** stated that **PADILLA** "entered into the area of Usama."

86.   On or about September 3, 2000, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, about sending people to Baku, Azerbaijan.

87.   On or about September 12, 2000, **JAYYOUSI** participated in a conversation with Unindicted Coconspirator #3 about finding a new domain name on the Internet for the purpose of reestablishing The Islam Report.

88.   On or about October 9, 2000, **YOUSSEF**, who was in Saudi Arabia, called **HASSOUN**, and gave him a telephone number in the Republic of Georgia, at which **YOUSSEF** could be reached in a few days.

89.   On or about October 15, 2000, **HASSOUN** participated in a conversation with unknown coconspirators in the Republic of Georgia, who told **HASSOUN** that **YOUSSEF** is still in "Baku," and that **PADILLA** is "currently in Afghanistan," and **HASSOUN** responded, "I would like to come over by you to smell some fresh air."

90. On or about October 15, 2000, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Baku, Azerbaijan, in which **HASSOUN** told **YOUSSEF** to join **PADILLA**, and **YOUSSEF** responded, "I have already reached the front line, why should I return?  And also, considering I have previous experience, you see?  Should I go there to get the experience I've already acquired?"

91.   On or about May 16, 2001, **HASSOUN** caused to be issued a $700 check to GRF with the memo line stating, "tourism and travel."

92.   On or about November 1, 2001, **HASSOUN** caused to be issued a $2,000 check for GRF with the memo line stating, "Afghan relief."

All in violation of Title 18, United States Code, Sections 956(a)(1) and 2.

## COUNT 2

### (Conspiracy to Provide Material Support for Terrorists)

Paragraphs 1 through 11 and 13 through 92 of this Superseding Indictment are realleged and incorporated herein by reference.

Beginning at a time uncertain, but no later than in or about October1993, and continuing until on or about November 1, 2001, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**
**MOHAMED HESHAM YOUSSEF,**
**a/k/a "Abu Turab,"**
**KIFAH WAEL JAYYOUSI,**
**a/k/a "Abu Mohamed,"**
**KASSEM DAHER,**
**a/k/a "Abu Zurr," and**
**JOSE PADILLA,**
**a/k/a "Ibrahim,"**
**a/k/a "Abu Abdullah the Puerto Rican,"**
**a/k/a "Abu Abdullah Al Mujahir,"**

within the United States, did knowingly and willfully combine, conspire, confederate, and agree with others, known and unknown to the Grand Jury, to commit offenses against the United States, that is, providing material support and resources, as defined in Title 18, United States Code, Section 2339A(b), and concealing and disguising the nature, location, source, and

ownership of material support and resources, knowing and intending that they be used in preparation for and carrying out a violation of Title 18, United States Code, Section 956(a)(1), that is, a conspiracy to murder, kidnap, and maim persons in a foreign country; and did commit one or more acts to effect the purpose and object of the conspiracy; all in violation of Title 18, United States Code, Sections 371 and 2339A(a).

## COUNT 3

### (Material Support for Terrorists)

Paragraphs 1 through 11 and 15 through 92 of this Superseding Indictment are realleged and incorporated herein by reference.

Beginning in or about October 1993, and continuing until on or about November 1, 2001, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**
**MOHAMED HESHAM YOUSSEF,**
**a/k/a "Abu Turab,"**
**KIFAH WAEL JAYYOUSI,**
**a/k/a "Abu Mohamed,"**
**KASSEM DAHER,**
**a/k/a "Abu Zurr," and**
**JOSE PADILLA,**
**a/k/a "Ibrahim,"**
**a/k/a "Abu Abdullah the Puerto Rican,"**
**a/k/a "Abu Abdullah Al Mujahir,"**

within the United States, did provide material support and resources, as defined in Title 18, United States Code, Section 2339A(b), and did conceal and disguise the nature, location, source, and ownership of material support and resources, knowing and intending that they be used in preparation for, and in carrying out, a violation of Title 18, United States Code, Section

18

956(a)(1), that is, a conspiracy to murder, kidnap, and maim persons in a foreign country; all in violation of Title 18, United States Code, Sections 2339A(a) and 2.

## COUNT 4

### (Unlawful Possession of Firearm)

On or about June 12, 2002, in Broward County, in the Southern District of Florida, the defendant,

### ADHAM AMIN HASSOUN,
### a/k/a "Abu Sayyaf,"

being an alien admitted to the United States under a nonimmigrant visa, did knowingly possess a firearm in and affecting interstate and foreign commerce, that is, a Smith & Wesson 9 millimeter pistol, in violation of Title 18, United States Code, Section 922(g)(5)(B).

## COUNT 5

### (False Statement)

On or about June 12, 2002, in Broward County, in the Southern District of Florida, the defendant,

### ADHAM AMIN HASSOUN,
### a/k/a "Abu Sayyaf,"

in a matter within the jurisdiction of the executive branch of the Government of the United States, that is, the DHS and the FBI, did knowingly and willfully make a materially false, fraudulent, and fictitious statement and representation, in that **HASSOUN** stated to a Special Agent of the DHS and to a Special Agent of the FBI that:

(1) he neither encouraged nor assisted an individual named Mohamed Youssef regarding travel to any foreign country, when in truth and in fact, and as the defendant then and there well

19

knew, he encouraged and assisted Youssef regarding travel to a foreign country for the purpose of fighting in a violent jihad; and

(2) he was not aware of Mohamed Youssef visiting a foreign country other than Egypt, when in truth and in fact, and as the defendant then and there well knew, Youssef had traveled to a foreign country other than Egypt for the purpose of fighting in a violent jihad.

All in violation of Title 18, United States Code, Section 1001(a).

## COUNT 6

### (Perjury)

On or about July 22, 2002, in Miami-Dade County, in the Southern District of Florida, the defendant,

### ADHAM AMIN HASSOUN,
### a/k/a "Abu Sayyaf,"

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration Judge, in a case in which a law of the United States authorizes an oath to be administered, that is, an Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did knowingly, willfully, and contrary to such oath, state and subscribe material matters which he did not believe to be true, concerning his recruitment of Mohamed Youssef to fight in a violent jihad and discussions about violent jihad over the telephone with Mohamed Youssef, as herein set forth below:

Q. And was he one of your recruits as has been said in the affidavit?

A. I never recruited him.

Q. And how - what's your phone contacts with Mr. Yousef?

A. At that time after he left to Egypt?

20

Q.  Yes.

A.  When he left to Egypt he kept in touch and he used to call to ask about how the

community is doing over here and how the family is doing and that was it.

The aforementioned testimony by **HASSOUN** as he then and there believed, was a false

material statement, in that **HASSOUN** did recruit Mohamed Youssef to fight in a violent jihad

and did discuss violent jihad over the telephone with Mohamed Youssef.

All in violation of Title 18, United States Code, Section 1621(1).

## COUNT 7

## (Perjury)

On or about July 22, 2002, in Miami-Dade County, in the Southern District of Florida,

the defendant,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration

Judge, in a case in which a law of the United States authorizes an oath to be administered, that is,

an Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did

knowingly, willfully, and contrary to such oath, state and subscribe material matters which he

did not believe to be true, concerning his purpose for providing financial assistance to Mohamed

Youssef, as herein set forth below:

Q.  And did you ever provide anything - any monetary financial assistance to him?

A.  At one point he wanted money to prepare a land that he has, this is what he said, and

that land, I believe, is close to the Suez canal, somewhere like that.  And he asked if the

community can help him to fix the land and the community responded and we helped

him.

Q. Okay. And was there any other purpose other than the land that you owned there?

A. This is what he asked and this is what we respond.

* * * *

Q. Right. And you said the money was for what?

A. To fix his land, fix his house.

The aforementioned testimony by **HASSOUN**, as he then and there believed, was a false material statement, in that **HASSOUN** did provide financial assistance to Mohamed Youssef for the purpose of fighting in a violent jihad.

All in violation of Title 18, United States Code, Section 1621(1).

<u>**COUNT 8**</u>

**(Perjury)**

On or about July 22, 2002, in Miami-Dade County, in the Southern District of Florida, the defendant,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration Judge, in a case in which a law of the United States authorizes an oath to be administered, that is, an Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did knowingly, willfully, and contrary to such oath, state and subscribe material matters which he did not believe to be true, concerning his use of coded language with other individuals, including Mohamed Youssef, when discussing violent jihad activities, as herein set forth below:

Q. Did you speak with him in code language?

A. Never.

22

Q. Do you have any code languages with any –

A. No, I don't.

* * * *

Q. And in 1998 it's alleged that you have a conversation, you talk about you have soccer equipment. Did you recall any conversation like that?

A. No. I know he wanted - he wanted to open a business, you know, and he wants to get something from here, buy equipment and stuff like that.

Q. Do you recall what equipment he was talking about?

A. Soccer maybe, or football, something like that. But I asked him to come over here and pick up whatever he wants.

* * * *

Q. Sir, in your - you talked about this in direct examination, but in your - one of your telephone conversations in 1998 with Mr. Yousef you discussed soccer equipment?

A. He discussed, yes.

Q. Okay. Well –

A. Yes, go ahead.

Q. - he discussed it with you?

A. Uh-huh.

Q. Right. And your assertion is that he was directly speaking just of soccer equipment?

A. Yes, he gave me the impression that he wants to open a business and he wants to do some trade. In my - you want to hear my (unintelligible).

Q. No. Sir, isn't it true that during that conversation you also asked, even though you were speaking about soccer equipment, you asked him if he had enough to launch an attack on the enemy?

A. What enemy?

Q. Did you say those words or something close to those words?

A. Not that I recall.

Q. Do you recall discussing with him an attack?

A. Where was he, in Egypt?

Q. Yes.

A. What enemy?

Q. Well I'm asking you, sir.

A. No.

Q. Did you discuss with him having enough equipment to engage an enemy?

A. I don't recall that.

Q. But you may have?

A. I don't recall that.

Q. Well –

A. I'm trying to put where you're going. If I may –

Q. Well, it's a very specific question, sir.

A. Go ahead.

Q. The question is: In your conversation in 1998 with Mr. Yousef in which he discussed soccer equipment did you or did you not talk to him about having enough equipment to engage an enemy?

24

A. No.

Q. You did not?

Q. Did you discuss with him anti-armor tools?

A. I don't recall.

Q. But you might have?

A. What is that again?

Q. Anti-armor tools. Did you discuss tools with him?

A. I don't recall what we spoke. I know that we spoke that he wants to trade and he wants to have a soccer team and stuff like that. Other than that, I don't recall. I know that part.

The aforementioned testimony by **HASSOUN**, as he then and there believed, was a false material statement, in that **HASSOUN** did speak in coded language with other individuals, including Mohamed Youssef, when discussing violent jihad activities.

All in violation of Title 18, United States Code, Section 1621(1).

## COUNT 9

### (Perjury)

On or about July 22, 2002, in Miami-Dade County, in the Southern District of Florida, the defendant,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration Judge, in a case in which a law of the United States authorizes an oath to be administered, that is, an Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did knowingly, willfully, and contrary to such oath, state and subscribe material matters which he

25

did not believe to be true, concerning his conversations with Mohamed Youssef about the experience of fighting in a violent jihad conflict, as herein set forth below:

Q. Sir, have you ever discussed with Yousef in any phone call his experiences on the front lines?

A. What front lines?

Q. Front lines of any battle.

A. What battle?

Q. Any battle, any armed conflict.

A. He never spoke to me about any armed conflict.

Q. So you've never discussed with him his activities on the front lines in any armed struggle or conflict?

A. I don't recall any of that happening.

Q. But it could have?

A. Not really. No.

The aforementioned testimony by **HASSOUN**, as he then and there believed, was a false material statement, in that **HASSOUN** did participate in conversations with Mohamed Youssef about the experience of fighting in a violent jihad conflict.

All in violation of Title 18, United States Code, Section 1621(1).

## COUNT 10

### (Perjury)

Beginning on or about July 22, 2002, and continuing until on or about August 1, 2002, in Miami-Dade County, in the Southern District of Florida, the defendant,

### ADHAM AMIN HASSOUN,

26

a/k/a "Abu Sayyaf,"

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration

Judge, in a case in which a law of the United States authorizes an oath to be administered, that is,

an Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did

knowingly, willfully, and contrary to such oath, state and subscribe material matters which he

did not believe to be true, concerning his participation in conversations about killing a woman in

Lebanon, as herein set forth below:

Q.  Now you have read the allegations in the affidavit provided by the Government

written by Officer Arena -

A.  Yes, I did.

Q.  - FBI Agent.  I'm going to direct your attention to that affidavit.  First, we're going to

go to Paragraph 17 where it has the allegation that sometime in August, 1997, you had a

conversation with someone identified as an associate concerning a female, the way I

understood, was stuck in Lebanon, and the Government, in cooperation with CIA and

State Department, was trying to bring her here.  And you made some comments.  Do you

recall any of those comments?

A.  No.

Q.  Do you recall any female stuck in Lebanon -

A.  No, I don't.

Q.  - In 1997?

A.  No.

Q.  Do you recall you ordering the assassination of that female?

A.  Never.

27

Q. I remind you are under oath.

A. I am under oath.

Q. And I want you to - five, six, years ago, which incident has been explained here, and do you recall saying that "I have to speak with brothers in Lebanon to take care of her."

A. Never.

Q. Do you recall any conversation?

A. Never. Never happened.

* * * *

Q. Do you recall any of this, which is said in paragraph 17, if it ever happened?

A. Never happened. I read it many times through the weekend, through the whole week since I had this, none of that happened.

* * * *

Q. And, sir, do you still claim that at no time you had a conversation about a female who had traveled from the United States to the Middle East, that conversation discussing the issue of having her killed?

A. Do I what?

Q. Did you ever have a conversation with somebody about killing a woman?

A. No, no, never.

* * * *

Q. Hassoun, you know that there's a - someone named "associate" mentioned in - in paragraph 17 of Agent Arena's declaration. Do you know who that person is?

A. No.

28

Q. Have you ever spoken to anyone who can say I overheard you saying that you want to kill someone, plot to kill someone?

A. No.

Q. Did you ever have in your mind ill - will against anyone?

A. Never.

Q. Do you know this female mentioned in paragraph 17?

A. I have no idea.

Q. So it's an absolute denial?

A. Absolute denial.

Q. You under oath.

A. I am under oath.

The aforementioned testimony by **HASSOUN**, as he then and there believed, was a false material statement, in that **HASSOUN** did participate in conversations about killing a woman in Lebanon.

All in violation of Title 18, United States Code, Section 1621(1).

## COUNT 11

### (Obstruction of Proceedings)

Beginning on or about June 12, 2002, and continuing until on or about September 30, 2002, in Broward and Miami-Dade Counties, in the Southern District of Florida, the defendant,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**

did knowingly and willfully corruptly endeavor to influence, obstruct, and impede the due and proper administration of law under which a pending proceeding, that is, an Immigration Court

proceeding, was being had before a department and agency of the United States, in violation of Title 18, United States Code, Section 1505.

## FORFEITURE

1.      The allegations in Count 4 of this Superseding Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeitures to the United States of America of property in which the defendant has an interest, pursuant to the provisions of Title 18, United States Code, Section 924(d)(1), as incorporated by Title 28, United States Code, Section 2461(c), and the procedures outlined in Title 21, United States Code, Section 853.

2.      Upon the conviction of any knowing violation of Title 18, United States Code, Section 922(g)(5)(B), the defendant shall forfeit to the United States any firearm involved in or used in the commission of said violation.

3.      The property subject to forfeiture includes, but is not limited to, a Smith & Wesson 9 millimeter pistol seized from the defendant on June 12, 2002.

All pursuant to Title 18, United States Code, Section 924(d)(1), as incorporated by Title 28, United States Code, Section 2461(c), and the procedures outlined in Title 21, United States Code, Section 853.

A TRUE BILL

_____
FOREPERSON

_____
R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

_____
RUSSELL R. KILLINGER
ASSISTANT UNITED STATES ATTORNEY

_____
STEPHANIE K. PELL, TRIAL ATTORNEY
COUNTERTERRORISM SECTION
UNITED STATES DEPARTMENT OF JUSTICE

_____
JULIA A. PAYLOR
ASSISTANT-UNITED STATES ATTORNEY

_____
BRIAN K. FRAZIER
ASSISTANT UNITED STATES ATTORNEY

31

UNITED STATES OF AMERICA                    CASE NO. 04-60001-CR-COOKE (s) (s) (s) (s)

v.

ADHAM AMIN HASSOUN, et al.,                 **CERTIFICATE OF TRIAL ATTORNEY\***

**Defendants**

                                            **Superseding Case Information:**

**Court Division:** (Select One)            New Defendant(s)            Yes    _X_    No  _____
                                            Number of New Defendants              _2_
_X_  Miami      _____  Key West             Total number of counts               _11_
_____  FTL      _____  WPB    _____  FTP

        I do hereby certify that:

1.      I have carefully considered the allegations of the indictment, the number of defendants, the number of probable
        witnesses and the legal complexities of the Indictment/Information attached hereto.

2.      I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their
        calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.      Interpreter:        (Yes or No)    No _____        CLARENCE MADDOX
        List language and/or dialect       _____          CLERK U.S. DIST. CT.
                                                                      S.D. OF FLA. · MIAMI

4.      This case will take  _120_  days for the parties to try.

5.      Please check appropriate category and type of offense listed below:
        (Check only one)                                     (Check only one)

I       0  to  5 days           _____              Petty        _____
II      6  to 10 days           _____              Minor        _____
III     11 to 20 days           _____              Misdem.      _____
IV      21 to 60 days           _____              Felony        _X_
V       61 days and over         _X_

6.      Has this case been previously filed in this District Court?  (Yes or No)        _Yes_
If yes:
Judge:      _Cooke_____        Case No. _04-60001-CR-COOKE (s) (s) (s)_
(Attach copy of dispositive order)
Has a complaint been filed in this matter?    (Yes or No)        Yes
If yes:
Magistrate Case No.                    _04-3565-BLD_
Related Miscellaneous numbers:         _____
Defendant(s) in federal custody as of  _January 8, 2004_
Defendant(s) in state custody as of    _____
Rule 20 from the                       District of  _____

Is this a potential death penalty case? (Yes or No)        No
7.      Does this case originate from a matter pending in the U.S. Attorney's Office prior to
        April 1, 2003?    _X_  Yes    _____  No

8.      Does this case originate from a matter pending in the U. S. Attorney's Office prior to
        April 1, 1999?    _____  Yes    _X_  No
        If yes, was it pending in the Central Region?    _____  Yes    _____  No

9.      Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to
        October 14, 2003?    _____  Yes    _X_  No

10.     Does this case originate from a matter pending in the Narcotics Section (Miami) prior to
        May 18, 2003?    _____  Yes    _X_  No

                                            RUSSELL R. KILLINGER
                                            ASSISTANT UNITED STATES ATTORNEY
                                            Florida Bar No. 312851

\*Penalty Sheet(s) attached                                                  REV. 1/14/04

## PENALTY SHEET

**Defendant's Name**:   Adham Amin Hassoun
**Case No**: 04-60001-CR-COOKE (s) (s) (s) (s) (s)

Count No: 1

Conspiracy to Murder, Kidnap, and Maim Persons in a Foreign Country

18 U.S.C. § 956(a)(1)

**\* Max. Penalty**: Life imprisonment

---

Count No: 2

Conspiracy to Provide Material Support for Terrorists

18 U.S.C. §§ 371 and 2339A(a)

**\* Max. Penalty**: Fifteen (15) years' imprisonment

```
FILED by _____ D.C.
MAG. SEC.

NOV 1 7 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. • MIAMI
```

---

Count No: 3

Providing Material Support for Terrorists

18 U.S.C. § 2339A(a)

**\* Max. Penalty**: Fifteen (15) years' imprisonment

---

Count No: 4

Unlawful Possession of a Firearm

18 U.S.C. § 922(g)(5)(B)

**\* Max. Penalty**: Ten (10) years' imprisonment

---

Count No: 5

Making a False Statement

18 U.S.C. § 1001(a)

**\* Max. Penalty**: Five (5) years' imprisonment

---

Count No: 6

Perjury

18 U.S.C. § 1621(1)

**\* Max. Penalty**: Five (5) years' imprisonment

---

Count No: 7

Perjury

18 U.S.C. § 1621(1)

**\* Max. Penalty**: Five (5) years' imprisonment

---

Count No: 8

Perjury

18 U.S.C. § 1621(1)

**\* Max. Penalty**: Five (5) years' imprisonment

---

Count No: 9

Perjury

18 U.S.C. § 1621(1)

**\* Max. Penalty**: Five (5) years' imprisonment

---

Count No: 10

Perjury

18 U.S.C. § 1621(1)

**\* Max. Penalty**: Five (5) years' imprisonment

---

Count No: 11

Obstruction of Proceedings

18 U.S.C. § 1505

**\* Max. Penalty**: Five (5) years' imprisonment

2

Count No: 6

Perjury

18 U.S.C. § 1621(1)

**\* Max. Penalty**: Five (5) years' imprisonment

---

Count No: 7

Perjury

18 U.S.C. § 1621(1)

**\* Max. Penalty**: Five (5) years' imprisonment

---

Count No: 8

Perjury

18 U.S.C. § 1621(1)

**\* Max. Penalty**: Five (5) years' imprisonment

---

Count No: 9

Perjury

18 U.S.C. § 1621(1)

**\* Max. Penalty**: Five (5) years' imprisonment

---

Count No: 10

Perjury

18 U.S.C. § 1621(1)

**\* Max. Penalty**: Five (5) years' imprisonment

---

Count No: 11

Obstruction of Proceedings

18 U.S.C. § 1505

**\* Max. Penalty**: Five (5) years' imprisonment

Perjury

18 U.S.C. § 1621(1)

**\* Max. Penalty**: Five (5) years' imprisonment

---

Count No: 7

Perjury

18 U.S.C. § 1621(1)

**\* Max. Penalty**: Five (5) years' imprisonment

---

Count No: 8

Perjury

18 U.S.C. § 1621(1)

**\* Max. Penalty**: Five (5) years' imprisonment

---

Count No: 9

Perjury

18 U.S.C. § 1621(1)

**\* Max. Penalty**: Five (5) years' imprisonment

---

Count No: 10

Perjury

18 U.S.C. § 1621(1)

**\* Max. Penalty**: Five (5) years' imprisonment

---

Count No: 11

Obstruction of Proceedings

18 U.S.C. § 1505

**\* Max. Penalty**: Five (5) years' imprisonment

2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

## PENALTY SHEET

**Defendant's Name:**   Mohamed Hesham Youssef
**Case No:** 04-60001-CR-COOKE (s) (s) (s) (s) (s)

Count No: 1

Conspiracy to Murder, Kidnap, and Maim Persons in a Foreign Country

18 U.S.C. § 956(a)(1)

**\* Max. Penalty**: Life imprisonment

---

Count No: 2

Conspiracy to Provide Material Support for Terrorists

18 U.S.C. §§ 371 and 2339A(a)

**\* Max. Penalty**: Fifteen (15) years' imprisonment

FILED by_____ D.C.
MAG. SEC.

NOV 1 7 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. · MIAMI

---

Count No: 3

Providing Material Support for Terrorists

18 U.S.C. § 2339A(a)

**\* Max. Penalty**: Fifteen (15) years' imprisonment

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

## PENALTY SHEET

**Defendant's Name**:   Kifah Wael Jayyousi
**Case No**: 04-60001-CR-COOKE (s) (s) (s) (s) (s)

Count No: 1

Conspiracy to Murder, Kidnap, and Maim Persons in a Foreign Country

18 U.S.C. § 956(a)(1)

**\* Max. Penalty**: Life imprisonment

---

Count No: 2

Conspiracy to Provide Material Support for Terrorists

18 U.S.C. §§ 371 and 2339A(a)

**\* Max. Penalty**: Fifteen (15) years' imprisonment



FILED by _____ D.C.
MAG. SEC.

NOV 17 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. • MIAMI

---

Count No: 3

Providing Material Support for Terrorists

18 U.S.C. § 2339A(a)

**\* Max. Penalty**: Fifteen (15) years' imprisonment

## PENALTY SHEET

**Defendant's Name**:   Kassem Daher
**Case No**: 04-60001-CR-COOKE (s) (s) (s) (s) (s)

Count No: 1

Conspiracy to Murder, Kidnap, and Maim Persons in a Foreign Country

18 U.S.C. § 956(a)(1)

**\* Max. Penalty**: Life imprisonment

---

Count No: 2

Conspiracy to Provide Material Support for Terrorists

18 U.S.C. §§ 371 and 2339A(a)

**\* Max. Penalty**: Fifteen (15) years' imprisonment

FILED by _____ D.C.
MAG. SEC.

NOV 1 7 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

---

Count No: 3

Providing Material Support for Terrorists

18 U.S.C. § 2339A(a)

**\* Max. Penalty**: Fifteen (15) years' imprisonment

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name**:   Jose Padilla
**Case No**: 04-60001-CR-COOKE (s) (s) (s) (s) (s)

Count No: 1

Conspiracy to Murder, Kidnap, and Maim Persons in a Foreign Country

18 U.S.C. § 956(a)(1)

**\* Max. Penalty**: Life imprisonment

---

Count No: 2

Conspiracy to Provide Material Support for Terrorists

18 U.S.C. §§ 371 and 2339A(a)

**\* Max. Penalty**: Fifteen (15) years' imprisonment

```
FILED by _____ D.C.
MAG. SEC.

    NOV 1 7 2005

   CLARENCE MADDOX
  CLERK U.S. DIST. CT.
  S.D. OF FLA. · MIAMI
```

---

Count No: 3

Providing Material Support for Terrorists

18 U.S.C. § 2339A(a)

**\* Max. Penalty**: Fifteen (15) years' imprisonment