04-60001.rr6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 04-60001-CR-COOKE/BROWN

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

JOSE PADILLA, et al.,

    Defendants.
_____/

## REPORT AND RECOMMENDATION

**This matter** is before this Court on Defendant Jose Padilla's Motion to Suppress Statements, filed April 19, 2006. The Court has considered the Motion, the Response and the Reply. In addition, an evidentiary hearing was held on July 17, 2006, and the Court adopts the transcript of that hearing by reference.

### Facts

Defendant moves to suppress statements made to FBI agents after his arrival into the United States at Chicago's O'Hare International Airport on May 8, 2002, claiming that the statements were made during custodial interrogation without the benefit of <u>Miranda</u> warnings. Testimony was provided by Immigration and Customs Enforcement Special Agent Thomas Knorr, and FBI Special Agents Russell Fincher, Robert Holley and Craig Donnachie.

Special Agent Knorr testified that on May 8, he was assigned to O'Hare Airport to coordinate between U.S. Customs inspectors and FBI agents who were planning to interview Defendant, who was suspected of being a member of a terrorist organization. After Defendant deplaned, he passed through

1



immigration, probably escorted by a customs agent, and into the customs area, where a secondary examination was performed by Customs Agent Andy Ferreri. On his declaration form, Defendant had claimed that he only possessed $8,000, when in actuality he possessed a little over $10,000, which was in violation of the current currency reporting requirements. The currency was confiscated and eventually passed on to FBI Special Agent Fincher to keep it as evidence.[1]

At approximately 3:00 p.m., Agent Knorr was standing outside of a conference room in the Customs area with some FBI agents.[2] An inspector, probably Mr. Ferreri, brought Defendant to the conference room. Defendant was not in handcuffs or being physically restrained. Agent Knorr, who was dressed in jeans and a polo shirt, had a weapon, but did not draw it at any time in Defendant's presence, nor did any other agent. The conference room was approximately 20 by 40 feet, with a large conference table with about 20 chairs, approximately 20 yards from the secondary area. Three FBI agents went into the conference room with Defendant and closed the door. Agent Knorr remained there for "quite a long time" and never heard any loud voices or cursing.

FBI Special Agent Russell Fincher testified that on May 8, 2002, he and Special Agent Donnachie traveled from New York to Chicago to speak with and attempt to gain the cooperation of Defendant, whom they believed had information which would prevent a terrorist attack. Upon arriving at the airport, Agent Fincher told the Customs agents to treat Defendant as if he were any other arriving passenger, and that if anything out of the ordinary happened, they would "have a conversation

---

[1] Agent Knorr testified that the currency was not evidence of a possible criminal violation because ICE's policy is that they must have $100,000 to bring the matter to the attention of the U.S. Attorney's Office. In Defendant's situation, there would have been a civil forfeiture proceeding and a mitigated penalty. The declaration form which Defendant filled out states that all amounts over $10,000 must be reported, and that if this question is answered falsely, it can subject one to criminal penalties.

[2] There were up to eight FBI agents standing outside the conference room at any one time, but four of them were going back and forth to another office.

about that."

While Defendant was coming through the immigration area, Agents Fincher and Donnachie were waiting in a utility closet off of the main customs area. The customs official advised them of a discrepancy concerning the amount of currency Defendant was carrying, and Agent Fincher told them to follow normal procedure, which was to interview him. Agent Fincher was not part of that interview. Subsequently, Agents Fincher, Donnachie, Holley and Todd Schmitt were taken to the conference room, where Defendant either was, or was shortly thereafter brought in. Agent Fincher, who was dressed in business attire, gave Defendant his name and rank and presented his credentials, as did the other agents. Defendant was to Agent Fincher's right, and on the left, around the corner of the table was Agent Donnachie. On the far side of the table were Agents Schmitt and Holley. None of the agents had visible weapons, and Defendant was not handcuffed or restrained in any manner.

Agent Fincher asked Defendant if he would talk to him about where the $10,000 came from and its intended purpose, because that was where he understood the Customs agents left off in their discussion with Defendant. Defendant said that he would. Agent Fincher began with background questions about Defendant's history and some of the places he traveled. Agent Fincher asked Defendant why he was coming to Chicago and he said to visit his son, as well as his mother who lived in Florida. Defendant stated that he had been living in Egypt and then voluntarily discussed his early life and relationships, and his incarceration, during which time he began his Islamic studies. He then discussed traveling to Pakistan and Egypt to continue his studies. Agent Fincher asked Defendant how he was able to afford to do that and Defendant replied that he was funded by a Mosque in Florida, and also mentioned several other individuals who helped him make arrangements to go to Egypt. Defendant also discussed his tutor in Islam studies, his pilgrimage to Mecca, and persons who assisted

3

him. Agent Fincher testified that the interview started at 3:15 p.m. and they took a dinner break at 4:25 p.m., at which time Agent Fincher left the room. He believes that Defendant was also allowed to use the restroom during this break.

The interview resumed at 5:35 p.m., at which time Agent Fincher asked Defendant whether he would continue to speak with him about his travels and the money he had in his possession, and Defendant again indicated his desire to cooperate. Agent Fincher asked Defendant why he declared $8,000 when he was carrying over $10,000, and Defendant stated that he didn't have knowledge that this was against the law and that the amount of money was not a "big deal." Agent Fincher stated that he expressed "skepticism" and he and Defendant talked about how much a public official would make in that part of the world. Defendant then asked to call his mother, but when Agent Fincher asked Defendant why he wanted to call, Defendant "dropped" the subject.

Agent Fincher again asked Defendant who gave him the money, and Defendant initially responded that he had received it in an envelope from an individual in Pakistan, but then said that it was money he had earned, as well as donations from additional unidentified individuals in Egypt who wanted to help him visit his family. Agent Fincher again expressed "skepticism" and "pressed" Defendant for details. He asked whether Defendant had received any guidance about what he should do with the money once he arrived in the United States. Agent Fincher also asked about people whom Defendant had associated with or admired or trusted while traveling overseas. Defendant responded that he didn't associate with foreigners when he traveled. He also could not remember the names of people he befriended and stated that he was tired. The agents thanked him for his cooperation and offered to take him to a hotel and pay for his stay in order to give him an opportunity to rest and then continue the next day. Defendant responded that he was cooperating fully, that he didn't want to go

to a hotel and that he wanted to "clear this up" that day, and also wanted to contact his mother. Agent Fincher testified that they did not tell Defendant that he couldn't contact his mother, but Defendant did not do so, and the interview continued.

Agent Fincher asked Defendant if he had ever traveled to Afghanistan, which Defendant denied. They talked about overseas travel and Agent Fincher asked Defendant what happened to his passport. Defendant stated that he had been stopped for questioning in Pakistan and in Zurich and that his passport had been stolen in a market. When asked for more details, Defendant could not remember the name of the market or the date the passport was stolen. Agent Fincher asked Defendant if he had actually sold the passport, and Defendant said no. Agent Fincher asked Defendant if he was traveling alone and he said that he was, but then went on to describe a person that was detained at about the same time he was and interviewed in a room close to his, but stated that he did not know that person. Agent Fincher asked if there was any reason the person would say that he knew Defendant, and he said no.

Agent Fincher testified that a ten minute break was taken at approximately 6:10 p.m.. Upon re-commencing the interview, Agent Fincher asked Defendant if he would be willing to continue speaking about his travels and the nature of the money. Agent Fincher testified that Defendant was concerned about getting his money back and again wanted to call his mother. He also stated that he was tired, and that he did not want to spend the night in a hotel or speak with the agents the following day. Agent Fincher offered Defendant the opportunity to take a polygraph test, but Defendant declined, and again stated that he wanted to call his mother. Agent Fincher offered to call Defendant's mother for him, in case she was waiting for him or he wanted her to know that he was alright, but Defendant declined, stating that he had been "clean" for many years and did not want his

mother to perceive that he was in any kind of trouble.

Agent Fincher testified that during the interview he had been using a soft-spoken tone in order to gain Defendant's cooperation, because it would have been counterproductive for him to take any aggressive tone. However, at this point, he "decided to confront [Defendant] with what [he] believed [Defendant's] intentions were." He described his tone as "confrontational," but denied yelling or cursing or pushing his chair towards Defendant. Agent Fincher testified that he told Defendant that he believed the following: that Defendant had been in Afghanistan, where he had engaged in training and had met high-ranking Al Qaeda officials; that those officials sent Defendant back to Pakistan, where he was with other associates; that he had left Pakistan en route for somewhere for an act of terrorism; that Defendant had been delayed and had traveled with another individual who was a foreign national with a false passport and was detained with that person in Karachi; and that Defendant then traveled from Zurich to Egypt and back and then to Chicago, where he intended to commit or conduct surveillance for a terrorist act. Agent Fincher told Defendant that he needed his assistance in understanding what was going on and that he believed that Defendant had been given the money somewhere in his travels for furtherance of those terrorist operational efforts. At that point, Defendant stood up and told Agent Fincher "that the interview was over and that it was time for him to go." Defendant had never asked to leave prior to this time.

Agent Fincher told Defendant that he would like him to volunteer to work with him and help him understand the issues that he had presented to him and that if he didn't, he was going to serve Defendant with a grand jury subpoena which he showed him, to compel his testimony in New York City. Defendant asked Agent Fincher what a grand jury subpoena meant and what would happen procedurally. He also "asked questions about representation." According to Agent Fincher, at that

6

point, there were no more questions asked about the nature of Defendant's activities, and the interview ended at 7:05 p.m.. When Defendant asked to make a phone call, the agents asked who he would like to call, but Defendant had no specific person or telephone number.

The FBI "302" form regarding the interview, which was prepared by Special Agent Donnachie, contains a notation that at 7:35 p.m., "Padilla declined to speak further with the agents the next day and declined to voluntarily travel with the interviewing agents to New York." Agent Fincher explained that during the half hour that transpired, they had only been talking about procedural matters, and that he explained to Defendant the nature of the subpoena and that all of his testimony was compelled. He told Defendant that he could also volunteer to go to New York and appear and testify, in which case the FBI would arrange for a hotel for the evening and would take him to New York. Defendant asked whether he would be represented, and Agent Fincher told him that they could arrange it. Defendant paused and considered it and then said that he wasn't going to volunteer to go to New York and that if Agent Fincher wanted him to go he would have to arrest him. Agent Fincher described Defendant's tone as "a bit confident" and "haughty." He told Defendant that he did have a material witness arrest warrant but that he would rather have him volunteer the information rather than serve him with it. Agent Fincher explained what that meant, and Defendant "expressed some concern about this now being on the record, that he had a clean record ...," and he was concerned that his mother would perceive that he was now in some kind of trouble.

Agent Fincher told Defendant that he didn't need to or want to arrest him, but Defendant said that he was not going to volunteer, and that Agent Fincher would have to arrest him. At that time, Agent Fincher arrested Defendant and read him Miranda rights pursuant to a Customs advice of rights form. Defendant was then transported to the detention center. Defendant was again advised of his

rights from an FBI advice of rights form at 9:10 p.m..

Special Agent Holley confirmed that after Defendant was taken into the conference room, there was no physical restraining of Defendant until he was arrested. Contrary to Agent Fincher's testimony, Agent Holley did not recall anyone leaving the room during the interview, which lasted approximately three hours. He also could not recall Agent Fincher confronting Defendant with the allegations regarding his involvement in terrorist activities. He described Defendant as tired, calm and cooperative regarding his time in Chicago, but not as cooperative with respect to his time overseas, although he was answering questions. Agent Holley further testified that they never told Defendant that he was not going to be arrested for not declaring the money, and that they used the money as a "pretext" to interview Defendant. They told Defendant that he violated the law, but did not recall if they stated that it was a civil or a criminal offense. Agent Holey confirmed that they stopped interviewing Defendant when he requested a lawyer, and stated that no agent ever physically touched Defendant.

Special Agent Donnachie, who prepared the "302," added that while they were in the conference room, Customs officers came in and then left. According to Agent Donnachie, when Agent Fincher was confronting Defendant about the allegations in the arrest warrant, he did have physical contact with Defendant when he turned Defendant's chair towards him, and raised his voice. Agent Donnachie initially testified that Defendant was not given permission to call his mother, but on cross-examination stated that Defendant was never told that he couldn't call his mother, and, in fact, Agent Fincher offered to do so. According to Agent Donnachie, between 7:05 and 7:35 p.m. Agent Fincher reiterated that he would like Defendant's help and cooperation, and told Defendant that he didn't completely believe him because he didn't feel that his information was adequately detailed. From

7:35-8:10 p.m., they again discussed whether Defendant would want to go to a hotel or travel to New York to discuss the case further.

Defendant was never told that he was free to leave or that he didn't need to talk to the agents.

## DISCUSSION

Defendant argues that his pre-arrest statements should be suppressed because he was not given Miranda warnings. Miranda warnings must be given only when a suspect is both in "custody" and subjected to "interrogation." See Illinois v. Perkins, 496 U.S. 292, 297 (1990). "Interrogation" occurs when there is action by law enforcement which is "reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 301-02 (1980). An exception is made in border settings for "routine questioning." See United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996).

As a preliminary matter, the Court notes that it has questions and reservations about the procedures which took place at the airport, and finds the discrepancies in the testimony of the three experienced FBI agents to be extremely disconcerting. However, those discrepancies do not affect the outcome of this motion, in that the agents were consistent as to the "core" facts with which the Court is concerned in determining the issues before it. Furthermore, the Government's burden of proof at this hearing is that of preponderance of the evidence. See Lego v. Twomey, 404 U.S. 477, 482-89 (1972); see also United States v. Matlock, 415 U.S. 164, 178 n. 14 (1974). There was no evidence to counter that presented by the Government, despite the fact that Defendant could have testified at the hearing without that evidence being used against him at trial, other than possibly as impeachment. See Simmons v. United States, 390 U.S. 377 (1968); United States v. Quesada-Rosdal, 685 F.2d 1281, 1283 (11th Cir. 1982).[3]

Based on the uncontroverted testimony of the agents, much of the "interview" by Agent Fincher consisted of statements which Defendant himself volunteered. However, the Court finds that

---

[3] The Court notes that Defendant only would have had to testify as to the procedure surrounding the interview, not any substantive conversations.

9

certain of Agent Fincher's inquiries did go beyond "routine" questioning, and because Agent Fincher suspected that Defendant had some degree of involvement in the planned terrorist activity, those questions were "reasonably likely to elicit an incriminating response." However, the Court further finds that <u>Miranda</u> warnings were not required prior to the time that they were actually given, in that at no time prior to his formal arrest was Defendant subject to <u>custodial</u> interrogation.[4]

In <u>Moya</u>, after stating the traditional test of determining whether a person is in custody, that is, whether "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement ... to such extent that he would not feel free to leave," (citing <u>United States v. Phillips</u>, 812 F.2d 1355, 1360 (11th Cir. 1987)), the Court went on to state:

> The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant. *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S. Ct. 3138, 3151, 82 L.Ed.2d 317 (1984); *Phillips*, 812 F.2d at 1360. But, to be more specific, the Supreme Court has said that whether a suspect is in custody turns on whether restrictions on the suspect's freedom of movement are "of the degree associated with formal arrest." *Minnesota v. Murphy*, 465 U.S. 420, 430, 104 S. Ct. 1136, 1144, 79 L.Ed.2d 409 (1984) (citations omitted). And, under the objective standard, the reasonable person from whose perspective "custody" is defined is a reasonable innocent person. *See Florida v. Bostick*, 501 U.S. 429, 437-38, 111 S. Ct. 2382, 2388, 115 L.Ed.2d 389 (1991). Whether a defendant knows he is guilty and believes incriminating evidence will soon be discovered is irrelevant.

Moya, 74 F.3d at 1119; see also Arizona v. Mauro, 481 U.S. 520, 529 (1987) (stating that "officers do not interrogate a suspect simply by hoping that he will incriminate himself").

In <u>Moya</u> the Court noted that due to the sovereign's responsibility to protect its borders,

---

[4]To the extent that Defendant relies on a "finding of fact" in the Supreme Court's opinion in <u>Rumsfeld v. Padilla</u>, 542 U.S. 426, 430 (2004), which stated that "[a]s he stepped off the plane, Mr. Padilla was apprehended by federal agents executing a material witness warrant ...," the Court finds this to be a generally true, but not specifically true, statement, as borne out by the testimony at the hearing before this Court, and further finds that the term "apprehended" does not bear any weight in this Court's determination of the custody issue.

"questioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam to the degree associated with formal arrest." Moya, 74 F.3d at 1120 (internal quotation marks omitted). The Court found the following facts significant in determining that the defendant was not in custody: he was not physically moved or restrained by officers on the way to the secondary interview; no handcuffs were employed and guns were not drawn; the defendant was not booked or told of formal accusations, nor told that he was under arrest; defendant did not ask to leave and the Inspector did not communicate to defendant that he was not free to do so; and the defendant made no admissions during the interview that would have led a reasonable person in his place to conclude that he would be arrested immediately. 74 F.3d at 1119; see also United States v. McDowell, 250 F.3d 1354 (11th Cir. 2001) (finding four hour inquiry at Port Everglades not a custodial interrogation).

Based on the foregoing case law, this Court finds that Defendant was not subjected to custodial interrogation during his interview. Agent Fincher's subjective belief concerning whether he could compel Defendant's testimony and/or had the ability to arrest Defendant is irrelevant to the issue of whether Defendant legally was in custody, until the time he communicated those beliefs to Defendant. See Stansbury v. California, 511 U.S. 318 (1994).[5]

Defendant was not restrained at any time, by handcuffs or otherwise. Every effort was made for Defendant to be made comfortable, in a non-threatening setting. Although there were a number

---

[5]Therefore, the fact that Agent Fincher had a material witness warrant in addition to the grand jury subpoena is not dispositive. Furthermore, Agent Fincher was under no obligation to inform Defendant of the level of his interest in talking with him or that a material witness warrant had been issued. See United States v. McVeigh, 940 F. Supp. 1541, 1561 (D. Colo. 1996) (stating that "the Supreme Court has held that the validity of a Miranda waiver is not dependent upon a fully informed declarant.") (citing Colorado v. Spring, 479 U.S. 564, 576 (1987)).

of agents in the hallway, they were dressed in business attire rather than clothing which would identify them as FBI agents, and the testimony was that half of them were moving back and forth between offices, which would not be unusual for an immigration/customs area, and to the Defendant would be indistinguishable from ordinary businessmen.

Although Defendant was told he had "violated the law" with respect to the currency he failed to report, he was not told by the agents that he would be subject to criminal penalties, and was never told that he was under arrest, until the arrest actually occurred. He was offered the opportunity to use the restroom and in fact to leave the premises to stay at a hotel for the night, and he was never told that he was not free to go. Even after Defendant was shown the grand jury subpoena, he was offered the opportunity to travel to New York voluntarily. Furthermore, although Agent Fincher referred several times to a material witness arrest warrant, he repeatedly stated that he did not want to arrest Defendant, but rather, sought his voluntary cooperation.

The four agents who were with Defendant during the interview did not display any show of "force," until, arguably, Agent Fincher turned Defendant's chair towards him and raised his voice, and the Court does not find this singular incident to rise to the level of coercion. Although under some circumstances, such an action might have a coercive effect on a suspect, that clearly was not the case here, as even after this activity occurred, Defendant stated that "the interview was over and that it was time for him to go." Therefore, in this case, the Court need not consider whether a "reasonable man" would feel " restraints on his ability to roam to the degree associated with formal arrest," in that Defendant himself obviously did not feel such restraint.

Under all of these circumstances, the Court finds that at no time prior to his arrest was Defendant subject to custodial interrogation.

## Recommendation

Accordingly, the Court respectfully recommends that Defendant's Jose Padilla's Motion to Suppress Statements be **DENIED**.

The parties have ten (10) days from the date of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Marcia G. Cooke, United States District Judge for the Southern District of Florida. Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. LoConte v. Dugger, 847 F.2d 745(11$^{th}$Cir.1988), cert. denied, 488 U.S. 958 (1988).

**DONE AND ORDERED** this 5th day of September, 2006 at Miami, Florida.

STEPHEN T. BROWN
U.S. MAGISTRATE JUDGE

cc:   Honorable Marcia G. Cooke
AUSA Russell Killinger
Kenneth Swartz, Esq.
Jeanne Baker, Esq.
Andrew Patel, Esq.
AFPD Michael Caruso
William W. Swor, Esq.