UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-60001-CR-COOKE/Brown (s)(s)(s)(s)(s)

UNITED STATES OF AMERICA

vs.

JOSE PADILLA,
    a/k/a "Ibrahim,"
    a/k/a "Abu Abdullah the Puerto Rican,"
    a/k/a "Abu Abdullah Al Mujahir,"

        Defendant.
_____/

## GOVERNMENT'S OPPOSITION TO DEFENDANT PADILLA'S MOTION TO DISMISS FOR "OUTRAGEOUS GOVERNMENT CONDUCT"

The United States of America, through undersigned counsel, respectfully submits this Opposition to defendant Jose Padilla's Motion to Dismiss for "Outrageous Government Conduct." Invoking the Due Process Clause of the Fifth Amendment, Padilla asks the Court to dismiss the indictment on the ground that he "was tortured for nearly the entire three years and eight months" of his "unlawful" military detention, such that the government is "absolutely" "divest[ed] of jurisdiction . . . to prosecute" him in this case. *See* Motion to Dismiss at 2, 7-8. The government in the strongest terms denies Padilla's allegations of torture – allegations made without support and without citing a shred of record evidence. For present purposes, however, what matters is that the law plainly does not permit the remedy he seeks: dismissal of the indictment. No further inquiry is required.[1]

---

[1] As discussed below, because the relief he seeks is unauthorized and thus his motion fails as a matter of law, there is no basis for a detailed response to Padilla's factual allegations. Moreover, because Padilla does not offer any evidence to support these allegations, a detailed factual

Padilla's allegations of torture have no merit whatsoever, but the more basic and insurmountable problem with his motion is a purely legal one. Padilla has not cited a single precedent "absolutely bar[ring]" a federal criminal prosecution because of alleged due process violations committed during a prior military detention. By contrast, courts have firmly and consistently held that an indictment may not be dismissed due to supposed "outrageous government conduct" arising out of the defendant's treatment while detained. The defendant's remedy, if any, lies in the civil process or prosecution of the offenders; he is not entitled to a free pass from his own criminal conduct. Moreover, even in the wholly distinct line of cases involving allegedly outrageous *prosecutorial* misconduct, a defendant still must show that the misconduct substantially prejudiced his defense, and produce up front evidence to support his claims. Padilla has not made such a showing, and his motion should be denied as a matter of law.

## BACKGROUND

On May 8, 2002, Padilla was arrested in the secure customs area of Chicago's O'Hare International Airport pursuant to a material witness warrant issued in the United States District Court for the Southern District of New York in connection with grand jury proceedings investigating the September 11 attacks. *See Padilla* v. *Hanft*, 423 F.3d 386, 390 (4th Cir. 2005), *cert. denied*, 126 S. Ct. 1649 (2006). Padilla was then transported to New York, where he was initially held at a civilian correctional facility. *See ibid*.

---

response to them is impossible as well as unwarranted. Nevertheless, Padilla's conditions of confinement were humane and designed to ensure his safety and security. His basic needs were met in a conscientious manner, including Halal (Muslim acceptable) food, clothing, sleep and daily medical assessment and treatment when necessary. When assessed to be safe, Padilla was also given the opportunity for outdoor recreation. While in the brig, Padilla never reported any abusive treatment to the staff or medical personnel.

On June 9, 2002, the President made a formal determination that Padilla was an enemy combatant against the United States. *See Padilla*, 423 F.3d at 390. The President found, in particular, that Padilla: was "closely associated with al Qaeda, an international terrorist organization with which the United States is at war"; had "engaged in . . . hostile and war-like acts, including conduct in preparation for acts of international terrorism" against the United States; "possesse[d] intelligence" about al Qaeda that "would aid U.S. efforts to prevent attacks by al Qaeda on the United States"; and "represent[ed] a continuing, present and grave danger to the national security of the United States," such that his military detention was "necessary to prevent him from aiding al Qaeda in its efforts to attack the United States or its armed forces, other governmental personnel, or citizens." *Id*. at 389 (quoting the President's order). Citing his authority under Article II of the Constitution and under Congress's Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001), the President directed the Secretary of Defense "to receive Mr. Padilla from the Department of Justice and to detain him as an enemy combatant." *Padilla*, 423 F.3d at 389 (quoting the President's order). Immediately upon issuance of the President's order, the Department of Justice moved the District Court for the Southern District of New York to vacate the material witness warrant, and the motion was granted. That same day (June 9), Padilla was transferred to military control and taken to the Naval Consolidated Brig in Charleston, South Carolina. *See id*. at 390.

On June 11, 2002, Padilla filed a petition for a writ of habeas corpus in the Southern District of New York, arguing that his military detention violated the Constitution. *See Padilla*, 423 F.3d at 390. The Supreme Court ultimately dismissed Padilla's petition without prejudice, holding that it should have been filed in the District of South Carolina instead of the Southern District of New

3

York. *Rumsfeld* v. *Padilla*, 542 U.S. 426, 451 (2004). Soon after the Supreme Court's decision, Padilla filed a habeas petition in the District of South Carolina, again claiming that his detention violated the Constitution. *See Padilla*, 423 F.3d at 390. The petition alleged, *inter alia*, that the conditions of Padilla's detention and interrogation "shock[ ] the conscience and violate[ ] fundamental principles of justice that are implicit in ordered liberty," such that Padilla was denied due process under the Fifth Amendment. Habeas Pet. ¶ 32. The district court granted the petition on grounds that the President lacked authority to detain Padilla militarily and that, accordingly, Padilla had to be charged with a crime or released. *See Padilla*, 423 F.3d at 390. On September 9, 2005, the Fourth Circuit reversed, holding that, based on the facts alleged by the government, the President had authority to order Padilla detained as an enemy combatant. In particular, the court relied on evidence that Padilla: trained with and was closely associated with al Qaeda both before and after the September 11 attacks; engaged in armed conflict against the United States and allied forces in Afghanistan; and, after eluding those forces, accepted a mission from al Qaeda to enter the United States and carry out attacks on American citizens within American borders. *Id*. at 390-397.

On November 17, 2005, a grand jury in this District returned an indictment charging Padilla with conspiring to murder, maim, and kidnap individuals outside of the United States, in violation of 18 U.S.C. §§ 2 and 956(a)(1) (Count One); conspiring to provide material support to terrorists, in violation of 18 U.S.C. §§ 371 and 2339A(a) (Count Two); and providing material support to terrorists, in violation of 18 U.S.C. § 2339A(a) (Count Three). Specifically, the indictment alleges that, *inter alia*, Padilla participated in a North American support cell that sent money, physical assets, technology, and "mujahideen" (warrior) recruits to overseas conflicts in furtherance of the destruction, murder, maiming, kidnaping, and hostage-taking of governments, institutions, and

4

individuals who do not share the cell's radical ideology. Indictment ¶¶ 1-6, 12-14. The indictment further alleges that Padilla "was recruited by the North American support cell to participate in [this] violent jihad," *id*. ¶ 11, and that he "traveled overseas for that purpose," *ibid*.; *see id*. ¶¶ 26, 28, 48, 56, 62-74, 77, 81, 83-85, 89-90.

On November 20, 2005, the President determined that "it is in the interest of the United States that Padilla be released from detention by the Secretary of Defense and transferred to the control of the Attorney General for the purpose of criminal proceedings against him." The President's memorandum to that effect made clear that it "supersede[d]" the President's June 9, 2002, directive to the Secretary of Defense to detain Padilla militarily as an enemy combatant. The memorandum thus ordered the Secretary of Defense to release Padilla from the Department of Defense's control and transfer him to civilian custody upon the Attorney General's request. On January 5, 2006, Padilla was transferred and taken into civilian custody, where he has since been detained.

On April 3, 2006, the Supreme Court denied Padilla's petition for a writ of certiorari to review the Fourth Circuit's holding that the President had authority to order Padilla's military detention. *Padilla* v. *Hanft*, 126 S. Ct. 1649 (2006). On October 4, 2006, Padilla filed the instant motion to dismiss the indictment for "outrageous government conduct," claiming again (*see* Mot. at 8) that the conditions of his military detention and interrogation "shock[ ] the conscience" in violation of his due process rights.

**ARGUMENT**

Padilla's motion fails as a matter of law. The government denies in the strongest terms Padilla's unsupported allegations of torture. But the relief he seeks is not permitted, and his motion

5

should be denied on that basis alone. In addition, Padilla fails to show that the alleged outrageous government conduct has prejudiced his defense to the indictment, and fails to present enough evidence – indeed, any evidence – warranting even threshold consideration of his motion.

**I.      Padilla's Motion Should Be Denied as a Matter of Law because His Requested Remedy – Dismissal of All Charges Against Him – Is Not Authorized.**

Even if this Court were to believe all of the unsupported allegations in Padilla's motion and thereby concluded that he suffered "shocking" due process violations during his military detention (a claim the government disputes emphatically), dismissal of the indictment would nevertheless be unwarranted as a matter of law. Padilla does not cite a single case authorizing the relief he seeks in this circumstance, and both the Supreme Court and the Eleventh Circuit have rejected similar arguments. Moreover, even if this were a case involving alleged *prosecutorial* misconduct (which it is not), a defendant still must show prejudice substantially affecting his defense to the charges against him, and Padilla has not done so.

   **A.      Under Supreme Court and Eleventh Circuit case law, dismissal of the indictment is not an appropriate remedy for this alleged misconduct.**

Padilla asserts that this indictment should be dismissed because of alleged "outrageous government conduct," but does not cite a single case entering such an order. That is not surprising, because federal courts have refused to recognize such a defense, let alone dismiss a pending indictment on that basis. *See United States* v. *Boyd*, 55 F.3d 239, 241 (7th Cir. 1995) (Posner, C.J.) ("[T]he doctrine of outrageous governmental misconduct . . . certainly has no support in the decisions of this court, which go out of their way to criticize the doctrine. . . . Today we let the other shoe drop, and hold that the doctrine does not exist in this circuit.") (quotations, citations, and alterations omitted); *United States* v. *Tucker*, 28 F.3d 1420, 1422-1427 (6th Cir. 1994) (concluding

6

that "such a defense simply does not exist"), *cert. denied*, 514 U.S. 1049 (1995); *cf. United States* v. *Santana*, 6 F.3d 1, 4 (1st Cir. 1993) ("[T]he doctrine is moribund; in practice, courts have rejected its application with almost monotonous regularity."). Padilla's argument flies in the face of these decisions.

Padilla relies instead on dicta from *United States* v. *Russell*, 411 U.S. 423 (1973), to the effect that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431-432. Holding aside that *Russell* did not involve alleged misconduct during a military detention distinct from the pending criminal prosecution, reliance on *Russell* is misplaced. In *Hampton* v. *United States*, 425 U.S. 484 (1976) — a case decided just three years after *Russell* — a plurality opinion authored by Justice Rehnquist (who also authored *Russell*) cautioned that *Russell*'s dicta was "not intended to give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it [does] not approve." *Id.* at 490 (quotation omitted). The plurality opinion in *Hampton* explained that "[i]f the police engage in illegal activity," "the remedy lies . . . not in freeing the equally culpable defendant . . . but in prosecuting the police under the applicable provisions of state or federal law." *Ibid*. Subsequent courts have highlighted this language from *Hampton* to squash any lingering argument that the dicta in *Russell* permits a court to bar prosecution of an individual based upon his alleged mistreatment prior to trial. *See Tucker*, 28 F.3d at 1423 ("Recognizing the internal inconsistency of *Russell*, then-Justice . . . Rehnquist, who had penned the decision in *Russell*, soon sought to recant its 'maybe someday' dicta . . . [i]n *Hampton*[.]").

Padilla also cites *United States* v. *Toscanino*, 500 F.2d 267 (2d Cir. 1974), but *Toscanino*

7

is likewise unavailing. That case involved a defendant who alleged that government agents "kidnapped [him abroad], used illegal electronic surveillance, tortured him and abducted him to the United States for the purpose of prosecuting him here." *Id.* at 268. The Second Circuit, noting these allegations and relying on the dicta from *Russell*, found that "due process . . . requir[es] a court to divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights." 500 F.2d at 275. The court acknowledged the Supreme Court's longstanding rule — widely known as the *Ker-Frisbie* doctrine — that "the power of a court to try a person for a crime is not impaired by the fact that he has been brought within the court's jurisdiction by reason of a forcible abduction." *Id.* at 272 (citations omitted). But the Second Circuit believed that "the *Ker-Frisbie* rule cannot be reconciled with the Supreme Court's expansion of the concept of due process" in *Russell*. *Id.* at 275. The court then remanded the case to the district court for factual proceedings to determine if dismissal was warranted.

Padilla fails to mention that *Toscanino* was decided two years before *Hampton*, which repudiates *Russell*'s dicta. Padilla also fails to mention that the Eleventh Circuit and its predecessor, the former Fifth Circuit, have never endorsed *Toscanino*. Rather, despite repeated invitations to endorse that opinion, courts in this Circuit have questioned *Toscanino* or rejected it outright. *See United States* v. *Rosenthal*, 793 F.2d 1214, 1232 (11th Cir. 1986) ("This court has declined to adopt the *Toscanino* approach."), *cert. denied*, 480 U.S. 919 (1987); *United States* v. *Darby*, 744 F.2d 1508, 1531 (11th Cir. 1984) ("The continuing validity of the *Toscanino* approach is questionable."); *United States* v. *Postal*, 589 F.2d 862, 874 n.17 (5th Cir.) ("This circuit has declined to follow the *Toscanino* rationale[.]); *United States* v. *Winter*, 509 F.2d 975, 987 (5th Cir. 1975) (same); *United States* v.

*Herrera*, 504 F.2d 859, 860 (5th Cir. 1974) (same).[2]

Perhaps most significantly, in *United States* v. *Matta*, 937 F.2d 567 (11th Cir. 1991), the Eleventh Circuit affirmed the denial of a motion to dismiss premised on *Toscanino* filed by a defendant who alleged that government agents had physically mistreated him prior to trial contrary to his due process rights. The Eleventh Circuit affirmed the denial of the motion "for the reasons stated" by the Seventh Circuit in an earlier opinion in the case. *Id*. at 568 (citing *Matta-Ballesteros* v. *Henman*, 896 F.2d 255, 261 (7th Cir.) *cert. denied*, 498 U.S. 878 (1990)).[3] In its opinion, the

---

[2]Decisions of the former Fifth Circuit prior to October 1, 1981 are binding precedent in the Eleventh Circuit. See *Bonner* v. *City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[3]The *Matta* litigation arose out of the prosecution of a Honduran citizen named Matta facing narcotics and escape charges in Arizona, California, and Florida. 896 F.2d at 256. He fled from the United States to Honduras but was captured there by Honduran military troops working in conjunction with several United States Marshals. *See ibid*. Matta alleged, and provided various affidavits bearing out, that the Marshals "tortured him before transporting him to the United States to face trial on [the] pending criminal charges." *Ibid.* As summarized by the Seventh Circuit in its opinion:

> [Matta] was arrested and handcuffed[.] . . . A black hood was placed over his head and he was pushed onto the floor of a car driven by the United States Marshals. . . . During the ride, Matta claims that he was severely beaten and burned . . . at the direction of the United States Marshals. Once he arrived at the airport, Matta was flown to the United States. He claims that during this flight, he was once again beaten and shocked about the body, including on his testicles and feet, again by the United States Marshals. . . . Matta was subsequently examined by a physician who found abrasions on his head, face, scalp, neck, arms, feet, and penis, as well as blistering on his back.

*Ibid*. After being detained in an Illinois penitentiary, Matta filed a habeas petition in the Southern District of Illinois, claiming that the Marshals had tortured him and thereby violated his substantive due process rights. *See ibid*. Matta's petition "demanded his release back to Honduras on the basis [that] the United States was without jurisdiction to prosecute him as a result of [these] violations." *Id*. at 256-257. The district court rejected Matta's due process claim as a matter of law without holding an evidentiary hearing, *id.* at 257; this was the ruling addressed by the Seventh Circuit in its opinion. In the meantime, Matta was transferred to the Northern District of Florida to face prosecution in that district. Once there, he raised the same argument he first advanced in Illinois,

9

Seventh Circuit squarely rejected *Toscanino* and concluded that the United States had jurisdiction to prosecute the defendant even if the alleged due process violations occurred. *Id*. at 259 (holding that "taking his allegations to be true" the defendant's due process claim still failed "as a matter of law"). More broadly, the Seventh Circuit emphasized the established rule that "'illegal arrest or detention does not void a subsequent conviction,'" *id*. at 260 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 199 (1975)), and reiterated that "*[t]he remedy . . . for violations of the due process clause during pre-trial detention is not the divestiture of jurisdiction, but rather an injunction or money damages*," *id*. at 261 n.7 (emphasis added).

There is no reason to believe that the Eleventh Circuit, having rejected *Toscanino* in the context in which it arose, would nonetheless expand *Toscanino* and apply it in a totally distinct context to dismiss an indictment outright – something *Toscanino* itself did not do – based upon a defendant's allegations of mistreatment while in military detention prior to criminal prosecution. Such a holding would be totally without precedent and contrary to law.

The foregoing authorities squarely foreclose Padilla's claim that the due process violations alleged in his motion have divested the government of jurisdiction to prosecute him in the instant matter. A defendant's recourse for such mistreatment is not amnesty from prosecution — a remedy Padilla himself acknowledges would be "calamit[ous]," *see* Mot. at 8, given the gravity of the charges against him and the public's interest in seeing them resolved — but rather whatever relief may be available through the civil process or prosecution of his alleged oppressors. *Matta-Ballesteros*, 896 F.2d at 261 n.7; *see generally Bivens* v. *Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403

---

this time seeking dismissal of the charges against him. The district court in Florida denied that motion, which matta appealed to the Eleventh Circuit.

U.S. 388, 389 (1971) (violation of constitutional right "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct"); *Cooper* v. *Dupnik*, 963 F.2d 1220, 1250 (9th Cir. 1992) (en banc) (coercive interrogation methods that "shock[ ] the conscience" in violation of substantive due process are actionable under 42 U.S.C. § 1983). Simply put, the remedy sought by Padilla in this motion is neither permissible nor appropriate.

The absence of any authority for Padilla's position is understandable, because even in cases involving prosecutorial misconduct (which this is not), the Supreme Court has long counseled against setting aside convictions "where means more narrowly tailored to deter objectionable . . . conduct are available." *United States* v. *Hasting*, 461 U.S. 499, 506 (1983). Padilla himself acknowledges that dismissal of an indictment for prosecutorial misconduct is a drastic measure. *See* Mot. at 8. Dismissal "must be approached with some caution" and "with a view toward balancing the interests involved." *Hasting*, 461 U.S. at 506. The Eleventh Circuit has warned repeatedly that "dismissal of an indictment for prosecutorial misconduct is an extreme sanction which should be infrequently utilized." *United States* v. *Accetturo*, 858 F.2d 679, 681 (11th Cir. 1988); *see also United States* v. *Pabian*, 704 F.2d 1533, 1536 (11th Cir. 1983) (same); *Santana*, 6 F.3d at 10 (stressing that dismissal "must be used sparingly" as such a "[p]otent elixir[ ] should not be casually dispensed").

This principle applies with special force here, because Padilla does not allege that the *prosecution* has violated his due process rights but rather that the *military* did so during an otherwise lawful exercise of its war-time detention authority.[4] The Ninth Circuit has recognized the importance

---

[4] Padilla claims in passing (Mot. at 2) that his military detention was *itself* "unlawful." That contention is plainly foreclosed by the Fourth Circuit's decision upholding the detention. *Padilla*, 423 F.3d at 390-397. Far from finding the detention "shocking," the court concluded that it was

11

of the distinction between prosecutorial misconduct and misconduct by others, rejecting a motion to dismiss an indictment based on the alleged "outrageous . . . misconduct" of investigative agents:

> The doctrine of separation of powers requires judicial respect for the independence of the prosecutor. Dismissing an indictment with prejudice encroaches on the prosecutor's charging authority, substituting a judicial wag-of-the-finger for the prosecutorial nod. Such an intrusion will be permitted only in cases of flagrant *prosecutorial* misconduct. The conduct here was neither fairly attributable to the prosecutor nor sufficiently flagrant to justify dismissal with prejudice. . . . We reverse the judgment of the district court and remand with instructions that it reinstate the indictment.

*United States* v. *Simpson*, 927 F.2d 1088, 1091 (9th Cir. 1991) (citations omitted) (emphasis added). Even if one were to believe Padilla's story that military personnel mistreated him during his detention — and again, he has not offered a shred of evidence to that effect — the prosecution team and the public to which it answers should not be punished for such misconduct by outright dismissal of these charges.

**B.    In any event, dismissal is unwarranted in this instance because the military's alleged misconduct has not prejudiced Padilla's defense against the indictment.**

Even if this Court were to conclude that it has the constitutional authority to dismiss the

---

"necessary and appropriate" in light of evidence that Padilla trained with and was closely associated with al Qaeda, engaged in armed conflict against the United States in Afghanistan, and subsequently accepted a mission from al Qaeda to attack unsuspecting civilians on American soil. *Ibid*. In so holding, the court rejected the due process claims and other legal challenges that Padilla had raised in his habeas petition. Well-established principles of comity and *res judicata* preclude Padilla from using this criminal proceeding to collaterally attack his military detention and the Fourth Circuit's approval thereof. *Cf. Schlesinger* v. *Councilman*, 420 U.S. 738, 746-747, 756 (1975) ("considerations of comity" and "respect for coordinate judicial systems" counsel limited judicial review of court-martial proceedings; such proceedings "have *res judicata* effect and preclude further litigation of the merits" in federal court absent a showing of "jurisdiction[al] . . . defect" or "some other equally fundamental defect"); *cf. also Withrow* v. *Williams*, 507 U.S. 680, 721 (1993) (Scalia, J., concurring) (in cases brought under 28 U.S.C. § 2255, "federal courts have uniformly held that . . . [i]f [a] claim was raised and rejected on direct review, the habeas court will not readjudicate it absent countervailing equitable considerations").

indictment for "outrageous government conduct" not attributable to the prosecution team, dismissal would still be unwarranted because Padilla has neither alleged nor proven any cognizable prejudice.

There is no precedent setting benchmarks for dismissal of an indictment based upon the circumstances alleged by Padilla, as such relief is simply not available. Nevertheless, even in the prosecutorial misconduct context, dismissal is not allowed unless the defendant can meet the burden of showing a particular type of prejudice from the alleged misconduct. The Supreme Court squarely concluded in *Bank of Nova Scotia* v. *United States*, 487 U.S. 250, 255 (1988) that "a district court exceeds its powers in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant." In *United States* v. *O'Keefe*, 825 F.2d 314, 318 (11th Cir. 1987), the Eleventh Circuit similarly explained that " prejudice to the defendant is required when dismissal of an indictment [for prosecutorial misconduct] is sought based on violations of the [C]onstitution." *See also United States* v. *Merlino*, 595 F.2d 1016, 1018 (5th Cir. 1979) (same).

To establish prejudice as that term is used in this context, a defendant must demonstrate that the misconduct infected the indictment or will otherwise result in a trial whose unfairness cannot be remedied by simply granting a new trial after conviction:

> If dismissal is appropriate [under *O'Keefe*] only if the defendant can show prejudice, it only makes sense that the prejudice he must show must be prejudice that the dismissal will remedy. . . . If prosecutorial misconduct occurs during trial, a court must consider whether the misconduct has prejudiced the defendant's right to a fair trial. If it has, and if the prejudice cannot be remedied by a curative instruction, the court should declare a mistrial. . . . Otherwise, dismissing the indictment only makes sense if the prosecutorial misconduct has somehow infected the indictment itself, rather than only the trial. . . .
>
> One might argue that a court should have the option of dismissing an indictment as a sanction for prosecutorial misconduct . . . sufficiently serious to warrant some greater sanction than a simple mistrial. But this argument lacks support in our precedent. Under *O'Keefe*, we require the defendant to show prejudice, 825 F.2d at 318[,] and this requirement would make little sense if the dismissal of an indictment

13

>is merely an enhanced sanction imposed in cases in which prosecutorial misconduct is somewhat worse than that which would ordinarily justify a mistrial. This requirement instead suggests that dismissing an indictment serves to remedy prosecutorial misconduct that causes or contributes to an indictment, just as a mistrial serves to remedy prosecutorial misconduct that prejudices the defendant's right to a fair trial. Indeed, whether a court grants or denies a defendant's motion for a mistrial is not dependent on the seriousness of the prosecutorial misconduct, but rather is dependent on whether a mistrial is necessary to protect the defendant's right to a fair trial. There are, of course, other avenues for sanctioning serious prosecutorial misconduct that do not result in windfall to a defendant who has not been prejudiced by the misconduct.

*United States* v. *Shelley*, 405 F.3d 1195, 1207 n.7 (11th Cir. 2005).

Because Padilla has alleged misconduct not attributable to the prosecution team, the prejudice standard set forth in *O'Keefe* and *Shelley* is the absolute minimum that should apply in this case. *See Simpson*, 927 F.2d at 1091 (reversing dismissal of indictment where misconduct was not "fairly attributable to the prosecutor"). Padilla's motion to dismiss clearly falls short of the mark under that standard. The motion does not allege, let alone prove, that the military's supposed mistreatment of Padilla "infected" or "contribute[d] to" the indictment against him. *Shelley*, 405 F.3d at 1207 n.7. Nor does the motion allege, let alone prove, that the supposed mistreatment would result in a fundamentally unfair trial not remediable by any other means. Quite the contrary, the motion acknowledges that the government "will not seek to introduce any evidence obtained from Mr. Padilla during his captivity in the Naval Brig." Mot. at 11-12. And for all of its rhetoric to the effect that "[t]his prosecution is an abomination" (*e.g.*, *id*. at 8), the motion devotes precisely one sentence to the subject of prejudice — stating without further explanation (*id*. at 12) that the government's proposal not to introduce evidence obtained from Padilla during his military detention "is clearly inadequate to make whole the prejudice suffered by Mr. Padilla at the hands of the government's gross misconduct." Whatever else can be said about the motion, its lone and bare assertion of

prejudice plainly fails to satisfy Padilla's burden, if indeed this Court were to consider the unprecedented relief he seeks.

## II.     Padilla Does Not Produce Even Threshold Evidence of a Due Process Violation.

Padilla's claim of torture is unsupported by evidence of any kind, let alone evidence proving his allegations or demonstrating "outrageous" government misconduct.  He submits no records, no affidavits, no testimony from himself or any other witness.  Even if this Court possessed the authority to dismiss an indictment outright based upon extreme and prejudicial mistreatment of a defendant while in military custody prior to his indictment, such relief should not even be considered unless the defendant meets a basic evidentiary threshold.  For example, courts routinely require defendants to meet such a threshold before considering allegations of improper prosecutorial conduct, and will deny motions to dismiss on that basis without further inquiry in the absence of such proof.  *See, e.g., Wade* v. *United States*, 504 U.S. 181, 186 (1992) (defendant claiming unconstitutional prosecutorial motive in violation of the Fifth Amendment must "make[ ] a substantial threshold showing" of such a violation; conclusory assertions "will not entitle [him] to a remedy or even to . . . evidentiary hearing"); *see also United States* v. *Apperson*, 441 F.3d 1162, 1192 (10th Cir. 2006) (dismissal of indictment because of "outrageous government conduct" unwarranted where motion to dismiss was "woefully lacking" in evidentiary support); *United States* v. *Cannon*, 88 F.3d 1495, 1501 (8th Cir. 1996) (dismissal of indictment on due process grounds was unwarranted where motion to dismiss "lack[ed] evidentiary support").  The total absence of any evidence supporting his allegations is a separate and distinct ground to reject this unfounded motion without further inquiry.

**CONCLUSION**

For all of the foregoing reasons, Defendant Padilla's Motion to Dismiss for "Outrageous Government Conduct" should be denied as a matter of law.

Respectfully submitted,

R. ALEXANDER ACOSTA
United States Attorney

s/ Russell R. Killinger
RUSSELL R. KILLINGER
Fla. Bar No. 0312851
BRIAN K. FRAZIER
Court No. A5500476
JOHN C. SHIPLEY
Fla. Bar No. 069670
Assistant United States Attorneys

STEPHAN E. OESTREICHER, JR.
Attorney, United States Department of Justice
Criminal Division, Appellate Section

STEPHANIE K. PELL
Court No. A5500301
Attorney, United Stated Department of Justice
Criminal Division, Counterterrorism Section
99 N.E. 4th Street, 8th Floor
Miami, Florida 33132
Tel: (305) 961-9000
Fax: (305) 530-4675

**CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2006, the undersigned electronically filed the foregoing document, "GOVERNMENT'S OPPOSITION TO DEFENDANT PADILLA'S MOTION TO DISMISS FOR "OUTRAGEOUS GOVERNMENT CONDUCT,"" with the Clerk of the Court using CM/ECF and served in some other authorized manner those counsel who are not authorized to receive electronically Notices of Electronic Filing:

>Andrew G. Patel, Esq.
>2301 Collins Avenue
>Apt. 1409
>Miami Beach, Florida 33139
>Counsel for Defendant Jose Padilla

> s/ Russell R. Killinger
> Russell R. Killinger
> Assistant United States Attorney