UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 04-60001-CR-COOKE

UNITED STATES OF AMERICA,

      Plaintiff,

v.

JOSE PADILLA,

      Defendant.

_____/

## JOINT DEFENSE MOTION IN LIMINE TO EXCLUDE GOVERNMENT EXPERTS AND REQUEST FOR A *DAUBERT* HEARING

Jose Padilla, Kifah Jayyousi, and Adham Hassoun, through undersigned counsel, hereby moves this Court for an order excluding the government's experts Evan Kohlmann and Dr. Rohan Gunaratna and for a *Daubert* hearing prior to any determination of this issue.

## The Testimony Of The Government's Proposed "Experts" Is Not Admissible

Fed. R. Evid. 702 governs the admissibility of expert opinion testimony:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of

1

reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 assigns to the district court the role of gatekeeper and charges the court with assuring that expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). As the Eleventh Circuit has held, in admitting testimony under Rule 702 trial courts must "engage in a rigorous three-part inquiry" and determine whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.*" United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*).

With regard to an expert's qualifications, the prosecutors have conceded in their Motion to Exclude Proposed Defense Experts (DE 702), that a proponent of expert testimony does not have the right to "put before the jury experts whose sole basis for testifying is their 'experience' without any proof that the opinions to be offered are reliable or helpful." Government Motion at pp. 1-2. Indeed, as the *Frazier* Court noted, the Committee Note to the 2000 Amendments of Rule 702 expressly

provides that, "[i]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Id*. at 1261(quoting Fed.R.Evid. 702 advisory committee's note (2000 amends.)(emphasis added). Therefore, the *Frazier* Court reiterated that "a basic foundation for admissibility [is] that [the] "[p]roposed [expert] testimony must be supported by appropriate validation- *i.e.,* 'good grounds,' based on what is known." *Id*. at 1261 (quoting *Daubert*, 509 U.S. at 590.)

Turning to the reliability of an expert's opinion, the trial court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is . . . valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.  The Court cautioned that the district court must focus "on [the] principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.  The Supreme Court has identified various factors for the trial court to consider when evaluating the reliability of the proposed expert opinion: (1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; and (4) whether the theory or technique

3

enjoys general acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 592-94. In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court clarified that the district court's duty to act as gatekeeper and to assure the reliability of expert testimony before admitting the evidence applies to all expert testimony, not merely scientific expert testimony. *Kumho Tire Co.*, 526 U.S. at 147; *see also Frazier*, 387 F.3d at 1262.

Finally, under Rule 702, the Court must ensure that the proposed expert testimony is relevant and will serve to aid the trier of fact. *Daubert,* at 592-93. In other words, the expert "must fit" the issues in the case by having a valid connection to the pertinent inquiry. *Id*. at 591-92.

In sum, the proponent of expert testimony always bears "the burden to show that his expert is qualified to testify competently regarding the matters he intended to address; the methodology by which the expert reached his conclusions is sufficiently reliable; and the testimony assists the trier of fact." *Id*. "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or the defendant in a civil suit, or the government or the accused in a criminal case." *Id.*

## A.      Opinion of Evan Kohlmann and Dr. Rohan Gunaratna

The prosecutors have provided purported notice that they intend to call Evan Kohlmann and Dr. Rohan Gunaratna as expert witnesses in this case.[1]  But, the notice that the prosecutors have provided to the defense these experts is deceptively scant. Despite the length of the prosecutors' proffer, the government has produced no information that would indicate that Kohlmann is qualified as an expert; or that Messrs. Kohlmann or Gunaratna opinions have been tested, subject to any peer review, nor whether their techniques or theories enjoy general acceptance within any scientific or historic community; or that their opinions would assist the jury.  Their opinions are therefore improper and should be excluded as shown in detail below.

### 1.      Evan Kohlmann

### a.      The government's  "terrorism expert" is not sufficiently qualified.

The government's primary "terrorism expert" - Evan Kohlmann - is a 2004 law school graduate and a self-proclaimed expert in terrorism.[2]  Indeed, Kohlmann

---

[1]   The government's proffers with regard to Kohlmann and Gunaratna are attached respectively as Exhibits A and B.

[2]   While Kohlmann's curriculum vitae includes experience as a Senior Terrorism Consultant for the Investigative Project in Washington, D.C. from February 1998 to January 2004, he testified in *United States v. Khan,* 03-296-A (E.D. Va.) that he "was getting paid part-time by a think tank in Washington, D.C., known as the Investigative Project,"  where he "worked part-time since February of 1998."  Kohlmann then "founded" a website named globalterroralert.com in February of 2004 that purports to act as an "exclusive information clearinghouse on international terrorism." Exhibit A at p.3.

declares himself on the internet as an "International Terrorism Consultant." *See* http://www.globalterroralert.com/about.htm.   His website proclaims that he has served as an approved expert witness on behalf of federal prosecutors in various terrorism matters, including most recently in *United States v. Aref* (N.D. N.Y. 2006). *Id.*   Kohlmann also boasts on his website that he is "frequent guest" on news programs and he is a regular contributor to The Counterterrorism Blog. *Id.*

Kohlmann is only one of many persons who have, in the aftermath of September 11, 2001, attempted to capitalize on the terrorism "cottage industry" by making regular appearances in the media by labeling themselves as experts.   While many such individuals have frequented the media circuit and have been widely quoted in the media on "terrorism" issues, this does not qualify Mr. Kohlmann to "provide a dissertation or exposition of the origin, ideology, organizational structure, evolution and goals of Al Qaeda and other affiliated radical Islamic terrorist and guerilla groups and movements"; "trace the spread and mobilization of the Arab-Afghan mujahideen from the jihad in Afghanistan to jihad conflicts in Bosnia, Chechnya and elsewhere"; and "analyze the contents of intercepted communications and other evidence in this case; identify and explain terminology, concepts, people and places found in the evidence . . . and render an opinion as to whether [sic] evidence in this [sic] is consistent with a cell supporting the mujahideen in Bosnia, Chechnya and elsewhere."

Exhibit A at p. 2.

Despite the bold assertion that Kohlmann is qualified to give such a dissertation or exposition the government has not disclosed to the defense, for example, that Kohlmann has ever infiltrated Al Qaeda; or any other "radical Islamic terrorist" group or personally conducted interviews of members of such groups; or that he has ever traveled to the countries he claims to know about; or that he speaks any of the languages of thouse countries.  Rather, the government's proffer of Kohlmann's testimony essentially tracks the topics contained in his book *Al-Qaida's Jihad in Europe.*  A review of the book does not disclose an expertise in these subjects, however, but only reveals that Kohlmann has read about the subjects that form the basis for his opinions. And, most importantly, the prosecutors' proffer, although lengthy in terms of the subjects about which the government wishes Kohlmann to opine, is void of information that would allow the Court to permit Kohlmann to render any of his proffered opinions and especially an opinion that the evidence in this case "is consistent with a cell supporting the mujahideen in Bosnia, Chechnya and elsewhere." Exhibit A at p. 2.  Kohlmann lacks any necessary experience and training in law enforcement, in the intelligence community or otherwise, which would permit him to offer credible "expert" testimony regarding what the government describes as a "cell" that is associated with the recruiting and funding of terrorism. *See* Fed. R. Evid. 104(a);

Fed. R. Evid. 702.  This Court should exclude Kohlmann's testimony on this basis alone.

The Court's ruling in *United States v. Abu-Ali*, 005-53 (E.D. Va.) is instructive. The government had charged Abu-Ali under various statutes with rendering, and conspiring to render, assistance or support to a designated foreign terrorist organization.  Specifically, Abu-Ali was charged with joining Al Qaeda and participating in a plan to carry out terrorist activities within the United States, including a conspiracy to assassinate the President of the United States.  *See United States v. Abu-Ali*, 395 F.Supp.2d 338 (E.D. Va. 2005).  Before trial commenced, the prosecutors noticed Kohlmann as a potential expert witness.  In the course of granting Abu-Ali's motion to exclude Kohlmann as an expert witness, the Court concluded:

> I note that first of all, as far as we can – has been proffered here today, Mr. Kohlmann has never met anyone from al-Qaeda, has not infiltrated al-Qaeda, has not done any research where he's had contact with someone who was in al-qaeda to know just what they do or did not do.
>
> He's read about it on the Internet and in scholarly books. And certainly a person can qualify based upon reading and education.
> . . .
>
> The Court does not think that the Internet, particularly the postings that he has described here, in and of themselves have any – there's no way to test the reliability of them.  There's no way to know who posts them. There's no way to know who maintains them.  There is no way to know whether the information there is accurate or not.  And that he has published a book, a self-published book, I note, in and of itself does not make him an expert.

And, the fact that the government has hired him to testify as an expert witness in cases . . . does not sit with this judge as a basis to qualify him as an expert in al-Qaeda, particularly where he has no contact with someone from al-Qaeda.  All he has done is to read about it.

. . .

He has not qualified because the methods that he's gathered his information are reading the Internet and reading books.  That in and of itself may be a way to learn engineering, but at some point, the engineer has to handle a device.

Exhibit C (transcript of Court's ruling in *United States v. Abu-Ali*, 005-53 (E.D. Va. October 28, 2005). This Court should likewise exclude Kohlmann's testimony on this basis.

If the Court chooses not to exclude Kohlmann's testimony on this ground, then this Court should order the government to provide a more detailed proffer. The government's disclosure is entirely inadequate under Federal Rule of Criminal Procedure 16, and Fed. R. Evid. 702 and 703.  In the discovery letter provided to the defense, the prosecutor stated that the government expects Kohlmann to give an explanation and overview of the following topics: "The Soviet-Afghan jihad"; "Jihad comes to Bosnia"; "The Role of Radical Islamic Shayks and/or their Non-Governmental Organizations in the Bosnian Jihad";  "Use of Islamic Charities as Fronts"; "Jihad comes to Chechnya" and "The use of the internet and publications for

9

propaganda in fund-raising and recruitment for violent jihad." Exhibit A at pp. 4-5.

Rule 16(a)(1)(G) requires that the government provide the "bases and reasons" for the

expert's conclusion.   Rather than produce the bases and reasons for Kohlmann's

opinions, the government has produced a mere outline of Kohlmann's expected

testimony.

For example, as noted above, the prosecutor has informed the defense that he

expects Kohlmann to render an opinion that the evidence in this case "is consistent

with a cell supporting the mujahideen in Bosnia, Chechnya, and elsewhere." Exhibit

A at p.2.  Absent from this disclosure are the "bases and reasons" for this conclusion.

This is plainly insufficient under Rule 16. Mr. Padilla therefore requests that this Court

order the government to provide to him the "bases and reasons" for Kohlmann's

proffered opinions.

### b.   The government's "terrorism expert" relies upon invalid reasoning and methodology.

Given the disclosure provided by the government for Kohlmann, undersigned

counsel cannot begin to understand the actual opinions held by him. Notwithstanding,

because the defense presumes that his opinions are those expressed in his book, any

such opinions held by Kohlmann are based upon invalid reasoning and methodology.

In short, Kohlmann's  opinions regarding "The Soviet-Afghan jihad"; "Jihad comes to

Bosnia"; "The Role of Radical Islamic Shayks and/or their Non-Governmental Organizations in the Bosnian Jihad";  "Use of Islamic Charities as Fronts"; "Jihad comes to Chechnya" and "The use of the internet and publications for propaganda fund-raising and recruitment for violent jihad"  as well as his opinion that in this case the evidence is consistent with a cell supporting the mujahideen in various parts of the world  are not opinions or theories that meet the requirements of  *Daubert*/*Kumho*. Indeed, the government has proffered no such support for these opinions and we are left to speculate that Mr. Kohlmann reads postings on the internet and who regularly briefs and testifies at the behest of the government regarding what he has read. Therefore, the defendants respectfully request that in the event the Court determines such testimony to be admissible, the Court should hold a *Daubert* hearing to conduct a thorough and probing analysis of this "terrorism" evidence before permitting expert testimony on the topic at trial.  *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability.  Under *Daubert*, that's not enough.").

11

Based upon the government's submission, it is impossible to test the methods that are employed by Mr. Kohlmann in reaching his conclusions because we are left to speculate the methods that he employs for reaching those conclusions. And, it is impossible, as a matter of time, because Kohlmann's writings are of such recent vintage, for any of his work to have been subject to peer review. The paper that Kohlmann wrote for his college class cannot be considered "peer tested" as that term is understood. Likewise, there is no evidence that his book has been peer tested unless blurbs on the back of the book constitute testing. Finally, there can be no dispute that his postings on his blog or his appearances on NBC News/MSNBC have not been peer tested .

Despite the fact that the government has not provided the defense with the reasons and bases for Kohlmann's purported opinions, certain observations may be made with regard to his work product that is available in the public domain. A review of Kohlmann's book reveals endless examples of citation to sources that lack credence, misrepresentations of sources, lurid depictions of alleged violent Jihadi behavior attributed to sources that do not provide corroboration and his tendency to quote, uncritically, any source that supports his assumptions without addressing potential problems with the source. In his book, Kohlmann also ignores other essential and credible evidence that does not support his assertions.

For example, on page four of his book, *Al-Qaida's Jihad in Europe*, Kohlmann attempts to draw a picture of the Afghani jihad but omits the relevant and crucial fact that in the period he discussed the government of the United States fully funded, armed, advised, and praised the efforts of the mujahideen.  On page twenty-eight of his book, Kohlmann asserts that various Saudi mujahideen initiated combat operations in Bosnia. In his notes, Kohlmann cites as one source for this assertion a document written by Miroslav Toholoj, the Serbian Minister of Information under Radovan Karadzic. Karadzic, the sworn enemy of the Bosnian Muslims,  has been indicted  for war crimes and  genocide  and  is  currently  a  fugitive  from  justice.  *See* http://www.un.org/icty/indictment/english/kar-ii950724e.htm  (Indictment  against Karadzic from The International Tribunal for the Former Yugoslavia).

The Court should be concerned with Kohlmann's predilection for stating facts without citing sources and when he does cite a source it is invariably an unconfirmed press  account.  On  page  seventy-seven,  Kohlmann  claims  that  the  "Muslim-led" government had "dreams of an independent autonomous ethnic region."  Kohlmann cites no source for this statement.  On page eighty-six, Kohlmann paints a lurid picture of of alleged Muslim torture and mutilation based upon a unconfirmed press report. Likewise, on page 116, Kohlmann refers to alleged "notorious Muslim militants" arrested by Croatian authorities with no attribution for this statement.  On pages 130

and 171, Kohlmann offers more lurid descriptions of alleged atrocities based upon unconfirmed reports.  These examples are illustrative, not exhaustive.

Kohlmann also fails to present a balanced account in his book. On page eighty-five, Kohlmann states that the damage to the Guca Gorca monastery was done "for much the same reason that the Taliban obliterated the Bamiyan Buddhas in Afghanistan."  The portion of the book that addresses this action  show Kohlmann's bias. Kohlmann ignores, because contrary to his ideology, the clear, dominant purpose for the destruction at Guca Gora - Serb Nationalists had a deliberate policy of destroying Muslim religious monuments and the actions taken at Guca Gora were a response in kind.

Kohlmann's written work also exposes a pervasive logical error.  Kohlmann assumes that because some Mujahideen in Bosnia had connections to terrorist organizations, then all Mujahideen were terrorists or part of a terrorist organization. This is certainly not the type of reasoning and methodology that *Daubert* requires and the Court should exclude his testimony.

Finally,  Kohlmann's opinion that the evidence in this case is consistent with a cell supporting the mujahideen in various parts of the world clearly invades the province of the jury. Although any witness may offer an opinion as to an ultimate issue to be decided by a jury, this opinion should not unduly invade the province of the jury

when the assistance of the witness is unnecessary. *See United States v. Dazey*, 403 F.3d 1147, 1172 (10th Cir.2005); *see* Fed.R.Evid. 704 advisory committee's notes ("Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day.").

### c.     The proposed testimony would not assist the jury and is irrelevant

The vast majority of the matters disclosed by the government as the subject of Kohlmann's "expert" testimony have nothing to do with the pending Superseding Indictment and Mr. Padilla therefore objects pursuant to Rules 702 and 403. The government has charged Mr. Padilla in a conspiracy to provide material support to a conspiracy to commit murder and providing material support to that conspiracy.  The government hopes to drown the defendants in a sea of irrelevant allegations: "The roles of Usama Bin Laden and Abdullah Azzam and divergence in their philosophies"; "The Egyptian influence on Usama Bin Laden"; Shaykh Abu Abdel Aziz' trip to Bosina-Heregovina"; Anwar Shaaban and the Islamic Cultural Institute of Milan"; and "The hospital hostage taking in Budyonnovsk."  While undoubtedly interesting, these "topics," and the others listed in the government's disclosure have no relevance to the instant case.

For example, the testimony of Kohlmann regarding Al Qaeda and Bin Laden will not assist the trier of fact to understand the evidence in this case or to determine a fact in issue as required by Rule 702 and will, as a matter of fact, be unduly prejudicial to the defense under Fed. R. Evid. 403.  Stated simply, the topics of Bin Laden and Al Qaeda fail to meet the relevancy requirements of Fed. R. Evid. 401, which requires the evidence to have the "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it  would be without the evidence."  The government is seeking to use Kohlmann's "expert" testimony to associate Mr. Padilla and his co-defendants with the most notorious figure of our time without any evidence of any contact or interaction of any sort between them.  Such an "opinion" is inadmissible because it carries with it the risk of prejudice that the jury will see Mr. Padilla as part of the Al Qaeda organization, when there is no evidence that would support admission of such outlandish and prejudicial statements as expert opinions.

The circumstances of this case stands in stark contrast to those in *United States v. Paracha*, 2006 WL 12768 (S.D. N.Y. January 3, 2006) a case where Kohlmann testified as an expert.  In *Paracha*, the district court admitted Kohlmann as an expert witness to opine regarding the origins and structure Al Qaeda. The government had charged Paracha, however, with a violation of 18 U.S.C. § 2339B.  This section

16

prohibits a person from providing material support to a foreign terrorist organization.

And, the government charged Paracha specifically with rendering material support to

al Qaeda while acting with the knowledge that his support would be used to further al

Qaeda activities. Accordingly, the district court's ruling that expert testimony regarding

Al Qaeda would assist the jury is not controversial. The government has charged Mr.

Padilla, by contrast, with a violation of 18 U.S.C. §§ 371 and 2339A and asserted that

he conspired to provide and actually provided material support to a conspiracy - not to

Al Qaeda. The origins and structure of Al Qaeda is therefore factually and legally

irrelevant to this case.

Expert evidence must be "strictly relevant to the particular offense charged."

*United States v. Anderson*, 933 F. 2d 1261, 1268 (5th Cir. 1991). This testimony is not

related in any way to the specific counts in this case. Mr. Padilla is not charged with

providing or conspiring to provide material support to Al Qaeda. Because there is no

allegation that defendants were actual members of Al Qaeda, detailed information

about Al Qaeda and Bin Laden and the other topics noted in the government's outline

would not be helpful to the jury or relevant. As such, the proffered testimony does not

assist the jury in determining whether Mr. Padilla is guilty of the charged crimes and

carries considerable risk of guilt by association. *United States v. St. Michael's Credit*

*Union*, 880 F. 2d 579, 602 (1st Cir. 1989).

17

Even if deemed to marginally relevant, Kohlmann's proffered testimony is unfairly prejudicial. Federal Rule of Evidence 403 states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The tenets of Rule 403 balancing are familiar and often quoted: "If the evidence brings unwanted baggage, say, unfair prejudice or a cognizable risk of confusing the jury, and if the baggage's weight substantially overbalances any probative value, then the evidence must be excluded." *United States v. Rodriguez-Estrada*, 877 F.2d 153, 155 (1st Cir.1989).

The government clearly wants to introduce Kohlmann's opinions to introduce evidence about Al Qaeda before the jury. This is inappropriate. First, this evidence has no probative value. Second, any probative value of this information is completely overshadowed by the danger of unfair prejudice.

The grand jury in this case has indicted the defendants for conspiring to and providing material support in violation of 18 U.S.C. § 2339A. Section 2339A makes it a crime to provide material support or resources knowing or intending that support or resources are to be used in preparation for, or in carrying out a violation of certain other sections of the code. Section 2339B, on the other hand, includes no such specific

intent element and requires only that a person knowingly provides material support or resources to a "foreign terrorist organization." *United States v. Sattar,* 272 F. Supp. 2d 348, 356 (S.D.N.Y. 2003).

The evidence concerning FTOs and the expert testimony proffered by the government is an attempt by the government to confuse the jury by offering proof of an offense that is different from the offense charged by the grand jury. The government is attempting, through this ruse, to put evidence before the jury that will lead them to find the defendants guilty based on evidence of providing material support to designated terrorist organizations in violation of 18 U.S.C. § 2339B, a crime that Congress has clearly defined as separate and distinct offense from the crime charged in the indictment.

Even if evidence concerning Al Qaeda is marginally relevant, the evidence is so grossly prejudicial that the evidence is inadmissible under Rule 403. *United States v. Rouco*, 765 F.2d 983, 995-996 (11th Cir. 1985). It is appropriate that at this stage of the proceeding for the Court to ensure against evidence that would unfairly inflame the jury's emotions and sidetrack the trial be ruled inadmissible. *United States v. Henderson*, 409 F.3d 1293, 1298 (11th Cir. 2005).

The trial judge may exclude expert opinion evidence, even if relevant, if its probative value is substantially outweighed by the danger of confusion of the issues or

misleading the jury.  Fed.R.Evid. 403.  The judge's exercise of this discretion should be upheld unless manifestly erroneous.  *Rouco*, 765 F.2d at 995.  Rule 403 affords the Court  discretion to preclude expert testimony unless it passes a more stringent test of reliability and relevance due to the potential impact on the jury of expert testimony. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999).   The extraordinary prejudice that would befall the defendants from the government's attempt to inject Al Qaeda into a case where the defendants have not been indicted under 2339B is beyond dispute.

The Court must weigh the danger that this evidence will unfairly prejudice the jury. Here, we cannot escape the conclusion that the most powerful inference that the jury will draw from Kohlmann's opinions is that Mr. Padilla and the co-defendants are members of Al Qaeda.  Because this is not charged and demonstrably untrue, the specter of impermissible character evidence is likely to significantly overshadow any legitimate probative value.  If admitted, this evidence will create an unacceptable risk that the jury will assume that Mr. Padilla is a member of Al Qaeda and convict on that basis alone.

In addition to be unduly prejudicial, the other concerns of Rule 403 are implicated here.  If introduced, the jury will effectively hear two trials – the case charged in the Indictment and a case about Al Qaeda.  This will undoubtedly  cause

20

confusion and the very real possibility that the jury will be misled, as well as undue delay. This Court should thus preclude Kohlmann from testifying at Mr. Padilla's trial.

**2.      Dr. Rohan Gunaratna**

**a.      The government has failed to meet the requirements of Rule 16 by not disclosing the reasons for his opinions**

In the government's Rule 16 disclosure with regard to Dr. Gunaratna, the prosecutor disclosed that "Dr. Gunaratna will opine that Al Qaeda and its allied organizations extend beyond strictly the organizations themselves to an entire Al Qaeda support system, which comprises leaders, lieutenants, financiers, logisticians, and other facilitators, foot solders, recruiters, supporting population segments, and religious or otherwise ideological figures which fuels the global Salafist violent jihad. The defendants herein, together with other known and unknown coconspirators fit comfortably within this system." Again, the government, through this disclosure, has failed to meet the requirements of Rule 16.

The government does list the basis for Dr. Gunaratna's conclusions - academic and field work. The government, however, fails to list the "reasons" for Dr. Gunaratna's conclusions. Rule 16 does not permit the government to omit this requirement by substituting a reading list of the purported expert's written works and leave for the defense the task of divining the reasons for the expert's conclusions. Rule

16 squarely requires the government to provide to the defense the reasons for the expert's conclusions.   The defendants therefore request the Court to order the government to provide to the defense the reasons for Dr. Gunaratna's proffered opinion that "the defendants herein, together with other known and unknown coconspirators fit comfortably within th[e] system" of Al Qaeda support.

### b.      Dr. Gunaratna's opinions will not assist the jury

Dr. Gunaratna's opinions will not assist the jury for the same reasons that Kohlmann's opinions will not.   The government has disclosed that

> Dr. Gunaratna will identify and describe the structure, key membership and tactics of those terrorist and guerilla groups made relevant by the evidence in this case.  He will begin with the Egyptian terrorist groups - The Islamic Group a/k/a Al Gamma Al Islamiya and Egyptian Islamic Jihad a/k/a Al Jihad.   He will explain how and when these groups developed and identify the key leaders and members, including Sheik Omar Abdel Rahman, Dr. Ayman Al Zawahiri, Mustapha Hamza, Rifa'i Ahmad Taha Musa, Talat Fuad Qassem a/k/a Abu Talal, Shawki Mohamed and Anwar Shaaban.  Dr. Gunaratna will testify regarding the violence committed by members of these groups, including the assassination of Egyptian President Anwar Sadat in 1981; the failed assassination attempt of Hosni Mubarak in 1995; and attacks against Coptic Christians, Egyptian government officials, and tourists, culminating in the Luxor massacre in November, 1997.

> Dr. Gunaratna will trace the evolution of the violent jihad movement from one of pan-Arabist to pan-Islamist brought on  by the Iranian revolution and the Soviet invasion of

Afghanistan in 1979.  He will testify regarding the establishment of MAK (Maktab al Khidemat - the Afgan Services Bureau) and its global reach, including the United States with the Al Kifah refugee centers in New York and Boston with the collaboration of Abdullah Azzam and Usama bin Laden.  He will testify regarding the creation of the concept of Al Qaeda (the base) by Abdullah Azzam in 1987-88, including the founding document published in *Al-Jihad* in April 1988.  He will trace the takeover of Al Qaeda by Bin Laden after the death of Azzam in 1989 and the influence of the Egyptian members (including Ayman Al Zawahiri and Sheikh Rahman) in transforming Al Qaeda into a transnational terrorist movement.  He will trace the evolution of Al Qaeda and its infiltration and alliance with other militant Islamic terrorist groups including the establishment of its media office in London through the Advice and Reformation Committee and the issuance of *fatwas* by Usama Bin Laden in August 1996, February 1997, and February 1998.

### Other Terrorist Groups.

Dr. Gunaratna will then move to the formation of militant, Al Qaeda-affiliated terrorist groups in various countries, including Algeria, Lebanon, Libya and Somalia.  He will testify regarding the key membership and violent tactics employed by these groups as discussed on the intercepts and published in the Islam Report and Nida'ul Islam magazine. The groups are listed below.

Armed Islamic Group (GIA) in Algeria

Asbat Al Ansar and Abu Mojhin in Lebanon

Libyan Islamic Fighting Group in Libya

Al Itihad al-Islamiya in Somalia

(Exhibit C).

The undersigned is hard-pressed to understand the relevance of any of these events or the history of the formation of any of these groups, for example, the assassination of Egyptian President Anwar Sadat in 1981; the failed assassination attempt of Hosni Mubarak in 1995; and attacks against Coptic Christians, Egyptian government officials, and tourists, culminating in the Luxor massacre in November, 1997; the influence of the in transforming Al Qaeda into a transnational terrorist movement; the establishment of its media office in London through the Advice and Reformation Committee and the issuance of *fatwas* by Usama Bin Laden in August 1996, February 1997, and February 1998. The government has charged Mr. Padilla in a conspiracy to provide material support to a conspiracy to commit murder and with providing material support to that conspiracy.  The government has not charged Mr. Padilla with conspiring to provide material support to  Al Qaeda.  As discussed above with regard to Kohlmann, Dr. Gunaratna's opinions and therefore irrelevant and unfairly prejudicial.  Dr. Gunaratna should be precluded from testifying at Mr. Padilla's trial.

24

Wherefore, Jose Padilla hereby moves this Court for an order excluding the government's experts Evan Kohlmann and Rohan Gunaratna and for a *Daubert* hearing prior to any determination of this issue.

                              Respectfully submitted,

                              MICHAEL CARUSO
                              ACTING FEDERAL PUBLIC DEFENDER

          By:        /s/ Michael Caruso
                     Michael Caruso
                     Acting Federal Public Defender
                     Florida Bar No.  0051993
                     Anthony J. Natale
                     Supervisory Assistant Federal Public Defender
                     Florida Bar No. 296627
                     Orlando do Campo
                     Supervisory Assistant Federal Public Defender
                     Florida Bar No. 156582
                     150 West Flagler, Suite 1700
                     Miami, Florida  33130
                     Tel/Fax (305) 530-7000/ (305) 536-4559
                     Andrew G. Patel, Esq.
                     111Broadway, 13th Floor
                     New York, New York 10006
                     Tel. (212) 349-0230

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2007, undersigned counsel electronically filed the foregoing document with the Clerk of the Court using CM/ECF and served same via U.S. Mail to counsel(s) who are not authorized to received electronically Notices of Electronic Filing.

Russell Killinger
Assistant United States Attorney
99 N. E. 4th Street
Miami, Florida 33130
Tel. (305) 961-9437
Fax. (305) 536-4675
Email: russell.killinger@usdoj.gov

Stephanie K. Pell
Trial Attorney, Counterterrorism Section
United States Dept. Of Justice
10th & Constitution Avenue, N.W.
Room 2649
Washington, D. C.  20530
Tel. (202) 353-2357
Fax. (202) 514-8714
Email: stephanie.pell2@usdoj.gov

Kenneth M. Swartz, Esq.
Swartz & Lenamon
New World Tower Building #2100
100 North Biscayne Boulevard
Miami, Florida 33l32

Jeanne Baker, Esq.
Attorney at Law, P.A.
Grove Forest Plaza, Suite 202
2937 Southwest 27th Avenue
Miami, Florida 33l33-3703

William W. Swor, Esq.
3060 Penobscot Building
645 Griswold Street
Detroit, Michigan 48226

/s/ Michael Caruso
Michael Caruso
Acting Federal Public Defender