UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 04-60001-CR-COOKE

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

JOSE PADILLA, et. al.,

      Defendant.

_____/

## ORDER DENYING DEFENDANT PADILLA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT

**THIS CAUSE** came before the Court upon defendant Jose Padilla's Motion to Dismiss for Outrageous Government Conduct [D.E. 597], filed on October 5, 2006. The government filed its Response on November 13, 2006 [D.E. 657] and defendant Padilla filed his Reply on December 1, 2006 [D.E. 695]. This Court has reviewed these pleadings, and finds as follows:

### I.    FACTS AND PROCEDURAL HISTORY

Mr. Padilla was arrested on May 8, 2002 at Chicago O'Hare International Airport pursuant to a material witness warrant issued by the United States District Court for the Southern District of New York in connection with grand jury proceedings investigating the September 11th attacks. On June 9, 2002 President George W. Bush declared Mr. Padilla an "enemy combatant" of the United States and directed Secretary of Defense Donald H. Rumsfeld to take custody of him. That same day Padilla was transferred to military control and taken to the Naval Consolidated Brig in Charleston,

South Carolina (hereinafter "Naval Brig"). On July 2, 2004, Padilla filed a petition for a writ of habeas corpus in the District of South Carolina claiming that his military detention violated the Constitution.[1] Stating that the President lacked authority to detain Mr. Padilla militarily, the district court granted the petition and held that Mr. Padilla had to be charged with a crime or released. On September 9, 2005, the Fourth Circuit reversed the district court, holding that the President had the congressionally sanctioned authority to detain Padilla as an enemy combatant.[2]

On November 17, 2005, a grand jury in this District returned an indictment charging Padilla[3] with three counts relating to the defendants' collective efforts to further jihad overseas.[4] On November 20, 2005, the President ordered the Secretary of Defense to release Mr. Padilla from military detention and, upon the Attorney General's request, transfer him to civilian custody. Padilla was transferred to civilian custody, and has remained there since January 5, 2006.

Padilla filed the instant motion to dismiss the indictment for outrageous government conduct on October 5, 2006. In his motion, Mr. Padilla argues that the conditions of his military detention

---

[1] Padilla initially filed his habeas petition in the Southern District of New York on June 11, 2002. The Supreme Court ultimately dismissed this petition without prejudice, holding that it should have been filed in the District of South Carolina rather than the Southern District of New York.

[2] On April 3, 2006, the Supreme Court denied Mr. Padilla's petition for a writ of certiorari to review the Fourth Circuit's holding that the President had the authority to militarily detain Padilla. See Padilla v. Hanft, 126 S. Ct. 1649 (2006).

[3] Along with Padilla, this indictment—the Fifth Superseding Indictment—additionally charged four defendants, Adham Amin Hassoun, Mohamed Hesham Youssef, Kifah Wael Jayyousi and Kassem Daher.

[4] Count 1 charges the defendants with "Conspiracy to Murder, Kidnap, and Maim Persons in a Foreign Country" in contravention of 18 U.S.C. §956(a)(1) and (2). Count 2 charges "Conspiracy to Provide Material Support to Terrorists" in contravention of 18 U.S.C. §371 and 2339(A). Count 3 charges the defendants with providing "Material Support to Terrorists" in contravention of 18 U.S.C. §2339A(a) and 2.

and interrogation while at the Naval Brig "shock[]the conscience" in violation of his due process rights. Padilla claims that the mistreatment he allegedly suffered while at the Naval Brig divests the government of its jurisdiction to prosecute him for the crimes charged in the indictment. Mr. Padilla's allegations with regard to his mistreatment stem exclusively from his time at the Naval Brig. Padilla makes no allegations regarding outrageous government conduct prior to his arrest, during the course of his arrest or during his civilian custodial detention in connection with the crimes charged in the indictment. Mr. Padilla also makes no claim of prosecutorial misconduct related to the government's efforts to try this case. For the reasons addressed in this Order, Defendant Padilla's Motion to Dismiss [the Indictment] for Outrageous Government Conduct [D.E. 597] is **DENIED**.

## II.   LEGAL STANDARD

In United States v. Russell, 411 U.S. 423 (1973), the Court noted, in dicta, that it "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction." Id. at 431-32. The Russell court ultimately found that the governmental conduct at issue did not rise to this level, and cited the defendant's predisposition to commit the crime charged as fatal to his entrapment claim. In Hampton v. United States, 425 U.S. 484 (1976), faced with defendant's attempt to invoke Russell's dicta, the Court noted that "[i]f the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law." Id. at 490.

Like Russell, the Hampton Court rejected the notion that the government conduct at issue was 'outrageous' enough to bar prosecution. Id. at 490-91. Russell and Hampton both arose in the

context of undercover governmental drug operations. In both cases, the government provided the defendant with the means to sell or manufacture an illicit substance. Consequently, both defendants contested the degree of governmental participation in the criminal enterprise. The 'outrageous government conduct' doctrine is thus borne out of cases where the vital issue is the proper scope of governmental involvement in the commission of the crime charged. Resultantly, defendant attempts to invoke Russell's dicta generally go hand-in-hand with entrapment claims. See, e.g., United States v. Sanchez, 138 F.3d 1410 (11th Cir. 1998) (noting that outrageous government conduct claims "focus[] on the tactics employed by law enforcement officials to obtain a conviction for conduct beyond the defendant's predisposition"); United States v. Edenfield, 995 F.2d 197 (11th Cir. 1993) (noting that the government did not "instigate the criminal activity" and that the defendants were "predisposed active participants" in the crimes charged).

Despite the willingness of courts to quote Russell's dicta in subsequent opinions, it has had very little practical effect. In Sanchez, the Eleventh Circuit noted that "[w]hile the Supreme Court and this Court have recognized the possibility that government involvement in a criminal scheme might be so pervasive that it would be a constitutional violation, that standard has not yet been met in any case either before the Supreme Court or this Court." Id. at 1413. The doctrine's application has been met with similar resistance in the other circuits. See United States v. Tucker, 28 F.3d 1420, 1425 (6th Cir. 1994) (noting that Russell's dicta has been employed to bar only one prosecution by an appellate court, and the court subsequently disavowed the holding in a later opinion). In United States v. Boyd, 55 F.3d 239 (7th Cir. 1995), the Seventh Circuit went so far as to hold that the doctrine "does not exist in [the Seventh] Circuit." Id. at 241.[5]

---

[5] Other circuit courts, while not going as far as the Seventh Circuit, have rendered the doctrine useless by deriding its authority, see United States v. Santana, 6 F.3d 1, 3-4 (1st Cir. 1993)

4

Regardless of whether courts choose to recognize, yet not apply the doctrine, or reject the doctrine outright, the question comes up almost exclusively within the context of government involvement in the defendant's crime and entrapment. Since the doctrine has never been effectively applied in any context, courts have had difficulty ascertaining its precise contours, if any. Interpreting the austere dicta in Russell, courts have attempted to delineate precisely when governmental involvement in the crime charged is so substantial and objectionable, that it should be deemed 'outrageous.' See, e.g., Sanchez, 138 F.3d at 1413 (holding that although the crime was "created by the government," governmental conduct was not outrageous); United States v. Barbosa, 271 F.3d 438 (3d Cir. 2001) (holding that governmental complicity in an undercover drug smuggling operation where defendant swallowed drugs was not sufficiently outrageous). The guidelines provided by the caselaw are often as indeterminate as Russell's dicta, and merely affirm that at some point governmental involvement in 'creating' a crime may rise to the level of outrageous conduct. See United States v. Santana, 6 F.3d 1 (1st Cir. 1993) ("Although it has a comfortably familiar ring, 'outrageous misconduct' is surpassingly difficult to translate into a closely defined set of behavioral norms. The broadest hints as to the content of the outrageousness standard lie in the dictum that spawned the doctrine."); see e.g., United States v. Chastain, 198 F.3d 1338 (11th Cir. 1999) (holding that government infiltration of criminal activity is deemed 'outrageous' when it violates fundamental fairness and shocks the universal cause of justice).

---

(calling the defense the "deathbed child of objective entrapment, a doctrine long since discarded in the federal courts"), and minimizing its lasting effect, see Tucker, 28 F.3d at 1426 ("[T]here is no binding Supreme Court authority recognizing a defense based solely upon an objective assessment of the government's conduct in inducing the commission of crimes. Nonbinding dicta of the Court, indicating that there may be such a defense, has been [subsequently] recanted by its author . . . .").

5

### III. ANALYSIS

In its Response to Mr. Padilla's Motion to Dismiss [the Indictment] for Outrageous Government Conduct the government argues that the "motion fails as a matter of law." Gov. Resp. p. 5. In order to assess whether Padilla's motion is legally insufficient, this Court must accept its allegations as true, and determine whether he has stated a cognizable claim. Thus, while this Court has not held a hearing, nor made any findings with regard to Padilla's claims of abuse and torture at the Naval Brig, for the sake of this Order, this Court will accept Padilla's allegations as true.

In his pleadings, Padilla fails to cite any cases where charges were dismissed for outrageous government conduct. While failure to provide evidence of the claim's application is by no means fatal to Padilla's motion, it bears testament to the claim's severely narrow scope. Furthermore, the caselaw that Padilla does cite is predominantly comprised of cases where the doctrine is considered in the context of governmental participation in the crime charged and entrapment.[6] In fact, many cases that defendant cites expressly state that the *only* instance where the claim may be properly invoked is within this governmental participation context. United States v. Gutierrez, Jr., 343 F.3d 415 (5th Cir. 2003) (holding that a defendant claiming 'outrageous government conduct,' need

---

[6] In Defendant's Reply, Mr. Padilla refutes the government's assertion that the circuits have not been willing to consider outrageous government conduct claims by citing to a litany of cases where the appellate courts have recognized the doctrine. However, Padilla fails to acknowledge that in the cited string of cases, the claim arises almost exclusively in the context of governmental participation in the crime charged and entrapment. See, e.g., United States v. Barbosa, 271 F.3d 438 (3d Cir. 2001); United States v. Gutierrez, Jr., 343 F.3d 415 (5th Cir. 2003); United States v. Blood, 435 F.3d 612 (6th Cir. 2006). This factor significantly distinguishes these cases from Padilla's case. In the cited cases, the allegedly objectionable governmental conduct occurred during the commission of the offense that the defendant was seeking to dismiss from the indictment. In Padilla's case, however, he is seeking to have criminal charges dismissed because of governmental actions perpetrated after the commission of the charged crimes. Furthermore, the objectionable governmental action did not occur during the course of his detainment for the criminal charges he is currently attempting to dismiss. Rather, the allegedly outrageous governmental conduct occurred during an independent military detainment in connection with his enemy combatant status.

demonstrate "both substantial government involvement in the offense and a passive role by the defendant"); United States v. Blood, 435 F.3d 612 (6th Cir. 2006) ("To establish outrageous government conduct a defendant must show that "the government's involvement in creating his crime (*i.e.,* the means and degrees of inducement) was so great that a criminal prosecution for the crime violates the fundamental principles of due process.") (quotations omitted); United States v. Garcia, 411 F.3d 1173 (10th Cir. 2005) ("To succeed on an outrageous conduct defense, the defendant must show either (1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime.") (quotations omitted).

In one of the few cases cited by defendant where the outrageous governmental conduct stems from something other than governmental participation in the charged crime, the court is careful to delineate the appropriate contours of the claim. In United States v. Boone, 437 F.3d 829, 841-42 (8th Cir. 2006), the defendant argued that the attempted murder charge against her should have been dismissed due to the outrageous government conduct of an FBI agent. Defendant claimed that she was threatened, intimidated, verbally abused, and subjected to other inappropriate conduct by the FBI agent during the investigation of the crime and the subsequent arrest. The court held "the rule that outrageous government conduct can foreclose criminal charges has been applied by our court almost exclusively to situations involving entrapment, where law enforcement officers have sought to create crimes in order to lure a defendant into illegal activity that she was not otherwise ready and willing to commit." Id. at 842 (quotations omitted). The court concluded that since defendant "has not even alleged that any government official had engaged in such conduct [in the case at bar, defendant] has not shown any due process bar to her attempted murder conviction." Id.

Mr. Padilla's failure to cite caselaw where outrageous government conduct claims are premised upon post-arrest abuse of the defendant is of no small moment. In Boone, the Eighth

7

Circuit echoed the holdings of its sister circuits by articulating that in order to invoke an outrageous government conduct claim, the government need first involve itself in the criminal scheme along with the defendant.  This makes practical sense since the claim itself is borne out of due process concerns.  See, Russell, 411 U.S. at 431-32.  Thus, a law enforcement officer may be behaving 'outrageously' in certain instances where her over-involvement in a criminal enterprise  "violates fundamental fairness" or is "shocking to the universal sense of justice."  On these occasions, due process concerns could preclude prosecution of the very claim in which the governmental agent was overzealously embroiled.  Thus, courts have noted, that in the rarest of circumstances, if it was  impossible to extract the objectionable governmental conduct from the crime, the prosecution may need to be stymied.

Mr. Padilla's claim does not present this scenario.  Padilla claims that his charges should be dismissed due to  outrageous governmental conduct perpetrated after the commission of his alleged crimes.  Padilla seeks this relief despite the fact that the objectionable conduct occurred during his military detention in connection with his enemy combatant status.  Padilla's argument contains numerous legal infirmities.

First, the fact that the governmental conduct occurred at a time and place removed from the crimes charged makes the remedy Padilla is seeking considerably more attenuated and arbitrary.  Short of resorting to a 'two wrongs make a right' judicial process, it is difficult for this Court to ascertain how the remedy sought emanates from the infirmity defendant describes.  This is considerably distinguishable from a government entrapment scenario, where the crime that the defendant is charged with is the crux of the outrageous government conduct claim.[7]

---

[7] An indictment may also be dismissed upon a sufficient showing of prejudice within the prosecutorial misconduct context.  See United States v. Acceturo, 858 F.2d 679 (11th Cir. 1988).

8

Second, the outrageous conduct occurred while Padilla was under military control at the Naval Brig in Charleston, South Carolina. At this time, Padilla was being held under Presidential orders in connection with his enemy combatant status and had not been charged with the crimes he is currently facing. This further attenuates Padilla's outrageous government conduct claim. Even if Padilla's due process rights were violated while being held at the Naval Brig as an enemy combatant, he fails to explain how this violation should result in the dismissal of distinct crimes that he was not charged with at that point.[8]

Third, Mr. Padilla fails to explain why suppressing governmental use of any evidence obtained from him at the Naval Brig is insufficient for purposes of this trial. In his motion, Padilla acknowledges that the government has already averred not to seek introduction of any of the Naval Brig evidence at trial.[9] Despite summarily rejecting this remedy as "clearly inadequate," Padilla fails

---

Prosecutorial misconduct is analogous to claims of outrageous government conduct premised on entrapment or government participation in the defendant's crime. In both instances, government action has prejudiced defendant with respect to the charges he is attempting to dismiss. Conversely, Mr. Padilla's claim focuses on governmental conduct that is not necessarily related to the charges he is facing and does not prejudice him in this prosecution. Although the pleadings cite to cases covering prosecutorial misconduct, Mr. Padilla has made no claim to this effect.

[8] Taken to its logical extreme, this rationale would effectively provide a defendant with amnesty for any uncharged crime so long as the government violated that defendant's due process rights at some prior point. This erroneous recitation clearly misconstrues the law regarding the outrageous government conduct doctrine as well as defendant's due process rights.

[9] Counsel for the government has stated to this Court in a number of contexts that the Naval Brig events are irrelevant to this criminal prosecution. The government has even sought to exclude all references to events at the Naval Brig. See Government's Motion *In Limine* to Exclude Evidence and Argument Regarding the Circumstances of Defendant Padilla's Pre-Indictment Detention as an Unlawful Enemy Combatant [D.E. 675]. However, the government has not agreed to absolutely preclude referencing Naval Brig events at trial. The government has stated, that should Mr. Padilla testify at trial, Padilla's Naval Brig statements may be offered as impeachment evidence. The Court has yet to rule on the government's motion to exclude Naval Brig evidence at trial. However, should any Naval Brig statements be introduced at trial, for impeachment or otherwise, the circumstances surrounding the making of the statements may be relevant and hence admissible.

to support this contention or explain why his requested remedy is more appropriate.[10] In fact, in his motion, Padilla relies heavily on United States v. Toscanino, 500 F.2d 267 (2d. Cir. 1974),[11] a case where the Second Circuit sanctions this very approach. Padilla's Motion concedes that "the court in Toscanino noted that many cases involving due process violations center on unlawful government

---

[10] This Court's holding does not imply that this is Mr. Padilla's only remedy with regard to any alleged mistreatment at the Naval Brig, only that it is the most appropriate remedy within the framework of this prosecution. Mr. Padilla is free to institute a Bivens action, an action for monetary damages or any other form of redress that he is legally entitled to pursue.

[11] Mr. Padilla's reliance on Toscanino is misplaced. Most importantly, the Supreme Court and the Eleventh Circuit have never adopted Toscanino's holding and have been particularly reticent to retreat from the Court's longstanding 'Ker-Frisbie' doctrine. See Gerstein v. Pugh, 420 U.S. 103, 119 (1975) (refusing to retreat from "the established rule that illegal arrest or detention does not void a subsequent conviction"); United States v. Crews, 445 U.S. 463, 474 (1980) ("Respondent himself is not a suppressible 'fruit' and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt . . ."); United States v. Darby, 744 F.2d 1508, 1530-31 (11th Cir. 1984) (noting that the Eleventh Circuit has never adopted Toscanino's holding and observing that "the continuing validity of the Toscanino approach is questionable [in light of subsequent Supreme Court caselaw]"); United States v. Matta, 937 F.2d 567 (11th Cir. 1991) (citing Darby to foreclose defendant's attempt to dismiss charges based on extreme governmental misconduct and endorsing the view that due process violations should be remedied not by divestiture of jurisdiction, but rather by an injunction or money damages). Additionally, Toscanino does not apply to the facts in this case. The Supreme Court's 'Ker-Frisbie' rule states that due process is limited to the guarantee of a fair trial, regardless of the method by which *jurisdiction* was obtained over the defendant. Toscanino, citing due process concerns and the exclusionary rule for support, carved out an exception to 'Ker-Frisbie' and held that due process requires a court to "divest itself of jurisdiction over the person of the defendant *where it has been acquired* as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights." Toscanino, 500 F.2d at 275 (emphasis added). The court reasoned that "when an accused is kidnapped and forcibly brought within the jurisdiction, the court's acquisition of power over his person represents the fruits of the government's exploitation of its own misconduct." Id. The court makes it clear that its decision is premised on denying the government the fruits of their exploitative conduct. Since in this case, the fruit of the government's exploitation was the illegally obtained jurisdiction over the defendant, the remedy was divestiture of that jurisdiction. Since he does not contest the government's jurisdiction, Mr. Padilla's case is considerably distinguishable . Mr. Padilla's claim of outrageous governmental conduct stems out of his military detention in connection with his status as an enemy combatant. Thus, unlike the defendant in Toscanino any fruits of the government's unlawful conduct can be adequately suppressed by preventing their admission at trial. Accordingly, regardless of the current validity of Toscanino, it is inapplicable here.

10

acquisition of evidence and that, in those instances, the proper remedy would be the exclusion of the tainted evidence." Def. Mot. at 11.

Mr. Padilla fails to present a cognizable claim of outrageous government conduct entitling him to dismissal of the indictment.[12] The objectionable conduct Padilla claims violated his due process rights occurred during his military detainment in isolation of the crimes charged. Padilla also fails to adequately explain why excluding any unlawfully obtained evidence would not be an appropriate remedy in this case. Applying the exclusionary rule to bar inclusion of any illegally obtained evidence would sufficiently satisfy due process concerns. This may ultimately be a moot point since the government has averred not to utilize any Naval Brig evidence in its case. However, should the government decide to make use of any such evidence, an appropriate hearing will be scheduled to determine to what extent it is admissible.

---

[12] This Court makes no finding with regard to Mr. Padilla's treatment at the Naval Brig. By stating that Mr. Padilla has failed to state a claim of 'outrageous government conduct,' the Court is merely rejecting the merits of Mr. Padilla's legal argument. Within the framework of this Order, the phrase 'outrageous government conduct' should be interpreted as a legal term of art and not defined in a conventional sense.

## IV.    CONCLUSION

For the reasons set forth above, it is hereby**:**

**ORDERED and ADJUDGED** that Defendant Padilla's Motion to Dismiss for Outrageous Government Conduct [D.E. 597], filed on October 5, 2006 is **DENIED**.

**DONE AND ORDERED** in Chambers at the United States District Courthouse, Miami, Florida, this 9th day of April, 2007.

_____
MARCIA G. COOKE
United States District Judge


Copies furnished to:   *All Counsel of Record*