UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 04-60001-CR-COOKE(s)(s)(s)(s)(s)

UNITED STATES OF AMERICA,

       Plaintiff,

v.

JOSE PADILLA,

       Defendant.

_____/

## JOSE PADILLA'S SENTENCING MEMORANDUM

For over 12 years, Jose Padilla has languished in solitary confinement. For the first three years of this unprecedented confinement, our government refused to charge him with any crime. When the government finally brought him to federal criminal court, the evidence revealed that he played a lesser role in the charged  crimes than what the public believed.  Since the time of his original detention, Jose has been the subject of both civil and criminal cases in our federal courts. As legal proceedings have swirled around him, our government has subjected Jose to extraordinarily harsh conditions of solitary confinement and isolation. Notwithstanding, Jose has been respectful and humble in the face of these significant deprivations.  Through this Memorandum, the defense respectfully requests that this Court impose a fair and reasonable sentence in this case that fulfills this Court's statutory directive under 18 U.S.C. § 3582 to impose a sentence that is "sufficient, but not greater than necessary" to achieve Congress's goals of sentencing.

1

I.      **Case History**

Years before the verdict and sentencing, on May 8, 2002, Jose was arrested in Chicago, Illinois as a material witness.  He was thereafter transferred to a civilian jail in New York. On June 9, 2002—two days before Jose's motion to vacate the material witness warrant was to be heard—President George W. Bush declared Jose to be an "enemy combatant," and military officials seized him from the civilian jail and transported him to the Consolidated Naval Brig in Charleston, South Carolina (hereinafter "Brig").

Two days after Jose's transfer to military custody, on June 11, 2002, his counsel filed a petition for a writ of *habeas corpus* in the Southern District of New York, challenging that detention. *See Padilla v. Bush*, 233 F. Supp. 2d 564 (S.D.N.Y. 2002) ("*Padilla I* "). The district court denied the petition, upholding the President's authority to detain Jose, but a divided panel of the Second Circuit reversed. *See Padilla v. Rumsfeld*, 352 F.3d 695 (2d Cir. 2003) ("*Padilla II* "). The Supreme Court vacated *Padilla II* on technical grounds, ruling that Jose's petition should have been filed in South Carolina where he was being held. *See Rumsfeld v. Padilla*, 542 U.S. 426, 451, 124 S. Ct. 2711 (2004) ("*Padilla III* ").

On July 2, 2004, Jose refiled his *habeas* petition in the District of South Carolina. The district court granted Jose's petition, holding that he could not be held as an enemy combatant because he had been detained in the United States. *See Padilla v. Hanft*, 389 F. Supp. 2d 678 (D. S.C. 2005) ("*Padilla IV* "). The Fourth Circuit Court of Appeals reversed, upholding the President's authority to detain Jose under the Authorization for Use of Military Force. *See Padilla v. Hanft*, 423 F.3d 386 (4th Cir. 2005) ("*Padilla V* ").

Jose promptly petitioned for *certiorari* in the Supreme Court.  Approximately two months

after the Fourth Circuit's ruling – while Jose's petition for *certiorari* was pending in the Supreme Court – the government unsealed the instant indictment here in the Southern District of Florida and petitioned the Fourth Circuit to vacate *Padilla V* and authorize Jose's removal into civilian custody.[1] When the Fourth Circuit denied the government's request, *see Padilla v. Hanft*, 432 F.3d 582 (4th Cir.2005) ("*Padilla VI* "), the Supreme Court directly authorized the transfer, *see Hanft v. Padilla*, 546 U.S. 1084, 126 S. Ct. 978 (2006) ("*Padilla VII*"). The Supreme Court ultimately denied *certiorari* on Jose's habeas claim, concluding that such a constitutional challenge to Jose's military detention no longer presented a live case or controversy because he had been transferred to civilian custody. *See Padilla v. Hanft*, 547 U.S. 1062, 126 S.Ct. 1649 (2006) ("*Padilla VIII* ").

While the government maneuvered to evade Supreme Court review of Jose's case, the government engaged in a systematic regime of deprivation during Jose's imprisonment and interrogation at the Brig. This plan has been described in previous court filings and will be discussed below. *See, e.g.,* PADILLA'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT (DE 597) (describing torture). As for the interrogations, the government saved eighty-eight videotapes of Jose's interrogations while he was suffering this torture. As the Court knows, the DVD showing Jose's "final interrogation" at the Brig was "lost" and never disclosed to the defense. February 22, 2007 Transcript at p.187 and February 26, 2007 Transcript at p. 228.

After this "final interrogation" occurred, Jose was added to an indictment that included charges against Adham Amin Hassoun, Mohamed Hesham Youssef, and Kifah Wael Jayyousi. DE

---

[1] Despite Jose's removal into civilian custody for the prosecution of this case "nothing prevents the Executive from returning to the road it earlier constructed and defended." *Padilla v. Hanft,* 547 U.S. 1062, 126 S. Ct. 1649 (mem.) (2006) (Ginsburg, J., dissenting). In other words, the government never has disavowed that once Jose is released from civilian custody that he will not be returned to military custody as an "enemy combatant."

141 (Superseding Indictment). The indictment contained 11 counts. *Id*. Jose was charged in three counts: (1) conspiracy, in violation of 18 U.S.C. § 956(a), to murder, kidnap or maim outside the United States; (2) conspiracy, in violation of 18 U.S.C. § 371, to provide and conceal material support to a § 956 conspiracy to commit murder, kidnap or maim; and, (3) providing or concealing material support, in violation of 18 U.S.C. § 2339A. *Id*. Jose, Hassoun, and Jayyousi were tried on only these three counts. *See* DE 1179 & 1333.

Prior to trial, Jose filed a SEALED MOTION FOR COMPETENCY HEARING and a MOTION FOR ORDER OF COMPETENCY TO STAND TRIAL that involved the government's treatment of him at the Brig. DE 644-645, 716. Subsequent to these motions and the government responses, this Court ordered a competency evaluation. DE 730. The Court conducted a competency hearing in February of 2007. DE 884, 885, 887.

During the competency hearing, this Court limited the defense from introducing evidence of the government's treatment of Jose while he was imprisoned at the Brig. *See* DE 853 (PADILLA'S MOTION TO INTRODUCE CLASSIFIED INFORMATION AT COMPETENCY HEARING) and February 26, 2007 Transcript at p. 228 (court stating that competency determination only concerned Jose's "present state of mind."). After the hearing, this Court found Jose competent to stand trial and pointedly made no findings regarding his confinement at the Brig. DE 888; February 28, 2007 Transcript at p.7.

Prior to trial, the defense also filed a MOTION TO DISMISS the Indictment based upon the outrageous government conduct that occurred at the Brig. DE 597. This Court "accept[ed] [Jose's] allegations as true," made no findings regarding these allegations, and denied the motion as a matter of law without an evidentiary hearing. DE 969:6.

4

Following a trial that spanned roughly five months, Jose, Jayyousi, and Hassoun were each convicted of Counts One, Two, and Three. DE 1193. This Court sentenced Jose to 208 months' imprisonment on Count One; concurrent terms of 60 months on Count Two and 180 months on Count Three; 20 years supervised release on Counts One and Three; and a concurrent three years on Count Two. DE 1333; DE 1373:19-20.

The Court sentenced Jayyousi to 152 months' imprisonment and Hassoun to 188 months' imprisonment. DE 1357 & 1335. While the government cross-appealed Jose's sentence, the government did not challenge Jayyousi or Hassoun's sentences on appeal. As a result, their sentences are final and their release dates are soon:

- Jayyousi's release date is September 15, 2017; and

- Hassoun's release date is October 10, 2017.

*See* Federal Bureau of Prisons Inmate Locator, available at http://www.bop.gov/inmateloc/ (last visited September 3, 2014). Therefore, Jose's co-defendants, the more culpable participants in these offenses, will be released from prison in about three years, after being detained for less time than Jose, and under conditions that pale in comparison to those to which the government has subjected Jose.

Jose appealed his convictions, and the government cross-appealed his sentence. In a sharply divided opinion, the Eleventh Circuit Court of Appeals upheld his convictions and vacated his sentence. *United States v. Padilla*, 657 F.3d 1085 (11th Cir. 2011) (hereinafter "*Padilla*"). The Court concluded that Jose's sentence was substantively unreasonable because "it does not adequately reflect his criminal history, does not adequately account for his risk of recidivism, was based partly on an impermissible comparison to sentences imposed in other terrorism cases, and was based in part

5

on inappropriate factors." *Id*. at 1117. Judge Barkett vigorously dissented and asserted that the majority simply disagreed with this Court's weighing of the § 3553(a) factors and "simply substitute[d]" their sentencing judgment for that of this Court. *Id*. at 1135 (Barkett, J, dissenting).[2] Ultimately, the Court remanded for re-sentencing.

## II.    18 U.S.C. § 3353(a)

The § 3553(a) factors are well-known to this Court but are recounted here:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed–

   (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (B)    to afford adequate deterrence to criminal conduct;

   (C)    to protect the public from further crimes of the defendant; and

   (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the advisory Guideline range;

(5)    any pertinent policy statements issued by the Sentencing Commission;

(6)    the need to avoid unwarranted sentence disparities; and

(7)    the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

The Supreme Court has stated, on more than one occasion, that a sentencing court may, through the consideration of the § 3553(a) factors, tailor the sentence to the individual defendant. *See, e.g.,*

---

[2] In a subsequent and unrelated case, another Eleventh Circuit judge has remarked, citing *Padilla* and other cases, that the Court of Appeals has shown greater deference to trial courts that vary upward as opposed to those who vary downward and that the different approaches have the potential of eroding public trust in the work of the Court. *See United States v. Early*, 686 F.3d 1219, 1223-25 (Martin, J., concurring).

*Pepper*, 131 S. Ct. at 1241; *Kimbrough v. United States*, 552 U.S. 85, 101, 128 S. Ct. 558, 570 (2007).

Moreover, this Court is required to follow the decree in the "parsimony provision" contained at the outset of § 3553(a). This provision mandates that the Court impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of § 3553(a)(2). *Talley*, 431 F.3d at 786. Therefore, this Court's task is to "consider" the seven listed factors contained in § 3553(a), and then to employ those considerations in arriving at a sentence that is sufficient but not greater than necessary to accomplish the purposes of sentencing listed in § 3553(a)(2). Notably, the "weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court." *United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007) (quotation omitted).

## A.   Avoiding Unwarranted Sentence Disparities: Relative Culpability and the Sentences Imposed upon the Co-Defendants.

In determining Jose's sentence, this Court should consider his relative culpability as compared to Jayyousi and Hassoun, who received sentences of 152 and 188 months' imprisonment, respectively. Jayyousi and Hassoun's sentences are final, and this Court should consider the relative culpability of these men in determining Jose's sentence. *See, e.g*, *United States v. Aybar*, 446 F. App'x 221 (11th Cir. 2011) (affirming below guideline sentence based upon defendant's physical health and his relative culpability compared to his convicted co-conspirators); *see also United States v. Grigsby,* 692 F.3d 778, 792 (7th Cir. 2012) (district court's discretion in evaluating the § 3553(a) factors allows the court to consider co-defendant disparities within a particular case); *United States v. Martinez,* 610 F.3d 1216, 1228 (10th Cir. 2010) (under *Gall* court may compare co-defendant disparity); *United States v. Simmons*, 501 F.3d 620, 624 (6th Cir. 2007) ("district judge . . . *may* exercise his or her discretion and determine a defendant's sentence in light of a co-defendant's

7

sentence"). There are a number of factors a court should consider in assessing relative culpability: a defendant's (1) role in the case; (2) reliance upon others to participate in the offense and the extent to which he was manipulated by other participants; (3) education and sophistication; and (4) prior criminal history.

The evidence demonstrates that Jose played an extremely limited role in the particular conspiracy at issue in this case and certainly the global Salafi jihad movement alleged in the indictment. In the scheme of the global movement the government depicted at trial, Jose clearly is an inconsequential figure. This is in contrast to other defendants who have been convicted of providing material support to al Qaeda. *See, e.g., United States v. Abu Ali*, 528 F.3d 210, 222-23 (4th Cir. 2008) (defendant suggested to be the leader of al Qaeda cell with specific targets and schemes that could be carried out in the United States, including assassinations and kidnappings of members of the United States Senate, the United States Army, and the President). Jose's trial revealed his lack of responsibility for directing the conspiracy, his attenuated relationship to Hassoun and his non-existent relationship to Jayyousi, his complete ignorance of the defined objectives or operations planned by the conspiracy, his lack of sophistication, and ultimately his lesser culpability as compared to other members of the conspiracy,

Next, as the Court remarked at the outset of the original sentencing, Jose, unlike Jayyousi and Hassoun, does have a criminal record, and this certainly should be considered. But the remaining second and third factors demonstrate that Jose is much less culpable than either of his co-defendants. Both Jayyousi and Hassoun were raised Muslim, are highly educated, world-traveled, and politically sophisticated. Furthermore, both Jayyousi and Hassoun, unlike Jose, exerted significant control, management, and influence in the commission of the charged offenses. Jose, by contrast, was a

recent convert to Islam, stopped attending school in the seventh grade, and was working at local fast food restaurants prior to moving to Egypt.

Jayyousi, born in Jordan, eventually moved to and graduated college here in the United States and then joined the United States Navy. DE 1281:6. Subsequently, he earned his Ph.D. in civil engineering. *Id.* Professionally, Jayyousi was the Deputy Superintendent for two school districts — Detroit and Washington, D.C. — and also consulted for the United States Army Corps of Engineers. *Id.* at 7.

As for his activities related to the charges, Jayyousi founded the American Islamic Group ("AIG") and took over American Worldwide Relief Organization ("AWR") after the death of Mohamed Zaky. June 4, 2007 Transcript at pp. 58, 72, 122-23 & GX 216, 800(o) 801, 802, and 803. Jayyousi operated a sophisticated organization using both AIG and AWR as covers to purchase supplies for the mujahideen. *Id.* at 83-87, 89,112 & GX 206F, 207F, 800. He also published "The Islam Report," a newsletter that promoted violent jihad. *See, e.g.*, PSI at ¶ 19.

Jayyousi had significant managerial and supervisory responsibility here in the United States and overseas. For example, as the government recognizes, Jayyousi "managed and supervised the activities of Salwa Shishani and Wiam Azhak, who manned the AWR offices in New Jersey and Baku, Azerbaijan, respectively." DE 1280:28 (Government's sentencing memorandum)."Salwa Shishani is the daughter of Sheikh Fat'hi Shishani, a mujahideen commander in Chechnya. She was a connecting link between the Chechen mujahideen and AWR and was aware of the needs of the mujahideen. The satellite phones purchased by Jayyousi were shipped to Salwa Shishani in New Jersey for forwarding to the mujahideen in Chechnya. " DE 1280:28 (citing GX 203, JE 112, GX 204, GX 800). These contacts show the depth of Jayyousi's sophistication and involvement in the

instant offense.

As for Hassoun, he worked for many years as a computer programmer here in South Florida. At the same time, Hassoun was the East Coast representative for AIG and AWR. He assisted in distributing "The Islam Report" and "Nida'ul Islam," two publications promoting violent jihad. He recruited fighters and conducted fundraising. The government contended that Hassoun

> represented at least six (6) mujahideen organizations, including Maktab al Khidimat (MAK) (the predecessor to al Qaeda), the mujahideen platoon in Bosnia, and Gulbuddin Hekmatyar's mujahideen party (Hizb-e-Islami) in Afghanistan. Hassoun would frequently seek to enroll mosque congregates as mujahideen. Once enrolled in the cause, Hassoun would continue to exert control and influence over his recruits by directing their activities and supporting them financially.

DE 1280:29 (citing GX 69, GX 711 & May 31, 2007 Transcript at pp. 50, 75)

By contrast, Jose had very little education and supported himself by working at various fast food restaurants. Furthermore, as a recent convert to Islam, he certainly did not have the depth of knowledge about the religion that Jayyousi or Hassoun possessed. Jose did, however, take the study of his new religion seriously. In the course of the government's investigation, the FBI interviewed numerous congregants at the mosques Jose attended and uniformly these witnesses stated that Jose was quiet, studious, and respectful. He also worked at the mosque by washing dishes and cleaning up after services. DE 1121:83-85.

In assessing relative culpability, the recruiting context is important. The government's expert, Dr. Rohan Gunaratna, testified that the leaders of the jihad movement – like Jayyousi and Hassoun — manipulate young men and women to believe that jihad is a defensive fight against those who would unlawfully murder Muslims. July 2, 2007 Transcript at p. 114. He further stated: "[t]hey must project their fight as a defensive fight, otherwise they would have no support." *Id.* Moreover, leaders of the jihad movement "corrupted, misinterpreted and misrepresented the tenets of the Islamic

10

religion to try to gain support . . . ." *Id*. at pp. 114-15. Indeed, Dr. Gunaratna agreed that the leaders of these movements "duped or tricked or cheated ordinary Muslims into giving them money or to participate in activities" and in many cases "take advantage" of the true faith of these recruits. July 9, 2007 Transcript at p. 97.

The record evidence at trial is replete with Hassoun and Jayyousi's manipulation, control, and influence. For example, Herbert Atwell testified at length about Hassoun's recruitment strategy. Atwell testified that, based upon Hassoun's pitch, he believed that he had a duty as a Muslim to "defend" other Muslims who were "under attack" and that he did not believe he was being recruited for terrorism. May 31, 2007 Transcript at pp. 69, 75.

In particular, Hassoun brought speakers to the mosque who addressed the congregation, including Jose, about "terrible suffering that Muslims were experiencing in other parts of the world." *Id*. at 31. When Hassoun himself spoke about the atrocities he would speak with much emotion and would often cry. *Id*. at 32. Hassoun would play footage for the congregation that reported, for example, Muslim girls being raped and brutalized in Chechnya. *Id*. at 31. Hassoun then would encourage the young men at the mosque to become mujahideen fighters, and Hassoun would bring other speakers to the mosque to provide the same type of encouragement. *Id*. at 16-17. In their recruitment pitches, Hassoun and these other speakers would state these men had a "Muslim duty" or "religious obligation" to protect and defend other Muslims who were being attacked in other parts of the world. *Id*. at p. 18, 25. Their obligation was to "defend and protect" other Muslims, including those girls being raped and brutalized in Chechnya. *Id*. at 26.

Another government witness, Yayha Goba, confirmed the belief that many young Muslim men had at the time thought they had a religious duty to defend Muslims who were under attack.

May 31, 2007 Transcript. at p. 64. Goba knew, like many others, that atrocities were being committed against Muslims in Chechnya. *Id*. at 139-40. In fact, Goba conceded that he had nightly youth meetings at his house in Lackawanna where he would discuss the religious obligation to defend Muslims who were suffering these atrocities. *Id*. at 143. This is particularly important because Goba, unlike Jose, was born and raised a Muslim and had a more sophisticated understanding of his religion.

Jayyousi, for his part, manipulated Jeremy Collins who worked as a clerk for both AIG and AWR. According to the government, "Jayyousi hid the true purpose of his criminal activities from Collins by maintaining the facade of relief work." DE 1280 (Government's sentencing memorandum at p. 28 (*citing* June 4, 2007 Transcript at pp. 87-88, 90, 117)).

Sadly, the concerns and outrage expressed by Hassoun and Jayyousi as to the atrocities being committed against Muslims in Chechnya were not overstated. For example, there can be no dispute that summary executions, rape, looting and other attacks on civilians during the military campaign by Russian forces. *See, e.g.*, DE 1278 Hassoun Sentencing Memorandum at pp. 3-5.

Like many, Jose turned to religion to provide answers, guidance, and solace after a troubled and turbulent childhood and young adulthood. By all accounts, Jose thrived while studying Islam, attending and working at the mosque. Unfortunately for him, while at the mosque, he listened to Adham Hassoun, an older, more sophisticated man who lectured and preached that all Muslims had a duty to defend other Muslims who were under attack. Blending the truth with lies, Hassoun manipulated Jose for his own ends.

After viewing the above evidence in the context of the factors this Court must consider when determining relative culpability, it is clear that Jose was significantly less culpable than both

Jayyousi and Hassoun. Compared to his co-defendants, who carried impressive educational and professional pedigrees, Jose was unsophisticated and relatively uneducated. Although Jose does have a significant criminal history, the totality of the factors clearly support a finding that Jose is less culpable than his co-defendants, whose sentences should be considered by this Court to avoid unwarranted sentencing disparity.

### B.      History of Jose: Confinement at the Brig

Unlike Hassoun or Jayyousi, the government systematically isolated Jose before turning him over to civilian authorities in this case. As previously noted, on May 8, 2002, Jose was arrested in Chicago, Illinois, as a material witness. The government thereafter transferred Jose to a civilian jail in New York. On June 9, 2002—two days before Jose's motion to vacate the material witness warrant was to be heard— President Bush declared Jose to be an "enemy combatant," and military officials seized him from the civilian jail and transported him to the Brig. While at the Brig, the government subjected Jose to numerous violations of his basic constitutional and human rights: indefinite and incommunicado detention; denial of access to counsel; denial of contact with his family; interference with his practice of religion; and imposition of a physical and psychological environment designed to maximize his disorientation, discomfort, hopelessness, and despair.

These conditions of Jose's confinement are demonstrated by the logs and records maintained by Brig personnel. Moreover, given that the government's "loss" of the DVD showing Jose's "final interrogation" at the Brig as it relates to the conditions of his confinement, the defense is entitled to an inference that further corroborating evidence bearing on his harsh treatment at the Brig existed.

After the government removed Jose to the Brig, two years passed before anyone beyond the Brig's doors heard from Jose. During that time, the government placed him in solitary confinement

and permitted no contact with counsel, courts, or family—aside from a single short message to his mother (after ten months) informing her that he was alive. Although Jose was actively represented by defense counsel during this time, once President Bush designated him an enemy combatant and ordered his detention at the Brig, he was immediately cut off from his legal representatives, denied any opportunity to personally challenge his status, the conditions of his confinement, or the violation of his rights. *See* Declaration of Vice Admiral Lowell E. Jacoby, USN, Director of the Defense Intelligence Agency (Jan. 9, 2003) ("JACOBY DECLARATION") (attached as Exhibit 1).

His only human interaction was with interrogators or with guards delivering food through a slot in the door or standing watch when he was allowed to shower. While incarcerated at the Brig, the windows of Jose's cell were blackened. He was alternately subjected to prolonged periods of constant light and complete darkness. He was unable to fulfill his religious obligation to pray five times a day. Removal from his cell entailed additional sensory deprivation, with black-out goggles and soundblocking earphones.

All outside information—papers, radio, television—was prohibited, and his Koran was confiscated. Jose was denied a mattress, blanket, sheet, and pillow, left with only a steel slab upon which to sleep. His efforts at rest were hindered by deliberate banging, glaring artificial light, noxious odors, and extreme temperature variations.

Jose was interrogated for long periods. He was screamed at, shaken – assaulted. Interrogators injected Jose with substances represented to be truth serums, shackled him for hours in excruciating "stress" positions, threatened to transfer him to a foreign country or Guantanamo where, he was told, he would be subjected to far worse treatment, and even threatened to kill him.

For a significant period, from June 9, 2002, until March 2, 2004, the government denied Jose

all access to counsel. The government argued that Jose should not be allowed to see a lawyer because he might pass illicit communications through his attorney. The government also asserted that allowing Jose access to counsel or to learn that a court was hearing his case could provide him with the expectation that he would some day be released:

> Only after such time as Padilla has perceived that help is not on the way can the United States reasonably expect to obtain all possible intelligence information from Padilla . . . Providing him access to counsel now . . . would break – probably irreparably – the sense of dependency and trust that the interrogators are attempting to create.

JACOBY DECLARATION, p. 8.

In an effort to force Jose's "dependency and trust," the government mistreated him for nearly the entire three years and eight months of his unlawful detention. The mistreatment took myriad forms, each designed to cause pain, anguish, depression and, ultimately, the loss of will to live. The base ingredient in Jose's mistreatment was stark isolation for a substantial portion of his captivity. For nearly two years, Jose was in complete isolation. Even after he was permitted contact with counsel, his conditions of confinement remained essentially the same. He was kept in a unit comprising sixteen individual cells, eight on the upper level and eight on the lower level, where Jose's cell was located. No other cells in the unit were occupied. His cell was electronically monitored twenty-four hours a day, eliminating the need for a guard to patrol his unit. His only contact with another person was when a guard would deliver and retrieve trays of food and when the government desired to interrogate him.

His isolation, furthermore, was aggravated by the efforts of his captors to maintain complete sensory deprivation. His tiny cell – nine feet by seven feet – had no view to the outside world. The door to his cell had a window, however, it was covered by a magnetic sticker, depriving Jose of even

a view into the hallway and adjacent common areas of his unit. He was not given a clock or a watch and for most of the time of his captivity, he was unaware whether it was day or night, or what time of year or day it was.

A substantial quantum of mistreatment endured by Jose came at the hands of his interrogators. In an effort to disorient Mr. Padilla, his captors would deceive him about his location and who his interrogators actually were. Jose was threatened with being forcibly removed from the United States to another country, including to the U.S. Naval Base at Guantanamo Bay, Cuba, where he was threatened his fate would be even worse than in the Naval Brig. He was threatened with being cut with a knife and having alcohol poured on the wounds. He was also threatened with imminent execution. He was hooded and forced to stand in stress positions for long durations of time. He was forced to endure exceedingly long interrogation sessions, without adequate sleep, wherein he would be confronted with false information, scenarios, and documents to further disorient him. Often he had to endure multiple interrogators who would scream, shake, and otherwise assault Mr. Padilla. Additionally, Jose was given drugs against his will, which he was allowed to believe were some form of lysergic acid diethylamide (LSD) or phencyclidine (PCP), to act as a sort of truth serum during his interrogations.

The deprivations, mental and physical abuse, and other forms of inhumane treatment visited upon Jose caused serious medical problems that have never been addressed. Apart from the psychological damage done to Jose, there were numerous health problems brought on by the conditions of his captivity. He suffered pain and was denied medicine to relieve the pain. Jose frequently experienced cardiothoracic difficulties while sleeping or attempting to fall asleep, including a heavy pressure on his chest and an inability to breath or move his body.

16

In one incident, Jose felt a burning sensation pulsing through his chest. He requested medical care but was given no relief. Toward the end of his captivity, Jose experienced swelling and pressure in his chest and arms. He was administered an electrocardiogram and given medication; however, Jose ceased taking the medicine when it caused him respiratory congestion. Although Jose was given medication in this instance, he was often denied medication for pain relief. The strain brought on by being placed in stress positions caused Jose great discomfort and agony. Many times he requested some form of pain relief but was denied it by the guards.

The cause of some of the medical problems experienced by Jose is obvious. Being cramped in a tiny cell with little or no opportunity for recreation and enduring stress positions and shackling for hours caused great pain and discomfort. It is unclear, though, whether Jose's cardiothoracic problems were a symptom of the stress he endured in captivity or a side effect from one of the drugs involuntarily induced into Jose's system in the Naval Brig. In either event, the strategically applied measures suffered by Jose at the hands of the government caused him both physical and psychological pain and agony.

It is worth noting that throughout his captivity, none of the restrictive and inhumane conditions visited upon Jose were brought on by his behavior or by any actions on his part. There were no incidents of Jose violating any regulation of the Naval Brig or taking any aggressive action towards any of his captors. Jose has always been peaceful and compliant with his captors. He was, and remains to the time of this filing, docile and resigned.

In sum, many of the conditions Jose experienced were inhumane and caused him great physical and psychological pain and anguish. Other deprivations experienced by Jose, taken in isolation, are merely cruel and some, merely petty; however, it is important to recognize that all of

the deprivations and assaults recounted above were employed in concert in a calculated manner to cause him maximum anguish and to "break" him. As is evident to anyone who has had any contact with Jose in the ensuing years, Jacoby succeeded.

A downward variance is appropriate based upon the mistreatment that Jose suffered at the hands of his own government. Jose's assertion that he was mistreated is, by any definition, unassailable. Through a substantial portion of his detention in the Naval Brig, Jose was subjected to prolonged and substantial physical and mental pain. He was assaulted, threatened with imminent death, and subjected to myriad other deprivations during his captivity at the Naval Brig while being subjected to cruel interrogations.

The most painful and damaging form of the mistreatment experienced by Jose, however, was the extreme isolation he suffered aggravated by the deprivation of sensory stimuli and sleep. The lack of human contact and isolation has caused Jose deep emotional and psychological injury.  Indeed, in the expert opinion of Dr. Stuart Grassian, a recognized expert on the psychiatric effects of solitary confinement, Jose "suffered prolonged severe mental pain and suffering" as a result of his solitary confinement at the Brig. DE 897 (Attached as Exhibit 2). This is not surprising. The government's own documents, discussed above, the enforced isolation, as well as the denial of access to legal counsel, process, and communication with his family, were calculated deprivations designed to render him hopeless and vulnerable to interrogators. *See* JACOBY DECLARATION.[3]

---

[3] The Supreme Court ruled in *Hamdi v. Rumsfeld*, 542 U.S. 507, 518, 538 124 S. Ct. 2633, 2640, 2652 (2004) that a citizen of the United States, detained as an enemy combatant has a due process to right to challenge his status before an impartial authority. Justice O'Connor, writing for a plurality, stated that a citizen enemy combatant "unquestionably has the right to access to counsel in connection with the proceedings," and must be treated humanely and may be detained only in a setting "'devoid of all penal character.'" These principles clearly were violated with regard to Jose's detention at the Brig.

Importantly, these deprivations were not a consequence of Jose's behavior or any misbehavior by him. Nor were these the normal inconvenience of prison life. Rather, as the government's own documents make clear, the conditions of Jose's confinement were manipulated by interrogators to create an environment of total discomfort, anxiety, and helplessness. The government subjected Jose to repeated and abusive interrogations according to an interrogation plan calculated at exploiting his vulnerability and well-being.

* * *

While Jose was at the Brig, the government also held Ali Saleh Kahlah al-Marri as an enemy combatant. Later, he, like Jose, was transferred into civilian custody to face criminal charges. The district court judge who sentenced al-Marri recognized that a downward variance was appropriate based upon the conditions of his confinement at the Brig. A citizen of Qatar and legal U.S. resident, al-Marri was arrested in Peoria, Illinois, in 2001 as a material witness in the FBI's investigation of 9/11. In 2002, he was charged with credit card fraud and other criminal offenses. Shortly before his criminal trial commenced in June 2003, President Bush declared him an "enemy combatant" and moved him to the Brig where the government subjected him to torture and other cruel treatment. President Barack Obama issued an Executive Order transferring al-Marri to civilian custody shortly after taking office.

The government's sentencing memorandum sets forth the facts and circumstances of al-Marri's case. *United States v. al-Marri*, 09-CR-10030-MMM-JAG, DE 36 (C.D. Ill. Oct. 2, 2009). The defendant pled guilty to conspiring with senior al Qaeda leaders to enter the United States and provide himself to al Qaeda's ongoing terrorist mission. He admitted that he joined the conspiracy with knowledge that al Qaeda was responsible for prior attacks against the United States that resulted

in the murder of innocent civilians. Specifically, al-Marri was aware of the fatwas issued by bin Laden against the United States and knew that al Qaeda was responsible for the Embassy bombings in East Africa in 1998 and the USS Cole bombing in Yemen in 2000.  When al-Marri met with Khalid Sheikh Mohammed ("KSM") and offered himself to al Qaeda, he knew that KSM was the external operations chief for al Qaeda. KSM directed al-Marri to enter the United States prior to September 10, 2001, and knew that to remain undetected he had to conceal his association with al Qaeda. To accomplish these goals, al-Marri applied to Bradley University for a bachelor's degree in computer science, despite already holding a bachelor's degree in business administration from the same institution. However, al-Marri was not concerned with enrolling in the university to attain a degree, he only needed to gain admission to Bradley University so that he could obtain a student visa to enter the United States. Once he obtained his student visa, al-Marri traveled to Pakistan to deliver electronic items and meet with KSM before he traveled to the United States.

Prior to entering the United States on September 10, 2001, al-Marri attended various terrorist training camps from 1998 through 2000, where he learned basic military training, including the use of various weapons and basic operational security tradecraft that al Qaeda associates employed which allowed those engaged in terrorist operations to avoid detection, conceal the true nature of their communications, and generally protect their operations. These methods included the use of prearranged codes and various other techniques to protect communications, counter-surveillance techniques, and the protection of information on computers. The defendant also took various courses to learn about poisons and chemicals that would be suitable for use in a terrorist attack.

Once safely ensconced in the heartland of the United States, under the pretense of being an international student and complete with family in tow, the defendant reached out to KSM to let al

Qaeda's external operations chief know that he had arrived and was enrolled in class. To conceal his contact with KSM, he traveled to another university in central Illinois and set up five different email addresses using various aliases. He used a pre-arranged communication code to conceal the fact that he was contacting al Qaeda from within the United States. He also used the pre-arranged code to provide his cellular telephone number to KSM. By this time, al-Marri had witnessed the carnage of the 9/11 attacks, knew that al Qaeda was responsible for those attacks, and further understood the reason why KSM directed him to enter the United States prior to September 10, 2001.

Over the next two months, al-Marri attempted contact with Mustafa al Hawsawi, who he knew was an al Qaeda associate and who he had met in Dubai in August at the direction of KSM. While in Dubai, he provided $10,000 in funding from al Hawsawi, part of which he used to purchase a laptop computer for his mission. When the defendant was interviewed by the FBI in October 2001 and December 2001, he denied knowing al Hawsawi and denied making calls to al Hawsawi, despite electronically maintaining al Hawsawi's contact information concealed in 10-code format in his digital personal assistant.

Also during this time, he used his laptop computer, which he purchased using funds provided by al Qaeda, to conduct internet research on the location, availability for purchase, pricing, and toxicity of various poisons and compounds which he knew were suitable for terrorist attacks. The research that al-Marri conducted on the poison compounds was consistent with the training he previously received at the various terrorist training camps he attended. Upon a search of the his apartment in December 2001, the FBI discovered an almanac, purchased by the defendant, which was bookmarked on a page containing information on dams, tunnels, and waterways in the United States–locations that were suitable for a terrorist attack using poisonous compounds and chemicals.

Despite this egregious criminal conduct, the government offered al-Marri a plea deal that capped his exposure to a 15-year term of imprisonment. The government's plea agreement effectively halved, at the outset, al-Marri's low-end sentencing exposure — his advisory guideline range was 30 years to life. Under the terms of the plea agreement, however, al-Marri could request a lower sentence. He did so citing his treatment at the Brig as a mitigating factor. The district court agreed and further reduced al-Marri's sentence to eight years. The government did not appeal this sentence. As a result, al-Marri's projected release date is January 18, 2015.

The defense is not suggesting that this Court consider al-Marri's criminal conduct in determining a fair and reasonable sentence for Jose. The defense does cite al-Marri because the only other court to confront a former enemy combatant in a civilian case did take into account the severe conditions at the Brig under § 3553(a)(2).

The physical and psychological toll of Jose's treatment at the Brig and the severe impact of his isolation, indefinite detention, and separation from his family has not abated. Moreover, the government, which held Jose for over ten years, has done nothing to address his trauma and isolation. These unusually harsh conditions of confinement are egregious and unprecedented and must certainly be relevant to determining a sentence under § 3553(a).

There can be no dispute, based upon the JACOBY DECLARATION and the other evidence offered by Jose throughout this case, that his confinement at the Brig caused him severe psychological pain and suffering. The § 3553(a)(2) factors clearly authorize the Court to consider Jose's pre-indictment imprisonment for a reduced sentence in the instant case. *See* U.S.S.G. § 5G1.3, comment. (n.3(e)) (authorizing downward departure for a period of imprisonment already served on

a undischarged term of imprisonment).[4]

### C.    Characteristics of Jose's Life: Confinement at Florence ADX

In 1842, Charles Dickens toured the United States, and during his trip, he visited Eastern State Penitentiary which was located in Philadelphia. He wrote about his day-long visit, and one of his most famous passages focused on the effects of solitary confinement at the prison:

> The system here, is rigid, strict, and hopeless solitary confinement. I believe it, in its effects, to be cruel and wrong. In its intention, I am well convinced that it is kind, humane, and meant for reformation; but I am persuaded that those who devised this system of Prison Discipline, and those benevolent gentlemen who carry it into execution, do not know what it is that they are doing. I believe that very few men are capable of estimating the immense amount of torture and agony which this dreadful punishment, prolonged for years, inflicts upon the sufferers; and in guessing at it myself, and in reasoning from what I have seen written upon their faces, and what to my certain knowledge they feel within, I am only the more convinced that there is a depth of terrible endurance in it which none but the sufferers themselves can fathom, and which no man has a right to inflict upon his fellow-creature. I hold this slow and daily tampering with the mysteries of the brain, to be immeasurably worse than any torture of the body: and because its ghastly signs and tokens are not so palpable to the eye and sense of touch as scars upon the flesh; because its wounds are not upon the surface, and it extorts few cries that human ears can hear; therefore I the more denounce it, as a secret punishment which slumbering humanity is not roused up to stay.

Charles Dickens, AMERICAN NOTES FOR GENERAL CIRCULATION 119-20 (London: Chapman and Hall) (1842).

These sentiments were echoed more recently by Supreme Court Justice Anthony Kennedy, who eloquently stated in his 2003 address to the American Bar Association, "[w]hen the door is

---

[4] Jose also requests that the Court take into account the conditions of his confinement at the Federal Detention Center pending trial. After he was transferred from the Brig, he was held in solitary confinement pursuant to the Special Administrative Measures issued by the Department of Justice. The solitary confinement restricted Jose's social interaction with the general population of FDC, while the SAMs significantly curtailed his contact with the outside world, including his family.

locked against the prisoner, we do not think about what is behind it." Justice Kennedy urged "a greater responsibility . . . as a people, we should know what happens after the prisoner is taken away." Justice Anthony M. Kennedy, "Address at the ABA Annual Meeting" (Aug. 9, 2003) (transcript available at http://www.abanow. org/2003/08/ speech-by-justice- anthony- kennedy- at- aba-annual-meeting/)(last visited February 15, 2013). Here is what happened to Jose after he was taken away from this Court in 2008.

The Bureau of Prisons, an agency within the Department of Justice, designated Jose to ADX Florence. ADX Florence is the Bureau of Prisons' only "Supermax" facility and the most restrictive prison in the federal system. Every single prisoner at ADX, including Jose, is held in solitary confinement. In an interview with "60 Minutes," a former ADX warden described it as "a clean version of hell." *See* CBSNews, "Supermax: A Clean Version of Hell," http://www.cbsnews.com/ 8301-18560_162-3357727.html.

For the past five years, Jose has been held in solitary confinement in the Special Security Unit (H-Unit) at ADX Florence. Jose's existence includes the following characteristics and routines:

- He spends 24 hours a day alone in his cell, a space that is 75.5 square feet – the equivalent of a small bathroom.

- His cell contains a bed, desk, sink, and toilet, all made from poured concrete.

- His cell and all others have thick concrete walls and two doors, one of which is made of solid steel, the purpose of which is to limit all communication between inmates.

- He has limited interaction with prison staff.

- His cell has one small window; however, the only view is of the cement "yard."

- Concrete walls and a partial roof surround the outside cages preventing prisoners from

seeing the surrounding landscape.

- Each and every time he is permitted to leave his cell he is restrained with leg irons, handcuffs, and a belly chain.

- He is not allowed to have contact visits with anyone.

- By regulation, he only is allowed to have 5 hours of out-of-cell exercise per month.

- By regulation, he only is allowed to have one monthly social telephone call.

- He receives no individualized or classroom types of instruction or programming.

- His ability to practice his religion with assistance of an Imam is curtailed and limited.

In *Pepper v. United States,* __U.S.__, 131 S. Ct. 1229, 1235, 1241 (2011) the United States Supreme Court held that the plain language of 18 U.S.C. § 3661 makes clear that there is "[n]o limitation . . . on . . . background, character, and conduct" information, and makes no distinction between an initial sentencing and a subsequent resentencing. The Supreme Court further held that at the time of *any* sentencing proceeding, a district court should be allowed consider "the fullest information possible concerning the defendant's life and characteristics. *Id*. at 1240. Under *Pepper*, therefore, this Court may look to the conditions of Jose's confinement after his original sentencing.

A fuller description of "life" at Florence is warranted. While in this clean version of hell, ADX prisoners eat all meals alone inside their cells, within arm's length of their toilet. Each cell has a small window to the outside; however, the only view is of the cement "yard." Prisoners at ADX cannot see any nature—not the surrounding mountains or even a patch of grass.

The only time prisoners are regularly allowed outside of their cells is for limited recreation, which occurs either in an indoor cell that is empty except for a pull-up bar, or in an outdoor solitary cage. The outside recreation cages are only slightly larger in size than the inside cells and are known

as "dog runs" because they resemble animal kennels. The warden can (and does) cancel recreation for any reason he deems appropriate, including weather, shakedowns, or lack of staff. Some prisoners are required to undergo a strip search as a precondition to any out-of-cell exercise. Accordingly, ADX prisoners sometimes go for days without ever leaving their cells.

Direct contact with others is rare. The prison was specifically designed to limit all communication among the people that it houses. Accordingly, the cells have thick concrete walls and two doors, one with bars and a second made of solid steel. The only "contact" ADX prisoners have with other inmates in the main unit is attempted shouting through the thick cell walls, doors, toilets, and vents. All visits are non-contact, meaning the prisoner and visitor are separated by a plexiglass barrier. Most ADX prisoners remain shackled at their hands and feet throughout the non-contact visits.

Federal courts have recognized that ADX is solitary confinement facility. *See, e.g* ., *Jordan v. Sosa,* 654 F.3d 1012, 1015 (10th Cir. 2011) ("Plaintiff-Appellant Mark Jordan was incarcerated in solitary confinement at the administrative maximum security facility in Florence, Colorado (ADX)"); *Sattar v. Holder,* 2012 WL 882401, *1 (D. Colo. 2012) ("At ADX, inmates are housed in solitary confinement and are subject to highly restrictive conditions.").

But these issues are not novel. In 1890, the Supreme Court had occasion to visit the subject of solitary confinement.  In *In re Medley*, 134 U.S. 160 (1890), the Court recounted the "colorful" history of solitary confinement. The Court uncovered an old English law entitled "an act for better preventing the horrid crime of murder." *Id*. at 170. The statute's preamble read:

> Whereas, the horrid crime of murder has of late been more frequently perpetrated than formerly; * * * and whereas, it is thereby become necessary that some further terror and peculiar mark of infamy be added to the punishment of death now by law

26

inflicted on such as shall be guilty of the said heinous offense, ' – then follow certain enactments, the sixth section of which reads as follows: 'Be it further enacted, * * * that from and after such conviction, and judgment given thereupon, the jailer or keeper to whom such criminal shall be delivered for safe custody shall confine such prisoner to some cell * * * separate and apart from the other prisoners, and that no person or persons whatsoever, except the jailer or keeper, or his servants, shall have access to any such prisoner, without license being first obtained.

*In re Medley*, 134 U.S. at 170.

The Supreme Court observed that in our own country controversy over the propriety of solitary confinement had raged for more than a hundred years. Objections were raised because "[a] considerable number of prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community." *Id*. at 168.

Closer to home, in *United States v. Noriega*, 40 F. Supp. 2d 1378 (S.D. Fla. 1999), a case cited earlier, the court referenced the blunt assessment of risks associated with solitary confinement found in *McClary v. Kelly*, 4 F. Supp. 2d 195, 208 (W.D.N.Y. 1998). A conclusion, however, that prolonged isolation from social and environmental stimulation increases the risk of developing mental illness should not be controversial. "Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric disturbances." *Noriega*, 40 F. Supp. 2d at 1379-80.

Recently, a district court addressed the constitutional issue presented by the mental torture associated with excessive social and environmental deprivation. In a comprehensive and scholarly

opinion, the court identified social interaction and environmental stimulation as basic human needs

worthy of protection under the Eighth Amendment to the United States Constitution. *Wilkerson v.*

*Stadler*, 2007 WL 2693852, at *15 (M.D. La. Sept. 11, 2007).[5] The *Wilkerson* court recognized the

"inhumanity of institutionally-imposed psychological pain and suffering." *Id*. at *16.

 Jose's isolation has been and continues to be extreme. Earlier, Dr. Stuart Grassian, an expert

in the effects of solitary confinement and familiar with Jose's case had submitted a declaration

related to the debilitating effect of Jose's custody on his mental health. (Exhibit 2). Dr. Grassian

stated that Jose:

> has become profoundly suspicious, apparently paranoid at times (e.g. his conviction
> that his mother's letter was a forgery). His grimacing and eye blinking, often
> accompanied by a strange, tense spreading of his lips as though in an attempt to
> smile, has an eerie, psychotic feel to it. He perserverates (repeating the same thought
> over and over again, even though the thought makes little sense in the first place).
> There has, indeed, been a fundamental irrationality in his thinking about his case; he
> continually repeated that his attorneys already knew everything, that "we have gone
> over all this before", when in fact he had virtually <u>never</u> been willing to talk about
> <u>any</u> of these issues with any of his attorneys. In short, his presentation suggests not
> simply a reaction to fear and trauma, but really a <u>disorganizing</u>, <u>psychotic</u> reaction.

*Id*. at p.23.

 People are sent to prison as punishment, not to be punished even more. But Jose is subjected

to the "further punishment" of solitary confinement every day. The longer he is subjected to the

conditions he endures, the more likely the serious and irreparable psychological damage he has

suffered will be exacerbated. But even without psychological injury, the characteristics of his life

in confinement deserve vigorous consideration by the Court in determining Jose's sentence.

---

[5] Jose also incorporates here the factual statements, medical evidence, and legal arguments raised in his Motion to Dismiss for Outrageous Government Misconduct, filed on October 4, 2006. (DE 597.)

### D.    Parsimony Provision: Comparison to 18 U.S.C. § 2339D Penalty

The government's ultimate claim of wrongdoing as to Mr. Padilla is the allegation that he attended the al Farouq camp in Afghanistan and once there received military-type training. But, the guideline range recommended by the advisory guidelines is extremely disproportionate to this conduct as evidenced by the collective wisdom of Congress and the Department of Justice.

As part of The Intelligence Reform Act of 2004, Congress created a new crime codified at 18 U.S.C. § 2339D. Section 2339D makes it a crime for anyone to receive military-type training from a foreign terrorist organization. Congress decreed that the absolute maximum term of imprisonment a person could receive upon commission of this crime is 10 years**.** *See* 18 U.S.C. § 2339D.  It is important to note that Congress enacted this statute after the 9/11 tragedy and knowing that John Walker Lindh, David Hicks, the Lackawanna 6, Richard Reid, Zacarias Moussaoui, and dozens of men being held at Guantanamo Bay had attended these camps.

Armed with this knowledge, Congress made the considered decision to set the maximum punishment for this offense at 10 years. It is beyond peradventure that from the founding of our Nation a basic principle within our federal constitutional framework is that the power to define criminal offenses and to prescribe the punishments to be imposed upon those found guilty of them resides wholly with the Congress. *United States v. Wiltberger*, 18 U.S. 76 (1820). And, of course, "[w]hen Congress and the Sentencing Commission disagree on matters of sentencing policy, Congress trumps." *United States v. Berger*, 103 F.3d 67, 71 (9th Cir. 1996). Therefore, the arm of our government specifically charged with the plenary power to set the penalty for a federal offense has mandated that a person who receives military-type training from a foreign terrorist organization

shall receive no more than 10-years' imprisonment. The wisdom of Congress in setting the penalty in § 2339D should weigh strongly in favor of a below-guidelines sentence for Mr. Padilla.

Moreover, the Department of Justice concurs in the proposition that a 10-year sentence is a sufficient sentence to reflect the considerations of § 3553(a)(2). After the enactment of § 2339D, on May 10, 2005, Gregory Katsas, Deputy Assistant Attorney General, Civil Division, Department of Justice and Barry Sabin, Chief of Counterterrorism Section, Criminal Division, Department of Justice appeared before the House of Representatives' Subcommittee on Crime, Terrorism, and Homeland Security. During the course of their testimony, Messrs. Katsas and Sabin told the subcommittee that  § 2339D is

> a potent remedy for the serious problems created by the steady flow of recruits to terrorist training camps. Various investigations have uncovered individuals who have traveled overseas to training camps to receive military-style training. These individuals, who in many cases have received firearms and explosives training, appear to be preparing to conduct terrorist activity or violence and pose a clear threat here and abroad.

(Attached as Exhibit 3).

At the time of their testimony, these men were the officials of the Executive Branch who were responsible for formulating our government's criminal law policy with regard to terrorism-related offenses.  Undersigned counsel agrees, in the words of Messrs. Katsas and Sabin, that the penalty prescribed in § 2339D is a "potent remedy" for the offense of attending a training camp. And, a "potent" remedy is certainly a sufficient punishment under § 3553(a). This consideration should weigh in Jose's favor.

E.     **Respect for the Law**

Jose has endured egregiously harsh treatment during his years of detention as an enemy combatant, including severe isolation and incommunicado detention. He also has been subjected to the conditions of the Supermax for the last five years.  Jose has already been significantly punished for his offense. A just sentence must take into account the severity and prolonged nature of this harsh treatment, both with respect to the sentence that Jose deserves in light of his already severe punishment, and with respect to the public's general respect and confidence in the rule of law.

As discussed earlier, the government held Jose under extraordinarily harsh conditions and subjected him to abusive interrogation techniques that have since been fully repudiated as contrary to our Nation's values and our law. Promoting respect for the rule of law demands that this Court not ignore what occurred in this case: that Jose was removed from the criminal process to allow the government to interrogate him using methods that are disturbing, unlawful, and, now, have been repudiated, all in order to improperly coerce his cooperation.  The extraordinary chain of events that has led Jose to be adjudicated within the federal criminal justice system has been applauded as strengthening the public perception that the Rule of Law survives. Respect for the law will further be strengthened by fashioning a just sentence, which appropriately takes into account the length and form of the treatment to which Jose was subjected, and accordingly varies from the advisory Guideline sentence.

### III. Conclusion

Based upon the foregoing, Jose Padilla respectfully requests that the Court impose a just and appropriate sentence that varies downward from the advisory Guidelines range. Under the truly unique circumstances of this case – in which Jose was removed from the  criminal  justice system subjected to incommunicado, isolated detention, including treatment that has now been outlawed by our government, and then returned to face charges and sentencing – a downward variance is appropriate.

Respectfully submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

By:      /s/ Michael Caruso
Federal Public Defender
Florida Bar No.  0051993
150 West Flagler, Suite 1700
Miami, Florida  33130
Tel/Fax (305) 530-7000/ (305) 536-4559

### CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2014, undersigned counsel electronically filed the foregoing document with the Clerk of the Court using CM/ECF and served same via U.S. Mail to counsel(s) who are not authorized to received electronically Notices of Electronic Filing.

/s/ Michael Caruso

32