## Declaration of Vice Admiral Lowell E. Jacoby (USN)
## Director of the Defense Intelligence Agency

Pursuant to 28 U.S.C. § 1746, I, Vice Admiral Lowell E. Jacoby, hereby declare that, to the best of my knowledge, information, and belief, and under penalty of perjury, the following is true and correct:

### Summary

I submit this Declaration for the Court's consideration in the matter of Jose Padilla v. George W. Bush et al., Case No. 02 Civ. 4445, pending in the United States District Court for the Southern District of New York. This Declaration addresses the following topics:
- my qualifications as an intelligence officer and Director of the Defense Intelligence Agency;
- the roles and mission of the Defense Intelligence Agency;
- the intelligence process;
- interrogations as an intelligence tool;
- interrogation techniques;
- use of interrogations in the War on Terrorism;
- intelligence value of Jose Padilla; and
- potential impact of granting Padilla access to counsel.

Based upon information provided to me in the course of my official duties, I am familiar with each of the topics addressed in this Declaration. I am also familiar with the interrogations of Jose Padilla ("Padilla") conducted by agents of the Federal Bureau of Investigation ("FBI") after his detention in Chicago on 8 May 2002 and by agents of the Department of Defense ("DoD") after DoD took control of Padilla on 9 June 2002. I have not included information obtained from any interrogations in this Declaration, however.

I assess Padilla's potential intelligence value as very high. I also firmly believe that providing Padilla access to counsel risks loss of a critical intelligence resource, resulting in a grave and direct threat to national security.

1



## Experience

I am a Vice Admiral in the United States Navy, with more than 30 years of active federal commissioned service. I currently am the Director of the Defense Intelligence Agency. I report to the Secretary of Defense. In addition to other assignments, I have previously served as the Director of Intelligence (J2) for the Chairman of the Joint Chiefs of Staff; the Director of Intelligence for the Commander of the U.S. Pacific Command; the Commander of the Joint Intelligence Center Pacific; and the Commander of the Office of Naval Intelligence.

I have received the National Intelligence Medal of Achievement from the Director of Central Intelligence. My military decorations include two Defense Distinguished Service Medals, the Navy Distinguished Service Medal, the Defense Superior Service Medal, and two Legions of Merit. I hold a Masters degree in National Security Affairs from the Naval Postgraduate School.

## The Defense Intelligence Agency

The Defense Intelligence Agency ("DIA") is a DoD combat support agency with over 7,000 military and civilian employees worldwide. DIA is a component of DoD and an important member of the United States Intelligence Community—a federation of 14 executive branch agencies and organizations that work separately and cooperatively to conduct intelligence activities necessary to protect the national security of the United States.

DIA activities include collection of information needed by the President and Vice President, the National Security Council, the Secretaries of State and Defense, and other Executive Branch officials for the performance of their duties and responsibilities. One of DIA's highest priorities is to collect intelligence on terrorists, including al Qaida members, by interrogation and other means.

The Defense HUMINT Service ("DHS"), under DIA's Directorate for Operations, handles all human-source intelligence collection within DoD.

## The Intelligence Process

The security of this Nation and its citizens is dependent upon the United States Government's ability to gather, analyze, and disseminate timely and effective intelligence. DIA has expended considerable efforts to develop effective intelligence techniques.

Generally speaking, the intelligence cycle can be broken down into five basic steps:

1. **Planning and direction.** Senior United States policy makers establish the intelligence requirements for DIA. DIA formulates more specific plans and directions to meet those requirements. Finished intelligence products also generate new requirements.

2. **Collection.** Raw intelligence data can be gathered by various means. Human-Source Intelligence ("HUMINT") is the oldest and historically the primary method of collecting intelligence. HUMINT includes clandestine acquisition of materials as well as overt collection of information through methods such as interrogation.

3. **Processing and exploitation.** Intelligence data, including human-source reports, must be converted to a form and context to make them more comprehensible to the intelligence analysts and other users.

4. **Analysis and production.** Intelligence analysts absorb the incoming information, evaluate it, and prepare a variety of intelligence products.

5. **Dissemination.** After reviewing intelligence information and correlating it with other information available, analysts typically disseminate finished intelligence to various users.

One critical feature of the intelligence process is that it must be continuous. Any interruption to the intelligence gathering process, especially from an external source, risks mission failure. The timely, effective use of intelligence provides this Nation with the best chance of achieving success in combating terrorism at home and abroad, thus helping to prevent future catastrophic terrorist attacks.

Protecting the specific sources and methods used during the intelligence process is of paramount importance to the integrity of the process. DIA employs all available safeguards to ensure that its sources and methods are not intentionally or inadvertently made public or disclosed outside the Intelligence Community, because of the resulting damage to intelligence collection efforts.

3

### Interrogation as an Intelligence Tool

Interrogation is a fundamental tool used in the gathering of intelligence. Interrogation is the art of questioning and examining a source to obtain the maximum amount of usable, reliable information in the least amount of time to meet intelligence requirements. Sources may include insurgents, enemy combatants, defectors, refugees, displaced persons, agents, suspected agents, or others.

Interrogations are vital in all combat operations, regardless of the intensity of conflict. Interrogation permits the collection of information from sources with direct knowledge of, among other things, plans, locations, and persons seeking to do harm to the United States and its citizens. When done effectively, interrogation provides information that likely could not be gained from any other source. Interrogations can provide information on almost any topic of intelligence interest.

The Department of the Army's Field Manual governing Intelligence Interrogation, FM 34-52, dated 28 September 1992, provides several examples of the importance of interrogations in gathering intelligence. The Manual cites, for example, the United States General Board on Intelligence survey of nearly 80 intelligence units after World War II. Based upon those surveys, the Board estimated that 43 percent of all intelligence produced in the European theater of operations was from HUMINT, and 84 percent of the HUMINT was from interrogation. The majority of those surveyed agreed that interrogation was the most valuable of all collection operations.

The Army Field Manual also notes that during OPERATION DESERT STORM, DoD interrogators collected information that, among other things, helped to:
- develop a plan to breach Iraqi defensive belts;
- confirm Iraqi supply-line interdiction by coalition air strikes;
- identify diminishing Iraqi troop morale; and
- identify a United States Prisoner of War captured during the battle of Kafji.

### Interrogation Techniques

DIA's approach to interrogation is largely dependent upon creating an atmosphere of dependency and trust between the subject and interrogator. Developing the kind of relationship of trust and dependency necessary for effective interrogations is a process that can take a significant amount of time. There are numerous examples of situations where interrogators have been unable to obtain valuable intelligence from a subject until months, or even years, after the interrogation process began.

4

Anything that threatens the perceived dependency and trust between the subject and interrogator directly threatens the value of interrogation as an intelligence-gathering tool. Even seemingly minor interruptions can have profound psychological impacts on the delicate subject-interrogator relationship. Any insertion of counsel into the subject-interrogator relationship, for example—even if only for a limited duration or for a specific purpose—can undo months of work and may permanently shut down the interrogation process. Therefore, it is critical to minimize external influences on the interrogation process. Indeed, foreign governments have used these techniques against captured DoD personnel.

Even the Geneva Convention Relative to the Protection of Civilian Persons in Time of War of August 12, 1949—which the President has determined does not apply to enemy combatants such as Padilla—recognizes that a detainee's ability to communicate with members of his or her family or government may be suspended when such a person is suspected of engaging in activities hostile to the security of the detaining State.

## Use of Interrogations in the War on Terrorism

Terrorism poses an asymmetric threat to the United States. "Asymmetric warfare" generally consists of unanticipated or non-traditional approaches to circumvent or undermine an adversary's strengths while exploiting its vulnerabilities through unexpected technologies or innovative means. "Asymmetric warfare" may also consist of leveraging inferior tactical or operational strength against American vulnerabilities to achieve disproportionate effect with the aim of undermining American will in order to achieve the asymmetric actor's strategic objectives.

Unlike any previous conflict, we face a foe that knows no borders and perceives all Americans, wherever they may be, as targets of opportunity. Our terrorist enemies have also clearly demonstrated their willingness—and in fact have expressed their intent—to use any type of potential weapon, including weapons of mass destruction.

This asymmetric threat creates difficult and unique challenges for DIA because of the many variables in identifying and addressing the threat. The complexities of the problem—and the dire consequences at stake—require innovative and aggressive solutions.

As explained above, the intelligence cycle is continuous. This dynamic is especially important in the War on Terrorism. There is a constant need to ask detainees new lines of questions as additional detainees are taken into custody and new information is obtained from them and from other intelligence-gathering

5

methods. Thus, it is vitally important to maintain an ongoing intelligence process, including interrogations.

The United States is now engaged in a robust program of interrogating individuals who have been identified as enemy combatants in the War on Terrorism. These enemy combatants hold critical information about our enemy and its planned attacks against the United States that is vital to our national security.

These interrogations have been conducted at many locations worldwide by personnel from DIA and other organizations in the Intelligence Community. The results of these interrogations have provided vital information to the President, military commanders, and others involved in the War on Terrorism. It is estimated that more than 100 additional attacks on the United States and its interests have been thwarted since 11 September 2001 by the effective intelligence gathering efforts of the Intelligence Community and others.

In fact, Padilla's capture and detention were the direct result of such effective intelligence gathering efforts. The information leading to Padilla's capture came from a variety of sources over time, including the interrogation of other detainees. Knowledge of and disruption of al Qaida's plot to detonate a "dirty bomb" or arrange for other attacks within the United States may not have occurred absent the interrogation techniques described above.

Interrogating members of al Qaida, or those individuals trained by al Qaida, poses additional challenges and risks. Al Qaida is a highly dangerous and sophisticated terrorist organization that has studied and learned many counterintelligence techniques. An al Qaida training manual, "Military Studies in the Jihad Against the Tyrants," provides instructions regarding, among other things: the collection of intelligence; counter-interrogation techniques; and means of covert communication during periods of capture. As detainees collectively increase their knowledge about United States detention facilities and methods of interrogation, the potential risk to national security increases should those methods be released. Moreover, counsel or others given access to detainees could unwittingly provide information to the detainee, or be used by the detainee as a communication tool.

In summary, the War on Terrorism cannot be won without timely, reliable, and abundant intelligence. That intelligence cannot be obtained without robust interrogation efforts. Impairment of the interrogation tool—especially with respect to enemy combatants associated with al Qaida—would undermine our Nation's intelligence gathering efforts, thus jeopardizing the national security of the United States.

## Intelligence Value of Jose Padilla

Padilla is currently being detained in the Naval Consolidated Brig, Charleston at Naval Weapons Station, Charleston, South Carolina. The President has determined that Padilla is closely associated with al Qaida, an international terrorist organization with which the United States is at war. The President has further determined that Padilla possesses intelligence, including intelligence about personnel and activities of al Qaida, that, if communicated to the United States, would aid our efforts to prevent further attacks by al Qaida on the United States, its armed forces, other government personnel, or its citizens.

Padilla has been implicated in several plots to carry out attacks against the United States, including the possible use of a "dirty" radiological bomb in Washington DC or elsewhere, and the possible detonation of explosives in hotel rooms, gas stations, and train stations.

As noted in the unclassified Declaration of Michael H. Mobbs, Special Advisor to the Under Secretary of Defense for Policy, dated 27 August 2002, Padilla has, among other things:
- met with senior Usama Bin Laden lieutenant Abu Zabaydah in Afghanistan about conducting terrorist operations in the United States;
- conducted research in the construction of a "uranium-enhanced" explosive device at an al Qaida safehouse in Pakistan;
- discussed plans to build and detonate a "radiological dispersal device" (also known as a "dirty bomb") within the United States;
- received training from al Qaida operatives in furtherance of terrorist activities;
- met with other senior al Qaida operatives to discuss Padilla's involvement and participation in terrorist activities targeting the United States; and
- spent time in Afghanistan, Pakistan, Saudi Arabia, Egypt, and Southwest Asia.

Thus, Padilla could potentially provide information about, among other things:
- details on any potential plot to attack the United States in which he has been implicated, including the identities and whereabouts of al Qaida members possibly still at large in the United States and elsewhere;
- additional al Qaida plans to attack the United States, its property, or its citizens;
- al Qaida recruitment;
- al Qaida training;
- al Qaida planning;

7

- al Qaida operations;
- al Qaida methods;
- al Qaida infrastructure;
- al Qaida capabilities, including potential nuclear capabilities;
- other al Qaida members and sympathizers; and
- al Qaida activities in Afghanistan, Pakistan, Saudi Arabia, Egypt, Southwest Asia, the United States, or elsewhere.

The information that Padilla may be able to provide is time-sensitive and perishable. As noted above, any information obtained from Padilla must be assessed in connection with other intelligence sources; similarly, Padilla is a potential source to help assess information obtained from other sources. Any delay in obtaining information from Padilla could have the severest consequences for national security and public safety.

### Potential Impact of Granting Padilla Access to Counsel

Permitting Padilla any access to counsel may substantially harm our national security interests. As with most detainees, Padilla is unlikely to cooperate if he believes that an attorney will intercede in his detention. DIA's assessment is that Padilla is even more inclined to resist interrogation than most detainees. DIA is aware that Padilla has had extensive experience in the United States criminal justice system and had access to counsel when he was being held as a material witness. These experiences have likely heightened his expectations that counsel will assist him in the interrogation process. Only after such time as Padilla has perceived that help is not on the way can the United States reasonably expect to obtain all possible intelligence information from Padilla.

Because Padilla is likely more attuned to the possibility of counsel intervention than most detainees, I believe that any potential sign of counsel involvement would disrupt our ability to gather intelligence from Padilla. Padilla has been detained without access to counsel for seven months—since the DoD took control of him on 9 June 2002. Providing him access to counsel now would create expectations by Padilla that his ultimate release may be obtained through an adversarial civil litigation process. This would break—probably irreparably—the sense of dependency and trust that the interrogators are attempting to create.

At a minimum, Padilla might delay providing information until he believes that his judicial avenues of relief have been exhausted. Given the nature of his case, his prior experience in the criminal justice system, and the length of time that has already elapsed since his detention, Padilla might reasonably expect that his judicial avenues of relief may not be exhausted for many months or years.

8

Moreover, Padilla might harbor the belief that his counsel would be available to assist him at any point and that seven months is not an unprecedented time for him to be without access to counsel.

Any such delay in Padilla's case risks that plans for future attacks will go undetected during that period, and that whatever information Padilla may eventually provide will be outdated and more difficult to corroborate.

Additionally, permitting Padilla's counsel to learn what information Padilla may have provided to interrogators, and what information the interrogators may have provided Padilla, unnecessarily risks disclosure of the intelligence sources and methods being employed in the War on Terrorism.

In summary, the United States has an urgent and critical national security need to determine what Padilla knows. Padilla may hold extremely valuable information for the short-term and long-term security of the United States. Providing Padilla access to counsel risks the loss of a critical intelligence resource, and could affect our ability to detain other high value terrorist targets and to disrupt and prevent additional terrorist attacks.

LOWELL E. JACOBY, VADM, USN
Director of the Defense Intelligence Agency

Executed on 9 January 2003