Case 0:04-cr-60001-MGC   Document 897-1   Entered on FLSD Docket 03/07/2007   Page 1 of 15

March 7, 2007

### Expected Testimony Regarding Jose Padilla

I am a Board-certified psychiatrist, licensed to practice medicine in the Commonwealth of Massachusetts, and was on the faculty of the Harvard Medical School for twenty-five years. I have had extensive experience in evaluating the psychiatric effects of stringent conditions of confinement. My c.v. is attached as exhibit "A".

My observations and conclusions regarding the psychiatric effects of such confinement have been cited in a number of federal court decisions, for example: Davenport v. DeRobertis, 844 F.2d 1310, and Madrid v. Gomez, 889 F.Supp.1146. I prepared a written declaration for Madrid describing the medical literature and historical experience concerning the psychiatric effects of restricted and isolated conditions of confinement as well as of other conditions of restricted environmental and social stimulation, and subsequently prepared the general (non-institution specific) and non-redacted (non-inmate specific) portions of that declaration into a general Statement, which I have entitled "Psychiatric Effects of Solitary Confinement"; this work has subsequently been published in the Washington University Journal of Law and Policy, 2006, vol. 22, pp. 325-383. This paper provides a fairly detailed description of my expected general testimony regarding the effects of solitary confinement, and is incorporated herein. It describes the extensive body of literature, including clinical and experimental literature, regarding the effects of decreased environmental and social stimulation, as well as specifically, observations concerning the effects of segregated confinement on prisoners.

I have given lectures and seminars regarding this issue. Although I do not have a complete list of those lectures and seminars, they include among others, lectures at Harvard Medical School-Beth Israel Hospital, Boston, The Federal Capital Defenders Habeas Unit and The Correctional Association of New York, as well as invited testimony before State legislative hearings in New York State and Massachusetts. I have been retained as an expert in class-action lawsuits regarding these issues in Massachusetts (2), New York State (3), California (2), Kentucky, Michigan, Ohio, and Florida, as well as individual cases in other States, including California, Connecticut, Florida, Georgia, Maine, Massachusetts, New Mexico, New York, Pennsylvania, Texas, Virginia and the State of Washington. I have been retained and consulted by a variety of public advocacy groups, including The Legal Aid Society of New York, Prisoner's Legal Services of New York, the Center for Constitutional Rights, The Massachusetts Correctional Legal Services, The Massachusetts Civil Liberties Union, the National Prison Project of the American Civil Liberties Union, and the Department of Corrections of the State of Florida.

### 1. Overview of Effects of Stringent Conditions of Confinement.

It has long been known that severe restriction of environmental and social stimulation has a profoundly deleterious effect on mental functioning; this issue has, for example, been a major concern for many groups of patients including, for example, patients in intensive care units, spinal patients immobilized by the need for prolonged traction, and patients with impairment of their



DEFENDANT'S EXHIBIT

sensory apparatus (such as eye-patched or hearing impaired patients). This issue has also been a very significant concern in military situations and in exploration - polar and submarine expeditions, and in preparations for space travel.

In regard to segregated confinement, the United States was actually the world leader in introducing prolonged incarceration - and solitary confinement - as a means of dealing with criminal behavior; the "penitentiary system" began in the United States in the early 19th century, a product of a spirit of great social optimism about the possibility of rehabilitation of individuals with socially deviant behavior. This system, originally embodied as the "Philadelphia System," involved almost an exclusive reliance upon segregated confinement as a means of incarceration, and also became the predominant mode of incarceration - both for post conviction and also for pretrial detainees - in the several European prison systems which emulated the American model.

The results were catastrophic. The incidence of mental disturbances among prisoners so detained, and the severity of such disturbances, was so great that the system fell into disfavor and was ultimately abandoned. During this process, a major body of clinical literature developed which documented the psychiatric disturbances created by such stringent conditions of confinement. The paradigmatic disturbance was an agitated confusional state which, in more severe cases, had the characteristics of a florid delirium, characterized by severe confusional, paranoid and hallucinatory features, and also by intense agitation and random, impulsive violence - often self-directed.

The psychiatric harm caused by confinement in isolation became exceedingly apparent. Indeed, by 1890, in In re Medley, 10 S.Ct. 384, the United States Supreme Court explicitly recognized the massive psychiatric harm caused by such restricted conditions of confinement: "This matter of solitary confinement is not ... a mere unimportant regulation as to the safekeeping of the prisoner .... [E]xperience [with the penitentiary system of solitary confinement] demonstrated that there were serious objections to it. A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community." 10 S.Ct. at 386.

The consequences of the Supreme Court's holding were quite dramatic for Mr. Medley. Mr. Medley had been convicted of having murdered his wife. Under the Colorado statute in force at the time of the murder, he would have been executed after about one additional month of incarceration in the county jail. But in the interim between Mr. Medley's crime and his trial, the Colorado legislature had passed a new statute which called for the convicted murderer to be, instead, incarcerated in segregated confinement in the State Prison during the month prior to his execution. Unhappily, simultaneously with the passage of the new law, the legislature rescinded the older law, without allowing for a bridging clause which would have allowed for Mr. Medley's sentencing under the older statute.

Mr. Medley appealed his sentencing under the new statute, arguing that punishment under this new law was so substantially more burdensome than punishment under the old law, as to render its application to him ex post facto. The Supreme Court agreed with him, even though it

2

simultaneously recognized that if Mr. Medley was not sentenced under the new law, he could not be sentenced at all. Despite this, the Court held that this additional punishment of one month of solitary confinement was simply too egregious to ignore; the Court declared Mr. Medley a free man, and ordered his release from prison.

Dramatic concerns about the profound psychiatric effects of such conditions of confinement have continued into the twentieth century, both in the medical literature, and in the news. The alarm raised about the "brainwashing" of political prisoners of the Soviet Union and of Communist China - and especially of American prisoners of war during the Korean War - gave rise to a major body of medical and scientific literature concerning the effects of sensory deprivation and social isolation, including a substantial body of experimental research.

This literature, as well as my own observations, has demonstrated that, deprived of a sufficient level of environmental and social stimulation, individuals will soon become incapable of maintaining an adequate state of alertness and attention to the environment. Indeed, even a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern towards an abnormal pattern characteristic of stupor and delirium.

This fact is, indeed, not surprising. Most individuals have at one time or another experienced, at least briefly, the effects of intense monotony and inadequate environmental stimulation. After even a relatively brief period of time in such a situation, an individual is likely to descend into a mental torpor - a "fog" - in which alertness, attention and concentration all become impaired. In such a state, after a time, the individual becomes increasingly incapable of processing external stimuli, and often becomes "hyper-responsive" to such stimulation; for example, a sudden noise or the flashing of a light jars the individual from his stupor, and becomes intensely unpleasant. Over time, the very absence of stimulation causes whatever stimulation is available to become noxious and irritating; individuals in such a stupor tend to avoid any stimulation, and progressively to withdraw into themselves and their own mental fog.

An adequate state of responsiveness to the environment requires both the ability to achieve and maintain an attentional set - to focus attention - and the ability to shift attention. The impairment of alertness and concentration in solitary confinement leads to two related abnormalities:

The inability to focus, to achieve and maintain attention, is experienced as a kind of dissociative stupor - a mental "fog" in which the individual cannot focus attention, cannot, for example, grasp or recall when he attempts to read or to think.

The inability to shift attention results in a kind of "tunnel vision" in which the individual's attention becomes stuck - almost always on something intensely unpleasant - and in which he cannot stop thinking about that matter; instead, he becomes obsessively fixated upon it. These obsessional preoccupations are especially troubling. Individuals in isolated confinement easily become preoccupied with some thought, some perceived slight or irritation, some sound or smell coming from a neighboring cell, or - perhaps most commonly, by some bodily sensation - tortured by it, unable to stop dwelling on it. I have examined countless individuals in solitary confinement who have become obsessively preoccupied with some minor, almost imperceptible bodily sensation, a

sensation which grows over time into a worry, and finally into an all-consuming, life-threatening illness.

In segregation, ordinary stimuli become intensely unpleasant, and small irritations become maddening. Individuals in such confinement brood upon normally unimportant stimuli, and minor irritations become the focus of increasing agitation and paranoia. Individuals experiencing such environmental restriction find it difficult to maintain a normal pattern of daytime alertness and nighttime sleep. They often find themselves during the day incapable of resisting their bed - incapable of resisting the paralyzing effect of their stupor - and yet incapable at night of any restful sleep. The lack of meaningful activity is far compounded by the effect of continual exposure to artificial light, and diminished opportunity to experience natural daylight. And the individuals' difficulty in maintaining a normal day-night sleep cycle is often far worsened by the constant intrusions on nighttime dark and quiet - steel doors slamming shut, flashlights shining in their face, and so forth.

There are, of course, substantial differences in the effects of solitary confinement upon different individuals. Those most severely affected - often individuals with evidence of subtle neurological or attention deficit disorder, or with some other vulnerability - suffer from states of florid psychotic delirium, marked by severe hallucinatory confusion, disorientation, and even incoherence, and by intense agitation and paranoia; these psychotic disturbances often have a dissociative character, and individuals so affected often do not recall events which occurred during the course of the confusional psychosis. Other individuals - generally, individuals with more stable personalities and greater ability to modulate their emotional expression and behavior - are less severely affected. However, all of these individuals will still experience a degree of stupor, difficulties with thinking and concentration, obsessional thinking, agitation, irritability and difficulty tolerating external stimuli (especially noxious stimuli).

Individuals with stronger cognitive capabilities will often struggle to ward off stupor by generating their own stimulation internally - that is, by their own intellectual processes - but such individuals will almost invariably struggle against the inexorable pull towards obsessional thinking. It is very common for an inmate who spends virtually his entire day alone and without meaningful environmental, social, or occupational stimulation to become obsessively fixated on particular - even minor - features of his environment, and to become increasingly incapable of tolerating any change or increased deprivation in that environment. The inmate has very little to distract his attention from some, even minor, noxious event or stimulus. Inmates in solitary not only experience a deprivation of stimulation, but also experience a sense of helplessness - of loss of control over their environment. They become intolerant of change, of uncertainty, of their own passivity and helplessness in the face of their environment.

## 2. Sources of Information Regarding Jose Padilla.

1. Interviews with Andrew Patel, review of Attorney Patel's February 2007 testimony in this matter.
2. Interview with Attorney Donna Newman.
3. Interviews with Attorney Orlando do Campo.

4. Interview with Attorney Michael O'Connell.
5. Interview with Jose Padilla, December 2006.
6. Review of Mr. Padilla's affidavit dated December 16, 2006.
7. Review of Motion for Competency Hearing dated December 13, 2006, with attachments.
8. Government's Response to Competency Motion dated December 15, 2006.
9. Mr. Padilla's Motion to Dismiss for Outrageous Government Conduct.
10. Government's Response to Motion to Dismiss for Outrageous Government Conduct.
11. Mr. Padilla's Reply to Government's Response above.
12. Review of transcript of February 2007 Competency Hearing (and live attendance at most of February 26 testimony).
13. Mr. Padilla's Medical Records from Naval Brig.
14. Various news articles concerning Mr. Padilla.
15. Logs from Brig June 10, 2002 to January 5, 2006.
16. Interview with ex-wife Sherrie Stultz.
17. Interview with mother, Estella.
18. Review of U.S. Army Manual FN2-22.3. Human Intelligence Collector Operations, September 2006.
19. Jacoby Declaration.

The following sources have not yet been reviewed, but I expect to do so. If these other sources change my opinions in this case to any substantial extent, I will disclose this in an addendum to this report.

1. Interview with Mr. Padilla's brother, Thomas.
2. DVD of Mr. Padilla's transport to the Brig Dental Clinic.
3. Other Sources of Information Regarding U.S. Government Detention and Interrogation Procedures of Accused Enemy Combatants/Terrorists.

**3. Other Sources of Information Regarding U.S. Government Detention and Interrogation Procedures of Accused Enemy Combatants/Terrorists.**

From time to time I have been consulted by attorneys regarding a number of detainees at Guantanamo, including Messrs. Hamdi, Hamdan, Rasul, Habib, and Al Dossari. I also evaluated Messrs. Salim and El Hage, two pretrial detainees in solitary confinement at MCC Manhattan. I also consulted regarding the detention in the Charleston S.C. Naval Brig of Ali Saleh Kahlah Al-Marri. I was also consulted regarding the effects on Zacharias Moussouai of pretrial detention in solitary confinement.

I spent several days interviewing Ahmed Ressam, the so-called "Millenium Bomber", both close to the end of his several years of solitary confinement at Sea-Tac in Seattle Washington, and later, after several months of detention in a facility allowing substantial environmental, occupational, recreational, and social stimulation.

During the course of my involvement in the Ressam case, I had the opportunity to consult with and work cooperatively with staff of the FBI behavioral analysis program. I also reviewed a

5

letter dated July 14, 2004 regarding: "Suspected Mistreatment of Detainees," written to Major General Donald J. Ryder, Criminal Investigation Command, Department of the Army, by T.J. Harrington, Deputy Assistant Director, Counterterrorism Division, Federal Bureau of Investigations. From these sources and other news articles, I have come to understand that the various governmental agencies involved in dealing with such detainees do not necessarily agree on the moral propriety or the actual efficacy of the harsh and sometimes brutal tactics apparently employed by the Department of Defense.

This list represents my best recollection, but may not be fully complete. I will supplement it if needed.

### 4. Mr. Padilla's Conditions of Confinement.

The terms "segregated confinement," "SHU (Special Housing Unit) confinement," "solitary confinement," etc., all generally refer to confinement alone in a cell anywhere from about 56-90 square feet, with minimal opportunities for social interaction, conjoint recreation or religious services, minimal educational or occupational programming, and very limited environmental stimulation. In general in such settings, an inmate spends about 22-23 hours/day in his cell, with individual exercise and showering representing most of the time spent outside the cell. Administrative and environmental conditions can vary. Radio is often available, television sometimes; the opportunity for non-legal phone calls varies; visitation, however, is almost invariably non-contact. Some cells have windows affording a view of the outside world, but in many, there either is no window to the outside, or the window is only translucent and affords virtually no opportunity to see the outside world.

It is my understanding that Mr. Padilla's attorneys are presenting evidence that Mr. Padilla was subjected to intentionally brutal conditions of confinement in the Naval Brig, but that these allegations are disputed by the Government. In any event, it is apparently not disputed that Mr. Padilla was confined in solitary confinement in the Naval Brig in South Carolina from June 2002 until January 2006 while administrative procedures regarding his confinement varied over time, for the vast majority of this detention he had virtually no human contact at all. Even when he was allowed out of his cell into a Day Room-type area, he was entirely alone, except for the guards with whom he had virtually no interaction. His cell was quite small, about 80 square feet, and contained only a sink, toilet, and steel plate bed which was attached to the concrete wall of the cell. It apparently lacked a table or a place to sit other than the bed. It is my understanding that he was not even provided a mattress for considerable portions of his confinement, and when a mattress was provided, it was a very thin mattress, only about 3 inches thick. There are allegations that the temperature in his cell was intentionally adjusted to leave him extremely cold for extended periods of time. His cell had a narrow window, but the glass was painted over in such a manner that it was completely opaque, preventing him not only from seeing out of the window, but even from ascertaining whether it was day or night. The cell was lit by a fluorescent light over which he had no control; it was on 24 hours/day, though it was dimmed in intensity during the hours of 10 PM to 5 AM. The cell had a hinged solid steel door which added to his isolation. This door had a small window, however that was window was completely covered with a magnet for much of Mr. Padilla's

6

confinement. No one other than himself was housed on his tier, and he could not hear even the conversations between the guards.

He was utterly isolated from other people. During the entire period of his incarceration, he received only two social phone calls from his mother, and had only one social visit from his mother. Although his attorneys were assigned to his case in 2002, the government did not allow them to meet with him until March 2004; afterwards, he received attorney visits approximately once a month. During the first months of his incarceration, Mr. Padilla was visited with some regularity by an Imam, but then this was discontinued, and afterwards he had no contact with a Moslem clergyman. Other than his attorney visits, his only other contact was with representatives of the Red Cross, who periodically monitored his conditions of confinement.

He ate alone; for breakfast and lunch, food was passed through a food slot in his cell door and he ate sitting on his bed, with the tray balanced on his knees. He was given no access at all to canteen, so he had no way of augmenting or varying the food provided by the prison. Towards the end of his confinement in the Brig, he was able to come out of his cell to the Day Room area for dinner, but even then was utterly alone. Towards the latter part of his incarceration there, he was also allowed into an outdoor exercise yard for about two hours a day, but even then, he was utterly alone; the exercise yard was enclosed on all four sides by a high concrete wall, and was covered by a heavy metal fencing. His ability to obtain books to occupy himself apparently varied considerably during his incarceration in the Brig. His conditions were apparently made especially stringent during the first year of his confinement there, especially during a several month period of time when he was isolated intensively. During the first approximately two years, he had no access to television; however, towards the end of his stay he is able to watch broadcast TV and movies in the Day Room a few hours/day.

His isolation was made even more disturbing because, even though he had no social interaction, he was constantly being observed; his cell was constantly monitored by video camera, and for the first year of his confinement in the Brig, the door to his tier was opened every few minutes for more direct observation; the constant banging of that heavy metal door made sleep very difficult for him.

While Mr. Padilla's conditions of confinement varied throughout the three years, eight months he was kept in the Naval Brig, I have been informed by counsel that the logs of Mr. Padilla's confinement indicate that there was one particularly harsh period of confinement. Apparently, beginning approximately late November 2002 until early April 2003, Mr. Padilla was subjected to even more extreme isolation and perceptual deprivation. After his arrival at the Naval Brig on June 10, 2002, up until late November 2002, Mr. Padilla was given reading materials, including but not limited to a copy of the Qu'ran, fairly regular recreation time and opportunity for showering. However, commencing late November 2002, Mr. Padilla was apparently stripped of all reading materials, including the Qu'ran, and his opportunities for out of cell exercise and for showering was severely curtailed. During this period of time, it was not unusual for Mr. Padilla to go four, five, or six days without even brief (generally no more than a few minutes at most) rounding by Brig staff, who were, in any event, under instruction not to converse with him. And other than these, intermittent, brief rounds, during this several month period of time, Mr. Padilla went through long

7

stretches (e.g. 34, 17, 15 days) without any human contact. And when he did have such contact, it was inevitably with an interrogator.

The daily logs show that in this time period, Mr. Padilla was deprived of all reading material - the Qu'ran, magazines, newspapers - as well as of television and radio. During that time period, he was also allowed out of cell recreation very infrequently. In one stretch of time, he went 21 days straight without being offered any out of cell exercise, and there were other stretches of 15, 13, 7, 6, 5, and 4 day intervals between offers of out of cell time.[1] Moreover, what opportunities were afforded him, were always in solitude, and often indoors in another, albeit somewhat larger cell, in which he could do little but walk around in circles.

According to my calculations, in this twenty week period, Mr. Padilla had approximately ten hours of recreation time in total; about 30 minutes per week, an average of less than 4 1/2 minutes a day, a deprivation which in my experience is unprecedented even in the harshest conditions of solitary confinement in State and Federal Penitentiaries in the United States.

During this period of time, Mr. Padilla suffered other deprivations as well, which are reflected in the Brig daily logs. He was denied regular access to shower facilities, and commonly experienced periods of several - up to six - days without access to a shower in this time period was common. Again, in my experience this level of deprivation is not seen even in the harshest conditions of prison confinement in the United States. These observations are based on consultations with Mr. Padilla's counsel as well as a review of the Brig logs produced to defense counsel by the government. Attached to this report, as exhibit "B", is a summary in table form of the salient events of Mr. Padilla's confinement reflected in the Brig logs, prepared by Mr. Padilla's counsel.

There is also evidence that Mr. Padilla suffered other forms of abuse during this period of intense deprivation and interrogation. These include allegations of intentional sleep disruption, physical abuse, having to sleep on a metal slab in a cold cell with essentially no insulation against the cold and hard metal and concrete surfaces. (Concerns are also raised about possible forced drugging, though there is apparently little confirmatory evidence of this.)

---

[1] It is noted that during this period of severe deprivation, on a few occasions Mr. Padilla actually refused an offer of out of cell time. Unfortunately, this type of occurrence is not uncommon. After an extended period of isolation and perceptual deprivation, many inmates in solitary come to dread social interaction and perceptual stimulation. It is as though they can no longer bear the barrage of stimuli which are part of normal human experience. Unfortunately, too, this inability to tolerate social and perceptual stimulation often persists for an indefinite period of time even after the inmate is released from solitary confinement. A medical study coming out of the Balkan conflict demonstrated that there is in fact a continuing EEG correlate to this inability to tolerate normal levels of stimulation. Prisoners in the Balkans who had suffered from prolonged solitary incarceration demonstrated continuing abnormalities in their EEG's. These consisted of increased evoked potentials (EEG spike hyperresponsivity) to external stimulation. Other than a history of overt serious head injury, no other factor of incarceration (e.g. length of time incarcerated, severe beatings, starvation, etc.) was associated with this EEG abnormality.

8

Since Mr. Padilla was transferred to FDC-Miami in January 2006, he has been housed continually in the facility's Special Housing Unit (SHU) - where inmates are kept in solitary confinement; it was in this setting that I met him in December 2006.

Since he is apparently being housed there in response to the Special Administrative Measures (SAMS) governing his incarceration, he is housed in an especially isolated wing of the SHU; there are no inmates at all near his cell, and he cannot even hear other inmates' voices. As a prisoner subject to SAMS procedure, he suffers deprivations far beyond that of an ordinary inmate in the FDC-Miami SHU, much less that of an ordinary federal prisoner at the FDC.

For instance, Mr. Padilla's social visits and telephone contacts are extremely curtailed. His only authorized social visitor, his mother Ms. Estella LeBron, must request a visit fourteen days in advance of her anticipated visit, and these visits are constantly monitored. After Mr. Padilla arrived in FDC, his counsel finally managed to arrange a visit with his mother (non-contact, in separate rooms, able to see each other through a thick window, but requiring telephones to be able to speak with each other). Yet when Ms. LeBron arrived at the facility, she was flanked by two FBI agents who explained that they would remain present during the entire visit; Ms. LeBron and Mr. Padilla were informed that her visits would always be monitored in some such fashion. Eventually, cameras were set up to monitor the visits so as to obviate the need for the physical presence of FBI agents. However, on occasion, the surveillance equipment would not be functioning, preventing her from visiting with Mr. Padilla. Her visits became so emotionally oppressive for her and for her son as well, that eventually she gave up visiting her son altogether. Even leaving his cell at all has become an oppressive ordeal for Mr. Padilla. Despite the massive security surrounding Mr. Padilla, each time he returns to his cell he must submit to a body cavity search.

Moreover, unlike other federal inmates, Mr. Padilla has essentially no phone privileges. Also, he does not get to purchase anything at all from the prison commissary, thus allowing him no opportunity, for example, to purchase anything to eat to vary from the prison diet. His reading material is restricted in volume - preventing him from having even the full documentary material provided by his attorneys.

He has told his attorney that he refuses his recreation time because it is in a dark, caged area in the SHU, on the twelfth floor of the FDC. The place scares him, and going there is nowhere near worthwhile, especially in light of the body cavity search he would have to undergo afterwards. Moreover, Mr. Padilla has no television, extremely limited access to reading materials, and no contact with any human being other than his counsel and his guards. He was eventually given some access to a radio, but this access was severely limited in scope; the controls lie outside his cell and he is allowed to listen to only three stations, which are clearly labeled on the radio, and even then, it is the guards, not Mr. Padilla, who determine when the radio will be on, what station will be tuned in, and at what volume.

## 5. Effects of Confinement.

5.1 Prior History. Family Observations.

From these sources of information, I find that Mr. Padilla had no evidence of any mental illness prior to his arrest and incarceration in 2002. As a young child, he apparently was well-behaved, a good student, and a caring son and oldest brother. As a teenager, he unfortunately became entangled with peers in serious delinquent behavior and served some time in juvenile detention. Upon being released from juvenile detention he relocated to South Florida and again was convicted for carrying a concealed firearm, and sentenced to a brief term of imprisonment. The term in jail apparently had a profound effect on him, and over the next years he became committed to living a moral and upstanding life. By age 21, he had converted to Islam and had married his first wife, Sherri; during the following years, he worked steadily, maintained a very close relationship with his mother and siblings, and enjoyed a stable relationship with his wife. Indeed, she reports that the worst "moral offense" over which they argued was that he had obtained some parking tickets by being careless with where he parked his car.

During the course of the marriage, Mr. Padilla adhered faithfully to the moral tenets of his religion, and spent time studying and attempting to enrich his understanding of the Qu'ran. After about seven years of an apparently happy marriage, he announced to Sherri that he was committed to going to Egypt for some period of time to study the religion more deeply. He wanted his wife to join him in this, but after absorbing the initial shock of his pronouncement, she let him know that she would not join him. He told her he was going to go anyway, and the couple had a tearful farewell; neither apparently wanted the relationship to end. Indeed, Sherri maintained a cordial and warm relationship with Mr. Padilla, even after he remarried in Egypt, and even after his arrest here in the United States. She still feels great fondness for him.

Mr. Padilla's mother was similarly shocked when her son announced that he intended to go to Egypt. She expressed her fear that she would never see him again, but he reassured her that it was not his intention to remain away from home indefinitely.

Mr. Padilla remarried in Egypt; the couple have two children. Mr. Padilla has stated that he supported his family in Egypt by teaching English and that the couple lived an ordinary life there. The Government, on the other hand, claims he was involved with Al Qaeda while living abroad.

Mr. Padilla was arrested when he arrived at the Chicago airport in May 2002; he was then brought to MCC-Manhattan, where he was housed in solitary for about one month before being transferred to the Naval Brig in South Carolina. He was first seen by defense attorney Donna Newman while incarcerated in New York. When seen then, he presented as an affable, cooperative, thoughtful person who took an active interest in his legal case. In addition, he recurrently spoke of his concern for his family and of his great desire to have contact with them. He maintained good eye contact, had no facial grimacing, and was easily engaged in conversation.

After Mr. Padilla was transferred to the Brig, he had no further contact with any family or attorney until almost two years later when, as a result of a court order, he was allowed to have attorney visits. Attorney Newman, who was the only lawyer who had visited with him in New York City, was struck by how different he was now. He was extremely quiet, and seemed to have a terribly difficult time maintaining eye contact. He kept repeating - often inappropriately and oddly - how well he was being treated by his captors. It was unusual, even somewhat eerie according to Ms.

Newman. When a subject was brought up even remotely close to his case or to his confinement, he would begin to twitch. When he was asked if something was wrong, he would quickly respond: "My back hurts; I'm getting help for it; I'm fine" - quickly shutting off any further discussion. Ms. Newman last saw Mr. Padilla soon after he was transferred to FDC-Miami. He appeared obviously anxious, jittery, grimacing and his eyes blinking. Whereas before he had expressed great desire to see his mother, now he repeated several times: "Maybe it's too hard for her. Maybe she shouldn't come."

Indeed, it apparently has become too emotionally painful for Mr. Padilla's mother to visit him. She had visited him several times in Miami, and once in the Brig, and she saw his mental condition collapsing. When anything of substance was raised, his face would begin grimacing grotesquely, and he would start blinking rapidly. He would keep looking behind him, tense and disconnected from his mother. He kept telling her how well he had been treated, how much he trusted the government. He even told her that if she was encountering red tape trying to visit him, she should write a letter to President Bush; he was sure he would help her out.

It was utterly irrational. After all, it was President Bush who had ordered him detained as an enemy combatant. And the irrationality did not stop there. He trusted the government (the people trying to convict him) but he distrusted his attorneys because he thought they were secretly trying to lock him away in a psychiatric hospital, from which he would never escape and his mother would never see him again. He kept telling her that he was "fine," while it was becoming increasingly apparent to her that he was not. Her son seemed so agitated, so odd, so irrational, that finally his mother could bear it no more; she blurted out: "Did they torture you?" He turned towards her, his face grimacing, his eyes blinking, and in panic and rage he demanded: "Don't you ever, ever, ask that question again."

But on one visit, he did say something about the Brig - not much, but something. He told his mother that it was very bad. They kept him totally isolated. They put him in a room with no light at all. They made him drink pills. Sometimes they made it so cold, and they would not give him a blanket to cover himself. His mother could not ask more details after that; he completely clammed up.

5.2 Concerns Raised by Mr. Padilla's Attorneys.

Mr. Padilla's attorneys have noted a great number of odd behaviors and statements which Mr. Padilla has made. For example, Mr. Padilla consistently has denied - even to his own attorneys - that he has any mental health problems. Yet he once claimed that he was administered the psychedelic drug LSD while in the Brig. It is, of course, a terribly important claim. If he were in fact administered this drug against his will, this would be an apparent major violation of his civil liberties. But if were not so drugged, why would he make this claim? Why would he choose to claim that the drug was a psychedelic? After all, arguably psychedelics are not at all the most obvious choice. But the claim would make perfect sense if in fact Mr. Padilla experienced a "psychedelic-like" experience in solitary at the Brig - that is, an acute, frightening, confusional state marked by multiple perceptual distortions and hallucinatory phenomena. In short, his statement strongly

11

suggests that he experienced the paradigmatic disturbance associated with solitary confinement - a brief confusional hallucinatory psychosis.

Attorney Andrew Patel has described observations of Mr. Padilla that have caused him to have concern about his client's mental state:

> • In 2005, Mr. Padilla apparently began having repetitive episodes of intense shortness of breath, chest tightness, and sudden fear - classic symptoms of panic attacks. These episodes had never occurred prior to his incarceration.
> • Some of Mr. Padilla's attitudes and behavior suggest a growing paranoia. For example, he was provided by the prison with a facsimile of a letter from his mother, and became convinced that it was a forgery. His attorney then tried another approach; he had Mr. Padilla's mother write him a letter and mail it to the attorney's office. Mr. Patel then himself brought the letter to Mr. Padilla so he could review it, and despite this strict chain of custody, Mr. Padilla still was convinced that the handwriting was not his mother's, and that the letter was a forgery.
> • Similarly, when the prison administration tried to substitute another (non-Moslem) clergyman for the (apparently no longer available) Imam visits, Mr. Padilla became suspicious that this man was not really a clergyman, but rather an agent of the government, trying to extract information from him.
> • Attorney Patel also finds it puzzling and disturbing that Mr Padilla never attempts to contact him, never even sending him correspondence. Similarly, the prison administration told Mr. Patel that Mr. Padilla refuses or declines to put any requests in writing. Indeed, a senior prison administrative official commented to Mr. Patel that Mr. Padilla is so quiet and immobile that he seems "like a piece of furniture."
> • At times, Mr. Padilla seems confused, disoriented. Sometimes he loses track, not just of the day, but even of the year.

Attorney do Campo makes similar observations. He also expresses his frustration the utter void of communication from Mr. Padilla has severely impaired the defense's efforts to help him. Mr. Padilla has been extremely reluctant to discuss the conditions of his confinement in the Brig - whatever progress has been made is was through a lengthy and protracted process. It took months of pleading and cajoling with Mr. Padilla before he would even submit to confirming or denying whether certain things had been done to Mr. Padilla at the Brig. Mr. do Campo is currently not convinced that Mr. Padilla has told his lawyers all that he experienced at the Brig. There is clearly exculpatory material which the defense has discovered - information which was obviously known by Mr. Padilla but was never revealed to his attorneys. As a result, the attorneys have spent days and weeks attempting to ferret out even the smallest scraps of information about Mr. Padilla's case, a frustrating, inefficient and ineffective method or developing their case - so much so that it troubles their moral sense that they are not able to fulfill their ethical and professional responsibility to their client. And as noted by others, Mr. Padilla just keeps repeating irrational statements: He trusts the government and not them. He keeps repeating that he is "fine." When they try in the most gentle way to broach any subject about Egypt or about the Brig, his eyes blink fiercely, his mouth grimaces oddly, and in a half-smile, half-terror, he says he wants to go back to his cell now - that he is "tired." Then he tells them that they've gone over all this before (whereas in fact he has never told them

about the subject). And then again he insists he is "tired" and insists that he be allowed to go back to his cell.

## 6. Conclusions: Volition and Its Impairment.

Mr. Padilla manifests severe effects of long-term solitary confinement. It should, however, first be noted that Drs. Hegarty and Zapf both reached the conclusion that Mr. Padilla suffers from Posttraumatic Stress Disorder (PTSD) as a result of those conditions of confinement and of the interrogation which he endured at the Naval Brig in Charleston. I concur with that conclusion. He manifests a number of symptoms of that disorder, altogether suggestive that he suffers profoundly from it. These include hypervigilance (constantly looking around and over his shoulder while his attorney is talking with him), avoidance (being willing to speak with his attorneys about a number of subjects, but extremely reluctant to discuss his conditions in the Brig and absolutely nothing about the allegations in the indictment, and wants to literally leave the room when the subject is brought up), physiological reactivity when reminded of the trauma (his eyes start blinking wildly, and he begins making odd, eerie facial grimaces), and a profound sense of helplessness (for example, repeatedly telling Attorney O'Connell that there was nothing he could do for Mr. Padilla in regard to those conditions and his interrogation, because the government was all-powerful). Moreover, his tendency to identify with his captors rather than his own attorneys strongly suggests a profound fear and sense of helplessness.

But his symptomatic presentation suggests even more than this. He has become profoundly suspicious, apparently paranoid at times (e.g. his conviction that his mother's letter was a forgery). His grimacing and eye blinking, often accompanied by a strange, tense spreading of his lips as though in an attempt to smile has an eerie, psychotic feel to it. He perseverates (repeating the same thought over and over again, even though the thought makes little sense in the first place). There is, indeed, a fundamental irrationality in his thinking about his case; he continually repeats that his attorneys already know everything: that "we have gone over all this before," when in fact he has virtually never been willing to talk about any of these issues with any of his attorneys.

In short, his presentation suggests not simply a reaction to fear and trauma, but really a disorganizing, psychotic reaction. It is very significant that one of his paranoid fears is that his attorneys are trying to put him away forever in a psychiatric hospital. Of course, they intend nothing of the sort. What they did want was only for him to be evaluated in a clinical setting, removed from the continuing stress of solitary confinement. They had no thought whatsoever that he should remain in any such facility. Why then would Mr. Padilla come to fear this? No one had even raised it as a possibility. Why would he think of it? Obviously, the fear must have come from inside of him - from some vague recognition that he had become very ill.[2]

---

[2]It is not uncommon for inmates who become mentally ill in solitary to vehemently deny that they are ill; for one thing, it is terrifying for anyone to experience himself as deteriorating mentally, for another, in the particular situation of confinement, the fear of revealing weakness to one's captors can become overwhelmingly terrifying. See, for example, my 1982 article in the American Journal of Psychiatry, referenced in my more recent article in the Washington University Journal of Law and

Among people with the most severe cases of PTSD there are some for whom the trauma is so disorganizing that they become paranoid or psychotically disorganized when their attention is pointed to reminders of the trauma. This phenomenon is fairly rare, although not unheard of. Indeed, there is a long history to the use of isolation and perceptual deprivation by interrogators as a means of destroying an inmate's sense of identity and his will to resist. As described in my Washington University article, the United States intelligence services became acutely aware of this issue as a result of concern about "brainwashing" of American prisoners of war during the Korean War, as well as by the Soviet KGB.

Research funded by the United States Government described the Soviet detention prisons of that era:

> Incarceration in these prisons is almost universally in solitary confinement, in a cell approximately ten feet by six feet in size. ... An almost invariable feature of the management of any important suspect under detention is a period of total isolation in a detention cell. The effects upon prisoners of the regimen ... are striking. ... He becomes increasingly anxious and restless... As it continues, the prisoner becomes increasingly dejected and dependent. He gradually gives up all spontaneous activity within his cell ... Finally, he sits and stares with a vacant expression, perhaps twisting a button on his coat. . Ultimately he may reach a state of depression in which ... he pays little attention to his surroundings. In this state the prisoner may have illusory experiences. ... Some prisoners may become delirious and have ... hallucinations.

There have been multiple reports that the United States has at times come to copy some of these same techniques in its own interrogation procedures. It is certainly clear that the United States Department of Defense is entirely aware of the potentially catastrophic effects of prolonged isolation.[3] Also, in Mr. Padilla's case the government admitted that it desired to foster a sense of

---

Policy.

It is useful to think in terms of the two basic elements of medical diagnosis: symptoms versus signs of illness. Symptoms are those things of which the individual complains (e.g. I have a fever, my muscles ache). Signs, on the other hand, are pieces of evidence of which the patient either is unaware or which would not usually present as complaints (e.g. the physician notes a "bull's-eye rash" on the patient's arm; blood tests reveal elevated ESR and white count, suggestive of infection). Signs and symptoms are put together to yield a diagnosis (e.g. in this case, Lyme Disease). Individuals who are feigning disease will typically present with exaggerated (and often not exactly consistent) complaints of various symptoms, but the signs of disease will typically be lacking. On the other hand, individuals such as Mr. Padilla who are denying disease will typically deny having any symptoms, but the signs of disease will be telling.

[3]See, for example, U.S. Army Manual FN2-22.3. Human Intelligence Collector Operations, September 2006 at p. 354.

helplessness, dependency, and trust through his imprisonment in the Brig.[4] Thus if, as Mr. Padilla's defense contends in its Motion to Dismiss for Outrageous Government Conduct, there was a systematic use of isolation and physical and emotional abuse as a means of forcing him to become psychologically dependant upon his captors, and to destroy will to resist interrogation, then his psychological deterioration and inability to assist in his own defense would have likely been inevitable. Yet even if those contentions were not entirely accurate, Mr. Padilla has still undergone a profound, tremendously prolonged psychological stress, involving extended periods of utter isolation and deprivation. His solitary confinement now spans over 57 months continuously, under the most stringent of conditions, conditions rarely or never found in even the harshest of civilian prisons.

I have evaluated many individuals who were so traumatized by their incarceration in solitary that they developed PTSD as a result of that incarceration, a disorder which lingered well after their release from such confinement. Typically, their terrifying traumatic memory is of their own experience of psychological deterioration during the ordeal. Some such individuals cannot even talk about what happened, cannot focus their attention towards it at all. Doing so is unbearable, or perhaps more likely in Mr. Padilla's case, it is psychotically disorganizing.

I conclude to a reasonable degree of medical certainty that Jose Padilla has suffered prolonged severe mental pain and suffering as a result of his incarceration. Moreover, given the extensive research on this issue, much of it funded by the United States' government, it follows necessarily that the United States government was well aware of the likely consequences of its conduct in regard to Mr. Padilla.

Signed this 7th day of March, 2007


s/ Stuart Grassian
Stuart Grassian, M.D.


[4]See Jacoby Declaration at 8.

Exhibit "A"

## Stuart Grassian, M.D.
401 Beacon Street
Chestnut Hill, MA 02467-3976
Phone (617)244-3315
Fax (617) 244-2792

Born: June 29, 1946

## EDUCATION, TRAINING, FACULTY POSITIONS.

1963-1967    Harvard Club Scholar, Harvard University, Cambridge, MA

1967    B.A. Cum Laude, Harvard University, Cambridge, MA

1967-1969    NIMH Fellow in Sociology, Brandeis University, Waltham, MA

1969    M.A., Sociology, Brandeis University, Waltham, MA

1970    NSF Fellow in Psychiatry, Bellevue Hospital, NY

1973    M.D., New York University School of Medicine, NY

1973-1974    Intern (Medicine), New York University Medical Center, NY

1974-1977    Resident in Psychiatry, Beth Israel Hospital, Boston, MA.
Teaching Fellow in Psychiatry, Harvard Medical School.

1977-2003    Clinical Instructor in Psychiatry, Harvard Medical School.

1978-1980    Assistant Clinical Professor of Psychiatry, Tufts University School
of Medicine

## LICENSURE.

1974-    Massachusetts Medical License #37749.

1

Exhibit "A"

## BOARD CERTIFICATIONS

1979        Diplomate, American Board of Psychiatry and Neurology   (ABPN) in
            Psychiatry.

1994        Diplomate Certification, ABPN, Added Qualifications in Addiction
            Psychiatry.

1996        Diplomate Certification, ABPN, Added Qualifications in Forensic
            Psychiatry

## MAJOR PROFESSIONAL ACTIVITIES

1977 -      Private practice in Psychiatry:  Cambridge, MA (1977-1979),
            Chestnut Hill, MA (1979-  ), Stoneham, MA (1980-2003)

1977-1978   Clinical Director, Inpatient Service, Dorchester Mental Health
            Center, Boston, MA

1978-1980   Director, Inpatient Service, WestRosPark Mental Health Center,
            Boston, MA

1979-1983   Medical Staff, Lecturer, Glover Memorial Hospital, Needham, MA

1980-1994   Attending Psychiatrist, Adult & Adolescent Inpatient Services, New
            England Memorial Hospital, Stoneham, MA

1980-1983   Director, Adult & Adolescent Inpatient Services, Department of
            Psychiatry, New England Memorial Hospital, Stoneham, MA

1983-1994   Attending Psychiatrist, Addictions Treatment Unit, New England
            Memorial Hospital, Stoneham, MA

1987-1993   Supervising Psychiatrist, Outpatient Department, New England
            Memorial Hospital, Stoneham, MA

1992-1994   Psychiatric Director, Partnership Recovery Center, Melrose-
            Wakefield Hospital, Melrose, MA (Day treatment program for
            Addiction rehabilitation)

2

Exhibit "A"

## CONSULTATIONS, AFFILIATIONS, BOARD MEMBERSHIPS

1979-     Massachusetts Correctional Legal Services.  (Psychiatric Effects
          of Solitary Confinement, Psychiatric Effects of Strip Search Procedures)

1980-     Massachusetts Civil Liberties Union.  (Psychiatric Effects of Strip
Search Procedures, Psychiatric Effects of Solitary Confinement)

1993-     Massachusetts Department of Corrections, Stress Management
          Unit.  (Occupational Stress among Correctional Staff)

1993-4    Board of Trustees, New England Memorial Hospital, Stoneham, MA.

1995      Consultation to Psychiatric Expert/Special Master; Madrid v Gomez
          Federal District Court, Northern District, CA #C-90-3094TEH.
          (Psychiatric Effects of Solitary Confinement)

1995-     Consultant to Massachusetts Professional Recovery Committee,
          and to Substance Abuse Rehabilitation Program of the
          Massachusetts Board of Registration in Nursing.  (Addictive
          Disorders, Impaired professionals)

1997      Botech Corporation, Cambridge, MA.  (Effects of Solitary Confinement)

1998      Psychiatric Expert in Compliance Monitoring; Eng v Coombe
          Federal District Court, Western District, NY,  CIV #80-385-S.
          (Effects of Solitary Confinement)

2000-2    The Desisto School, Lenox MA

2001-     Consultant, Florida Department of Corrections.  (Solitary Confinement
          and Mental Health Issues in Florida State Prisons.)

2001-     Board of Advisors, Correctional Association of New York, (Mental Health
          Issues in New York State Prisons).

2002-4    Board of Directors, Massachusetts 9/11 Fund.

2002-4    American Boyschoir School, Princeton, NJ.

2002-3    Poly Prep School, Brooklyn, NY.

3

Exhibit "A"

(Note: As a result of my experience with the effects of stringent conditions of confinement, I ha
had a large number of other affiliations and consultations, which have not been separately liste
The following is not a complete list: American Friends Service Committee, Amnesty
International, The Capital Habeus Unit of the Defender Services Division of the United States
Courts, The Center for Constitutional Rights, The Correctional Association of New York, Feder
Public Defender - of E. Dist VA, of Tennessee, of the State of Washington, and of Washington,
DC, The Legal Aid Society of New York, National Defenders Investigators Association, The
National Prison Project of the ACLU, Prisoners Legal Services of Michigan, of New Mexico, an
of New York, Public Defenders Office of Connecticut, and of Maine, etc.)

## PROFESSIONAL SOCIETY/COMMITTEE/STAFF MEMBERSHIPS

1974-2003.   Member, American Psychiatric Association &
        Massachusetts Psychiatric Society

            Committee Memberships.
            Inpatient Psychiatry Committee (1981-1984)
            Private Practice Committee (1992-1995)
            Chair, Presidents Task Force on Managed Care (1993-1994)
            Steering Committee, Managed Care Retreat (1993-1994)

1974-1977   Resident in Psychiatry, Beth Israel Hospital, Boston, MA.
        Clinical Fellow in Psychiatry, Harvard Medical School.

1977-2003   Courtesy Staff, Beth Israel Hospital, Boston, MA
        Assistant in Psychiatry (1977-1991)
        Associate in Psychiatry (1991-2003)
        Clinical Instructor in Psychiatry, Harvard Medical School.

1980-1999   Active Staff, Boston Regional Medical Center, Stoneham, MA

        Committee Memberships
            Credentials Committee (1986-1990)
            Chair, Bylaws Committee (1987-1990)
            Medical Staff Executive Committee (1989-1992)
        Chief of Staff (1990-1992)
        Board of Trustees (1990-1992)

1992 -   Active/Courtesy Staff, Melrose-Wakefield Hospital, Melrose, MA

4

Exhibit "A"

1993-2000 Psychiatric Network of Massachusetts
Committee Memberships
Steering Committee (1993-1994)
Chairman, Board of Directors (1994-1995)


## AWARDS

2005. National Alliance for the Mentally Ill (NAMI). Exemplary Psychiatrist Award,

Presented at Annual Meeting, American Psychiatric Association,
May 2005.


## TEACHING APPOINTMENTS, PRESENTATIONS

| | |
|---|---|
| 1967 | Teaching Fellow, Harvard Graduate School of Education, Cambridge, MA |
| 1967-1969 | Teaching Fellow, Department of Sociology, Brandeis University, Waltham, MA |
| 1973 | Clinical Fellow in Psychiatry, New York University Medical Center, New York, NY |
| 1974-1977 | Clinical Fellow in Psychiatry, Harvard Medical School, Boston, MA |
| 1975-1976 | Consultant and Lecturer, Human Resources Institute, Brookline, MA |
| 1977-2003 | Clinical Instructor, Department of Psychiatry, Harvard Medical School, Boston, MA |
| 1978-80 | Assistant Clinical Professor, Department of Psychiatry, Tufts University Medical Center, Boston, MA |
| 1987 | Faculty, Third International Conference on Restricted Environmental Stimulation, New York, NY: "Effect of REST In Solitary Confinement and Psychiatric Seclusion" |
| 1987 | Guest Lecturer, Suffolk University School of Law, Boston, MA: |

Exhibit "A"

"Commitability and the Right to Refuse Treatment"

1988        Faculty, 32nd Institute on Hospital and Community Psychiatry,
            Boston, MA

1990        Massachusetts Bar Association Symposium, Boston, MA:
            "Drugs and Alcohol on Campus"

1992 -      Faculty, American Academy of Psychiatry and Law, Boston, MA:
            "Effects of Childhood Sexual Abuse"

1993        Faculty, Massachusetts Department of Corrections Stress Unit,
            Statewide Seminar, MA: "Stress Awareness for Managers"

1993        Massachusetts Continuing Legal Education Seminar, Boston, MA:
            "Psychiatric Effects of Physical and Sexual Assault"

1994        Massachusetts Academy of Trial Attorneys Seminar, Boston, MA:
            "Psychiatric Evaluation of Victims of Violent Crime"

1994        Beth Israel Hospital/Harvard Medical School, Boston, MA:
            "Psychiatric Consequences of Solitary Confinement; "Effects
            of Sensory Deprivation and Social Isolation in a Vulnerable
            Population"

1994        Massachusetts Medical Society, Committee on Managed Care,
            Waltham, MA: "Ethics of Managed Care"

1994        Prison Psychiatric Group, Albany, NY: "Criminality and Mental
            Illness, Revisited: Disorders of Volition". (Lecture sponsored
            by Pfizer Pharmaceuticals)

1995        Suffolk University Advanced Legal Studies, Boston, MA: "Sexual
            Abuse: Memory, Truth and Proof"

1995        Massachusetts Association of Trial Attorneys Seminar, Boston, MA:
            "Premises Liability/Negligent Security: Psychiatric Testimony and
            the Role of the Psychiatric Expert"

1996        New England Society for the Study of Dissociation,
            McLean Hospital, Belmont, MA: "Impact of Forensic Issues
            on Treating Victims of Violence"

Exhibit "A"

1996        Harvard Medical School, Children's Hospital Family Violence
            Seminar, Boston, MA: "Trauma and Memory"

1996        Trauma and Memory:  An International Research Conference,
            Durham, NH:  "Factors Distinguishing True and False Memory
            of Childhood Sexual Abuse"

1996        Trauma and Memory:  An International Research Conference,
            Durham, NH:  "Memory of Sexual Abuse by a Parish Priest"

1997        Correctional Association of New York, NY:  "Psychiatric Effects of
                                Solitary Confinement".

1998        Massachusetts Board of Registration in Medicine and
            Northeastern University Conference, Substance Abuse and
            The Licensed Professional, Boston, MA:  "Addictions and
            Compulsions:  Disorders of Volition"

2000        Human Rights Watch and American Civil Liberties Union Foundation
                Conference.  Washington, D.C.  "Super-Maximum Security
            Confinement in the United States."

2003        Capital Habeus Unit Training Conference of the Defender Services
            Division of the United States Courts, San Antonio, TX. (lecture
regarding death row confinement and its effects on post-conviction    appeal
process.)

2003        NAACP Legal Defense Fund Conference, Airlie, VA.  7/03.  Lecture
            regarding mental health issues and solitary confinement of
prisoners.

2005        Vera Institute.  National Commission on Safety and Abuse in
            Prisons.  Newark NJ, July 2005.  Effects of Isolation.

2005.       NAACP Legal Defense Fund, Airlie Conference, Va.  July 2005.
            "'Volunteers' in Death Row".

2006        University of California at Davis, Symposium -  The Neurobiology of
                Torture.  "What is Known about the Neurobiological Effects of
            Solitary Confinement."

7

Exhibit "A"

## MEDIA, PUBLIC AFFAIRS PRESENTATIONS

1988        NBC-TV, Today Show  "Small Group Confinement of Female
Political Prisoners at the Federal Penitentiary in Lexington, KY"

1990        NPR-TV, News Interview Program: "Psychiatric Effects of
Small Group Confinement"

1990        PBS-TV, Point of View  "Through the Wire", Documentary
regarding women confined for politically motivated crimes

1991        WBZ-TV, Boston, MA:  Channel 4 Nightly News  "Statute of
Limitations on Cases of Childhood Sexual Abuse"

1992        Boston Globe, New York Times, etc.:  "Effects of Childhood
Sexual Abuse by a Catholic Priest"

1992        Boston Globe, New York Times, San Francisco Chronicle,
Los Angeles Times, etc.:  "Psychiatric Effects of Solitary
Confinement"

1993        New England Cable News, Newton, MA:  Commentator regarding
insanity defense in Kenneth Sequin trial

1993        Massachusetts House of Representatives, Judiciary Committee
testimony:  Proposed change in Statute of Limitations in cases
of childhood sexual abuse

1993        CBS-TV, 60 Minutes  "Pelican Bay – Psychiatric Effects of Solitary
Confinement in California's High-Tech Maximum Security Prison"

1993        New England Cable News, Newton, MA:  News Night  "False
Memory and Recovered Memory of Childhood Sexual Abuse"

1993        WCVB-TV, Boston, MA:  Chronicle "Sentencing of Father Porter –
The Effect on the Victims"

1994        WHDH-TV, Boston, MA:  Boston Common "False Memory
Syndrome".

1994        FOX-TV, Boston, MA:  At Issue  "Psychiatric Effects of
Solitary  Confinement"

8

Exhibit "A"

1996        New England Cable News, Newton, MA: News Night  "The Insanity Defense"

1998        ABC-TV, Nightline with Ted Koppel; Primetime Live  "Crime and Punishment"

1998        WBZ-TV, Boston, MA:  Channel 4 Nightly News  "Perpetrators of Sexual Abuse:  Dangers to the Community"

1999        ABC-TV, 20/20  "Effects of Solitary Confinement"

2003        Discovery Channel.  "Mohammed Atta: Profile of a Terrorist".

2003        Invited Testimony, Joint Legislative Hearing, New York State Assembly, New York City, November 2003.  "Disciplinary Confinement and Treatment of Prison Inmates with Serious Mental   Illness."

2004        Invited Testimony, Massachusetts State Legislature. Joint Committee on Public Safety.  "The  Cost of Corrections".

## MAJOR INTERESTS IN FORENSIC PSYCHIATRY

1. Psychiatric Effects of Solitary Confinement

Psychiatric expert in large number of cases including several large class action suits and other lawsuits in Federal and State Courts in California, Connecticut, Florida, Georgia, Massachuset Maine, New Mexico, New York State, Texas, Virginia, the State of Washington, and in Washington, D.C.  Decisions in some of those cases, and my published findings, have been cit in Federal Appellate decisions, and have also generated significant national media interest. Issues have included:  mental illness among inmates so confined;  effect on ability to assist in inmate's own legal defense (both pretrial and postconviction);  "volunteering" for execution; impact on inmate's ability to cooperate with government in debriefing and testifying.

Case 0:04-cr-60001-MGC  Document 1454-2  Entered on FLSD Docket 09/05/2014  Page 25 of
36
Case 0:04-cr-60001-MGC  Document 897-2  Entered on FLSD Docket 03/07/2007  Page 10 of
10
Exhibit "A"

Peer-Reviewed Publications:

"Psychopathological Effects of Solitary Confinement", Am J Psychiatry 140:11, 1983.

"Effects of Sensory Deprivation in Psychiatric Seclusion and Solitary Confinement", Intl J Law &
Psychiatry 8:49, 1986.

2. Strip Search Procedures, Sexual and Physical Assault

Psychiatric expert in a number of strip search cases in Federal and Massachusetts state courts
Testimony has been cited by the Federal Appeals Court in Cole v Snow.  Consulted in settleme
of two class action suits.

Psychiatric expert in cases of rape, sexual and physical assault.  Substantial experience in
evaluating the effects of childhood sexual abuse, and the processing over time of memories of
that abuse. Evaluated approximately 100 victims of childhood sexual abuse, including many of
the plaintiffs in the clergy sex abuse scandals in Massachusetts.  Consulted to private schools
around such issues.

Research and Presentations:

Principal Investigator, Beth Israel Hospital, Department of Psychiatry, Boston, MA.
"Psychiatric and Addictive Problems in Survivors of Childhood Sexual Abuse Perpetrated by
Father Porter."

"Recovery of Memory of Childhood Sexual Abuse and Creation of False Memories; Can These
Processes be Distinguished?".

3. Addictive Disorders

Testimony in a number of criminal and civil cases.  My testimony in a highly publicized case, In
Cockrum, helped to establish that an individual who was otherwise highly competent, was not
competent to act in his own behalf in appealing his murder conviction, as a result of an
underlying addictive suicidal compulsion.

4. Civil Rights Issues

Expert in a number of cases regarding racial and sexual harassment in employment and housi
situations, including cases brought by Civil Rights Division of the United States Department of
Justice, and by Greater Boston Legal Services, and in strip search procedures by law
enforcement and prison personnel.

Case 0:04-cr-60001-MGC   Document 897-3   Entered on FLSD Docket 03/07/2007   Page 1 of 11

| Summary of Log Data Evidencing Isolation | | | | | |
|---|---|---|---|---|---|
| **Date** | **Visitors** | **Shower** | **Rec Call** | **Reading** | **Notes** |
| 11/21/02 | Ramos  10:24 to 11:02<br>Lawson  10:24 to 11:02<br>Perez  10:24 to 11:02<br>Connelly  10:24 to 11:02<br>Foster  19:04 to 19:12 | 13:53 to 14:06 | 13:39 to 13:45 | None | |
| 11/22/02 | Foster 15:58 to 16:02 | 7:41 to 7:55 | None | None | |
| 11/23/02 | Medical 13:30 to 13:32 | None | None | None | |
| 11/24/02 | None | None | None | None | |
| 11/25/02 | Foster 10:55 to 11:07 | None | None | None | |
| 11/26/02 | Foster  14:56 to 14:59 | 7:36 to 7:55 | None | None | |
| 11/27/02 | Foster  15:14 to 15:18 | None | None | None | |
| 11/28/02 | None | None | None | None | |
| 11/29/02 | None | None | None | None | |
| 11/30/02 | None | None | None | None | |
| 12/1/02 | None | None | None | None | |
| 12/2/02 | Foster 17:21 to ? | 10:06 to 10/26 | None | None | |
| 12/3/02 | Foster 19:21 to 19:25 | None | None | None | |

Exhibit "B"                                                    1

| Date | Visitors | Shower | Rec Call | Reading | Notes |
|------|----------|--------|----------|---------|-------|
| 12/4/02 | Lawson 13:10 to 14:14<br>Ramos 13:10 to 14:14<br>Foster 18:37 to 18:39 | 11:04 to 11:21 | None | None | |
| 12/5/02 | Lawrence 14:16 to 14:24<br>Lawson 14:25 to 15:11<br>Ramos 14:25 to 15:11<br>Foster 16:15 to 16:28 | None | None | None | Lawrence administered flu shot |
| 12/6/02 | Foster 16:03 to 16:08 | None | None | None | |
| 12/7/02 | Lawson 11:12 to 12:02<br>Ramos 11:12 to 12:02 | None | None | None | |
| 12/8/02 | Lawson 14:39 to 15:46<br>Ramos 14:39 to 15:46<br>Perez 14:39 to 15:46 | None | None | None | |
| 12/9/02 | Ramos 13:22<br>Lawson 13:22<br>Perez 13:22 | 15:40 to 15:56 | None | None | |
| 12/10/02 | Foster 6:31 to 6:43<br>Lawrence 17:20 to 17:30 | None | None | None | |
| 12/11/02 | Foster 13:25 to 13:27 | None | None | None | |
| 12/12/02 | Foster 18:57 to 18:59 | 14:16 to 14:31 | 13:54 to 14:15 | None | |
| 12/13/02 | Foster 12:25 to 12:27 | 13:24 to 13:37 | 13:14 Refused | None | |
| 12/14/02 | None | None | None | None | |

Exhibit "B"                                    2

| Date | Visitors | Shower | Rec Call | Reading | Notes |
|---|---|---|---|---|---|
| 12/15/02 | None | None | None | None | |
| 12/16/02 | Foster 16:55 to 17:02 | None | 11:35 Refused | None | |
| 12/17/02 | Foster 17:40 to 17:44 | 9:16 to 9:35 | 8:49 Refused | None | |
| 12/18/02 | Foster 19:02 to 19:07 | None | Refused | None | |
| 12/19/02 | Foster 16:54 to 16:57 | 10:00 to 10:17 | None | None | |
| 12/20/02 | Foster 17:17 to 17:29 | None | None | None | |
| 12/21/02 | None | None | None | None | |
| 12/22/02 | None | None | None | None | |
| 12/23/02 | None | 13:39 to 13:58 | Refused | None | |
| 12/24/02 | 10:58 to 11:02 | None | None | None | |
| 12/25/02 | None | None | None | None | |
| 12/26/02 | None | 12:18 to 12:36 | 7:35 Refused | None | |
| 12/27/02 | None | 9:42 to 9:58 | 9:10 to 9:37 | None | Walked in Day Room during rec |
| 12/28/02 | None | None | None | None | |
| 12/29/02 | None | None | None | None | |
| 12/30/02 | Seymour 10:22 to 10:29 | None | None | None | |
| 12/31/02 | Seymour 14:27 to 14:28 | 10:24 to 10:42 | 10:02 to 10:24 | None | |

Exhibit "B"                                3

| Date | Visitors | Shower | Rec Call | Reading | Notes |
|------|----------|--------|----------|---------|-------|
| 1/1/03 | None | 15:13 to 15:28 | 14:39 to 15:11 | None | |
| 1/2/03 | Foster 17:20 to 17:22 | None | None | None | |
| 1/3/03 | Foster 17:47 to 17:49 | None | None | None | Foster notes that Mr. Padilla needs haircut and shower |
| 1/4/03 | None | None | None | None | |
| 1/5/03 | None | None | None | None | |
| 1/6/03 | None | 14:26 to 14:43 | None | None | |
| 1/7/03 | Foster 21:27 to 21:35 | None | None | None | |
| 1/8/03 | Cooper 11:35 to 11:41 Foster 21:32 to 21:33 | 9:43 to 10:01 | 8:48 to 9:17 | None | |
| 1/9/03 | Foster 20:33 to 20:40 | None | None | None | |
| 1/10/03 | None | 14:42 to 14:58 | None | None | |
| 1/11/03 | None | None | None | None | |
| 1/12/03 | None | None | None | None | |
| 1/13/03 | None | 9:41 to 10:00 | 14:51 to 15:23 | None | |
| 1/14/03 | None | None | None | None | |
| 1/15/03 | None | 16:29 to 16:49 | 16:08 to 16:27 | None | |

Exhibit "B"                                   4

Case 0:04-cr-60001-MGC   Document 897-3   Entered on FLSD Docket 03/07/2007   Page 5 of 11

| Date | Visitors | Shower | Rec Call | Reading | Notes |
|---|---|---|---|---|---|
| 1/16/03 | Foster 14:40 to 14:43 | None | None | None | |
| 1/17/03 | Foster 18:25 to 18:36 | 14:15 to 15:05 | 13:32 to 14:15 | None | |
| 1/18/03 | None | None | None | None | |
| 1/19/03 | None | None | None | None | |
| 1/20/03 | Henning | None | None | None | Medical visit |
| 1/21/03 | Foster 18:03 to 18:05 | 13:48 to 14:06 | 13:45 Refused | None | |
| 1/22/03 | Foster 16:57 to 16:59 | 16:02 to 16:18 | None | None | Mr. Padilla requested Koran |
| 1/23/03 | Foster 20:51 to 20:56 | None | None | None | |
| 1/24/03 | Foster 19:04 to 19:13 | 15:44 to 16:02 | None | None | |
| 1/25/03 | None | None | None | None | |
| 1/26/03 | Seymour 16:26 to 16:29 | None | None | None | |
| 1/27/03 | Foster 20:07 to 20:11 | 15:48 to 16:08 | None | None | |
| 1/28/03 | None | None | None | None | |
| 1/29/03 | Ramos 13:59 to 14:37 Lawrence 13:59 to 14:37 Seymour 15:47 to 15:48 | 16:15 to 16:33 | 15:56 to 16:06 | None | |
| 1/30/03 | None | None | None | None | |

Exhibit "B"                                    5

| Date | Visitors | Shower | Rec Call | Reading | Notes |
|------|----------|--------|----------|---------|-------|
| 1/31/03 | Foster 14:30 to 14:36<br>Lawson 14:57 to 16:45<br>Ramos 15:02 to 16:45<br>Lawrence 16:53 to 16:56 | 11:32 to 11:50 | 11:13 to 11:28 | None | |
| 2/1/03 | Lawson 10:35 to 10:59<br>Ramos 10:35 to 10:59 | None | None | None | |
| 2/2/03 | None | None | None | None | |
| 2/3/03 | Foster 20:06 to 20:08 | 14:57 to 15:19 | None | None | |
| 2/4/03 | Foster 18:41 to 18:44 | 14:29 to 14:43 | 13:54 to 14:24 | None | |
| 2/5/03 | Foster 16:56 to 17:00 | 16:15 to 16:38 | None | None | |
| 2/6/03 | None | 15:28 to 15:44 | 15:06 to 15:22 | None | |
| 2/7/03 | Foster 16:33 to 16:36 | 11:31 to 11:46 | 11:15 to 11:28 | None | |
| 2/8/03 | None | None | None | None | |
| 2/9/03 | None | None | None | None | |
| 2/10/03 | None | 14:20 to 14:40 | 13:57 to 14:16 | None | |
| 2/11/03 | Foster 20:42 to 20:43 | None | None | None | |
| 2/12/03 | None | 14:23 to 14:42 | 14:06 to 14:16 | None | |
| 2/13/03 | Foster 13:11 to 13:16<br>Henning 8:09 | None | None | None | |

Exhibit "B"                                    6

Case 0:04-cr-60001-MGC   Document 897-3   Entered on FLSD Docket 03/07/2007   Page 7 of 11

| Date | Visitors | Shower | Rec Call | Reading | Notes |
|------|----------|--------|----------|---------|-------|
| 2/14/03 | Foster 8:56 to 8:58 | 15:56 to 16:13 | 15:30 to 15:53 | None | |
| 2/15/03 | None | None | None | None | |
| 2/16/03 | None | None | None | None | |
| 2/17/03 | None | None | None | None | |
| 2/18/03 | Warren 9:30 to 9:50<br>Foster 21:03 to 21:05 | 15:44 to 16:01 | 15:32 to 15:42 | None | |
| 2/19/03 | None | None | None | None | |
| 2/20/03 | Foster 20:31 to 20:40 | None | None | None | |
| 2/21/03 | Foster 15:58 to 16:04<br>Lawrence 19:56 to 19:59 | 15:54 to 16:11 | 15:40 to 15:50 | None | |
| 2/22/03 | None | None | None | None | |
| 2/23/03 | None | None | None | None | |
| 2/24/03 | None | 15:45 to 16:09 | 15:23 to 15:40 | None | |
| 2/25/03 | Foster 18:48 to 18:51 | 13:05 to 13:20 | 12:40 to 13:00 | None | |
| 2/26/03 | Foster 18:19 to 18:21 | None | None | None | |
| 2/27/03 | Foster 21:07 to 21:15 | 13:05 to 13:29 | 12:41 to 13:02 | None | |
| 2/28/03 | Foster 17:15 to 17:18 | 16:06 to 16:22 | None | None | |
| 3/1/03 | None | None | None | None | |

Exhibit "B"                                                    7

| Date | Visitors | Shower | Rec Call | Reading | Notes |
|------|----------|--------|----------|---------|-------|
| 3/2/03 | None | None | None | None | |
| 3/3/03 | Foster 21:50 to 21:53 | None | None | None | |
| 3/4/03 | Foster 19:18 to 19:22 | None | None | None | |
| 3/5/03 | Lawson 15:57 to 16:17<br>Ramos<br>Alexander<br>Perex<br>Foster 23:15 to 23:19 | 11:12 to 11:38 | 10:48 to 11:08 | 16:20 to 16:45 | Lawson gave Mr. Padilla an article to read |
| 3/6/03 | Foster 16:42 to 16:44 | 15:39 to 15:57 | 15:25 to 15:35 | None | |
| 3/7/03 | Foster 14:01 to 14:04<br>Lawrence 18:25 to 18:26 | None | None | None | |
| 3/8/03 | None | None | None | None | |
| 3/9/03 | None | None | None | None | |
| 3/10/03 | None | None | None | None | |
| 3/11/03 | Warren 10:52 to 12:17, 15:35 to 15:57<br>Parrison 11:47 to 11:55<br>Keen<br>Lawson<br>Ramos<br>Foster 19:44 to 19:49 | 12:18 to 12:32 | 12:00 to 12:15 | None | |
| 3/12/03 | Foster 19:07 to 19:14<br>Lawrence 19:34 to 19:35 | 9:39 to 9:56 | 9:14 to 9:37 | None | |

Exhibit "B"                                        8

| Date | Visitors | Shower | Rec Call | Reading | Notes |
|------|----------|--------|----------|---------|-------|
| 3/13/03 | Foster 18:07 to 18:11 | None | None | None | |
| 3/14/03 | Foster 14:57 to 14:59 | 15:05 to 15:20 | None | None | |
| 3/15/03 | None | None | None | None | |
| 3/16/03 | None | None | None | None | |
| 3/17/03 | Foster 17:55 to 17:57 | 12:39 to 12:56 | 12:21 to 12:36 | None | |
| 3/18/03 | Foster 18:43 to 18:49 | None | None | None | |
| 3/19/03 | Seymour 17:23 to 17:25 | 16:15 to 16:28 | 15:57 to 16:10 | None | |
| 3/20/03 | Foster 15:07 to 15:10 | None | None | None | |
| 3/21/03 | Lawrence 8:39 to 8:45<br>Foster 18:35 to 18:44 | None | None | None | |
| 3/22/03 | None | None | None | None | |
| 3/23/03 | None | None | None | None | |
| 3/24/03 | Foster 5:52 to 5:54 | 13:45 to 14:01 | 13:23 to 13:43 | None | |
| 3/25/03 | Foster 19:32 to 19:45 | None | None | None | |
| 3/26/03 | Foster 13:26 to 13:31 | None | None | None | |
| 3/27/03 | None | 15:59 to 16:17 | 15:41 to 15:56 | None | |
| 3/28/03 | Foster 13:05 to 13:06 | None | None | None | |
| 3/29/03 | Lawrence 17:25 to 17:31 | None | None | None | |

Exhibit "B"                                                    9

| Date | Visitors | Shower | Rec Call | Reading | Notes |
|------|----------|--------|----------|---------|-------|
| 3/30/03 | None | None | None | None | |
| 3/31/03 | Ramos 17:39 to 18:37<br>Lawson 17:39 to 18:37 | 14:57 to 15:09 | None | None | |
| 4/1/03 | Lawson 11:32 to 13:06, 16:23 to ?<br>Quinn 11:32 to 13:06, 16:23 to ?<br>Davis 11:32 to 13:06<br>Holdren 11:32 to 13:06, 16:23 to ?<br>Ramos 16:23 to ?<br>Remei 16:23 to ? | None | None | None | |
| 4/2/03 | Ramos 9:57 to 11:27, 15:58 to 18:33<br>Lawson 9:57 to 11:27, 15:53 to 18:33<br>Quinn 9:57 to 11:27, 15:53 to 18:33<br>Remei 9:57 to 11:27, 15:53 to 18:33<br>Perez 15:53 to 18:33 | 11:21 to 11:38 | None | None | |
| 4/3/03 | Lawson 14:02 to 16:18<br>Perez 14:02 to 16:18<br>Remei 14:02 to 16:18<br>Ramos 14:02 to 16:18<br>Quinn 14:02 to 16:18<br>Foster 16:55 to 16:56 | None | None | None | |

Exhibit "B"

| Date | Visitors | Shower | Rec Call | Reading | Notes |
|------|----------|--------|----------|---------|-------|
| 4/4/03 | Lawson 11:55 to 15:09<br>Ramos 11:55 to 15:09<br>Perez 11:55 to 15:09<br>Quinn 11:55 to 15:09<br>Remei 11:55 to 15:09<br>Foster 16:21 to 16:23 | 9:37 to 9:55 | 9:08 to 9:37 | None | Mr. Padilla given family photos to view in his cell |
| 4/5/03 | Lawson 13:36 to 17:45<br>Quinn 13:36 to 17:45<br>Ramos 13:44 to 17:45 | None | None | None | Mr. Padilla given family photos to view in his cell |
| 4/6/03 | Lawson 12:41 to 16:22<br>Quinn 12:41 to 16:22<br>Ramos 12:50 to 16:22 | None | None | None | Mr. Padilla given family photos to view in his cell |
|  |  |  |  |  |  |

Exhibit "B"                                        11