**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 04-60001-CR-COOKE (s)(s)(s)(s)(s)**

**UNITED STATES OF AMERICA**

**v.**

**JOSE PADILLA,**
    **a/k/a "Ibrahim,"**
    **a/k/a "Abu Abdullah the Puerto Rican,"**
    **a/k/a "Abu Abdullah Al Mujahir,"**

               **Defendant.**
_____/

## GOVERNMENT'S RE-SENTENCING MEMORANDUM

### I Introduction

Upon review of Defendant Jose Padilla's term of imprisonment of 205 months (17.5 years), the Eleventh Circuit found his sentence to be "substantively unreasonable." The court wrote: "Padilla's sentence of 12 years below the low end of the Guidelines range reflects a clear error of judgment about the sentencing of this career offender." United States v. Jayyousi, et al., 657 F.3d 1085, 1117 (11th Cir. 2011), cert. denied, 133 S. Ct. 29 (2012). Accordingly, the United States of America hereby files this memorandum in support of Defendant Jose Padilla's re-sentencing and recommends a term of imprisonment of 360 months (30 years), inclusive of any reduction. This Court's re-sentencing determination can and should be made on the existing record, and thus the government incorporates all its pleadings, evidence, objections, and arguments from the prior proceedings.

### II Argument

#### A.  30-Year Recommendation

Central to the Eleventh Circuit's concern is Padilla's criminal history, "which included

17 arrests and a murder conviction," qualifying him as a career offender, as well as his "heightened risk of future dangerousness due to his al-Qaeda training." Id. Padilla is 43 years old. The present release date for this inmate with prior convictions, hands-on terrorist training, and a violent personal history is May 9, 2023, when Padilla will be 53, a relatively young man. "'[T]errorists[,] [even those] with no prior criminal behavior[,] are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.'" Id. (quoting United States v. Meskini, 319 F.3d 88, 92 (2nd Cir. 2003)).

The government's recommended 30-year prison term satisfies the Eleventh Circuit's mandate for a reasonable sentence. "Congress has expressed a desire that career offenders receive sentences 'of imprisonment at or near the maximum term authorized.'" Id. at 1117 (citing 28 U.S.C. § 994(h)). The phrase "maximum term authorized" means anything in the range—or term—of 30 years to life, as the reference to § 994(h) would suggest. Section 994(h) mandates that the Sentencing Commission specify such a term for the most serious felony recidivists. The Jayyousi court concluded, "Padilla's Guidelines sentence reflected this policy, but the district court deviated from this policy." Id. (emphasis added). "Guidelines sentence" thus means 30 years to life, where Padilla scored out prior to any variance. The government's recommendation of 30 years falls within the "maximum term authorized."

At the most basic level, 30 years is an objectively reasonable sentence, especially when Padilla's conduct is viewed in light of other terrorism cases. Given Padilla's age and life expectancy, a 30-year prison term splits the difference between a true life sentence, most regularly meted out for disrupted terrorist plots proven in criminal court, see, e.g., United States v. Abdulmutallab, 739 F.3d 891 (6th Cir. 2014) (four life sentences for defendant who tried to destroy commercial aircraft with bomb held not substantively unreasonable), and a 15-year

sentence, which would accompany a single-count material support offense, such as attempted travel to jihad or financing of terrorist groups.  See, e.g., United States v. Mohammed, (S.D. Fla., Case No. 13-20364-CR-UNGARO) (guilty plea with 15-year sentencing exposure for terrorist financing and recruiting activities).  Padilla did far more than attempt to travel or send money to terrorists; he actually trained at an al-Qaeda camp with the intent to wage violent jihad.  Padilla's lead charge of an overseas murder conspiracy, in violation of 18 U.S.C. § 956(a)(1), must be given some meaningful operative effect in his sentence.  In this regard, 30 years is just and appropriate.[1]

Not only should Padilla receive a 30-year sentence, but also his sentence cannot fall below 21 years.  The Jayyousi court flatly stated that this Court should not have awarded the 42-month sentence reduction for "his time of pretrial confinement."  Jayyousi, 657 F.3d at 1118 & n.6.  This is, in the applicable case, the province of the Attorney General and the Bureau of Prisons.  See United States v. Wilson, 503 U.S. 329 (1992) (rejecting proposition that 18 U.S.C. § 3585(b) authorizes district court to award credit for "official detention" at sentencing).  Cf. Reno v. Koray, 515 U.S. 50 (1995) (holding that "official detention" in § 3585(b) applies only to defendants detained and committed to custody of Attorney General under Bail Reform Act, 18 U.S.C. § 3142).  Thus, under the Eleventh Circuit's mandate, the absolute minimum sentence this Court can impose is 250 months or 20.8 years in prison.  The question then becomes what if

---

[1] Of course, plot cases can bring less time and support offenses can bring more time.  Taking two such examples, however, Padilla's sentence still seems too lenient.  Daniel Patrick Boyd pleaded guilty to conspiring to provide material support and to murder, kidnap, and maim persons abroad.  Boyd was sentenced to 216 months (18 years) in prison, but only after testifying against several coconspirators who were convicted.  See United States v. Boyd (E.D.N.C., Case No. 09-00216-CR-FL).  One of those coconspirators, charged with the same offenses, received 380 months (32 years).  See United States v. Hassan, 742 F.3d 104, 150-51 (4th Cir. 2014) (holding that sentence to be substantively reasonable).  Padilla also received a more favorable sentence than Hafiz Khan, another terrorism defendant recently sentenced in this District (Case No. 11-20331-CR-SCOLA), who had sent money to a foreign terrorist organization.  Khan was convicted of multiple counts of material support, each carrying a 15-year sentence, and was sentenced to 25 years for these exclusively financial offenses.

any sentence less than 30 years and more than roughly 21 years is permissible.[2]

**B.  "Harsh Conditions" Variance**

The one appropriate factor that supported this Court's variance was the conditions of Padilla's confinement in the Naval Consolidated Brig.  "[W]e have held that a district court may reduce a sentence to account for harsh conditions of pretrial confinement, but that decision does not justify a downward departure as extensive as the one the district court gave Padilla."  Jayyousi, 657 F.3d at 1118 (citing United States v. Pressley, 345 F.3d 1205 (11th Cir. 2003)).  Viewed as a whole, this Court's sentence cut 42% off the bottom of Padilla's Guidelines range and up to 60% off the top given his age (at the time, 37) and life expectancy.  The Eleventh Circuit found that this variance could not have been predicated on any record factors except the conditions of pretrial confinement, and even then the extent of the variance was too great.[3]

The Eleventh Circuit offered a numerical framework within which to work through this issue.  That court found substantive error in Padilla's variance of 3-1/2 times the actual period of pretrial confinement.  It was more approving of the variance in Pressley, which involved six years of pretrial confinement, "five of which were spent on a 23 hour a day 'lockdown.'"  Id.;

---

[2] This framework undercuts Padilla's argument based on 18 U.S.C. § 2339D(a), which proscribes receiving military-type training from a foreign terrorist organization (FTO).  Padilla was not charged with this offense, which was not even on the books when he committed his crimes.  Still, Padilla invokes this 10-year statute on the theory that it covers exactly what he did.  But unlike cooperating witness Yahya Goba, who attended an al-Qaeda camp solely as a religious obligation, Padilla received military training to use it on the battlefield.  Accordingly, Padilla was also guilty of an 18 U.S.C. § 956(a)(1) murder conspiracy and thus back in the 30-to-life range.  Even aside from Padilla's offense conduct, his § 2339D(a) argument is risky.  Section 2339D(a) requires proof of both an FTO and military training.  Where such evidence is available, the government could conceivably charge 18 U.S.C. § 2339B, which treats material support to an FTO through the provision of personnel, and § 2339D(a).  Under U.S.S.G. § 5G1.2(d)'s mandate for consecutive sentences, Padilla's potential sentence then would be 25 years, not even counting the § 956(a)(1) offense.  If the government had proven the specific training Padilla had actually received at the al-Qaeda camp, and if § 2339D(a) had existed at the time, then it theoretically could have brought § 2339D(a) as an additional charge, not as an alternative to another material support offense.  The ultimate response to Padilla's point about § 2339D(a), of course, is that he was not charged under that statute, and thus it has no bearing on what sentence he should receive.

[3] The Eleventh Circuit surmised that 110 months (9.2 years) of the variance was "largely based on the harsh conditions of his prior confinement."  Jayyousi, 657 F.3d at 1118.  This reflected the total 152 months' departure, minus the impermissible 42-month day-for-day credit.

Pressley, 345 F.3d at 1219.  The sentencing court in Pressley reduced the sentence by 2-1/2 years.  This was 50% less than the harshest period of pretrial confinement and even less than that (42%) of the total period.  The Eleventh Circuit found no error with those ratios.  See Pressley, 345 F.3d at 1219 ("We cannot say that [these fact] are insufficient, as a matter of law, to support the two and a half year downward departure.").

It should be noted that the government's recommended 30-year sentence is not necessarily the baseline for any variance.  This is merely the lower end of the applicable Guidelines.  Thus, any reduction based on conditions of confinement could start from a baseline above 30 years, so long as the ultimate sentence hits that number.  For example, if the Guidelines sentence were 39 years, this Court could still discount its preferred 110 months for harsh conditions and still land on the 30-year target (29.8 years, to be exact).  To be clear, the government is not recommending a sentence above 30 years, only illustrating that its recommendation is consistent with even an excessive reduction to account for harsh conditions of pretrial confinement.

Whatever the starting point, any reduction for harsh conditions should be modest, and certainly not more than the Pressley safe harbor of 2-1/2 years or 30 months (which, interestingly in that case, came off a baseline 30-year sentence).  Starting with a Guidelines sentence of 30 years, the lowest possible, Pressley's logic would yield a sentence here of 27-1/2 years.  Taken as a percentage of time spent in harsh conditions (again, 42-50%, as approved in Pressley), Padilla's sentence would go no lower than 28-1/4 years (reflecting 50% of 3-1/2 years).  However, from the Guidelines calculation in Pressley, a narcotics case, it is clear that the defendant there had a Criminal History Category I.  Padilla has a Criminal History Category VI, both as a career offender and through the terrorism enhancement.  Using the Eleventh Circuit's

logic that any variance must be weighed against the seriousness of the crime and the dangerousness of the offender, the extent of <u>Pressley</u>'s minimal variance is too generous here.

### 1. Enemy Combatant Detention

The Eleventh Circuit recognized that the facts of Padilla's military detention may support a modest reduction. Those facts certainly do not support any more. <u>See</u> <u>Jayyousi</u>, 657 F.3d at 1118 ("[T]he district court abused its discretion when it varied Padilla's minimum Guidelines sentence downward by 42 percent, a period three and one-half times his period of actual pretrial confinement."). The Eleventh Circuit's concern was not that the record before this Court was <u>inadequate</u>, but rather than this Court <u>improperly weighed</u> the sentencing factors given the record before it. The appellate court, having "meticulously reviewed the entire record," reached this conclusion. <u>Id.</u> at 1119. The record evidence before this Court at the first sentencing, which included sworn testimony about Padilla's conditions of pretrial confinement, still do not support this Court's downward departure.

Moreover, since the first sentencing, a number of federal courts have weighed in on Padilla's treatment as an enemy combatant to one degree or another. As Judge J. Harvie Wilkinson III of the Fourth Circuit wrote, "Since his 2002 detention, Padilla has received the regular attention of the federal courts." <u>Lebron v. Rumsfeld</u>, 670 F.3d 540, 545 (4th Cir. 2012), <u>cert. denied</u>, 132 S. Ct. 2751 (2012). Judge Wilkinson then proceeded to tick off no less than eight prior published opinions ("Padilla I-Padilla VIII") dealing with Padilla's time in military confinement. Since the Fourth Circuit penned the ninth such opinion (<u>Lebron</u>), there has been still a tenth, <u>see</u> <u>Padilla v. Yoo</u>, 678 F.3d 748 (9th Cir. 2012), all without counting the two published opinions in <u>this</u> case. Federal courts have also had occasion to adjudicate the criminal cases of two other Law of War detainees, one of whom received life imprisonment despite

claims of torture.  This last case provides an apt point of comparison.

There is nothing in the other Padilla opinions to preclude a harsh conditions reduction, but they do explain the legal context that governed his detention.  As a threshold matter, the Congressional authorization and Presidential order that placed him in military detention were perfectly legal.  Padilla v. Hanft, 423 F.3d 386 (4th Cir. 2005), cert. denied, 547 U.S. 1062 (2006).  Moreover, taking Padilla's specific allegations of mistreatment as true, as it must on a dispositive motion, the Fourth Circuit declined to recognize any civil cause of action.  Lebron v. Rumsfeld, 670 F.3d 540, 545 (4th Cir. 2012).  Then the Ninth Circuit dismissed an identical set of claims, this time against a different defendant, based on qualified immunity.  Padilla v. Yoo, 678 F.3d 748 (9th Cir. 2012).  Interestingly, the latter court reasoned, in light of Ex parte Quirin, 317 U.S. 1 (1942), it was unclear at the time of Padilla's detention whether enemy combatants should receive full constitutional rights, and that, even after Hamdi v. Rumsfeld, 542 U.S. 507 (2004), the question remains open.  Padilla, 678 F.3d at 759-61.  These opinions place Padilla's factual record in a broader legal context.[4]

## 2.   United States v. Ghailani

Given the legality of Padilla's detention, United States v. Ghailani, 733 F.3d 29 (2nd Cir. 2013), provides guidance on how enemy combatant detention should factor into a criminal sentence.  Ghailani was convicted of involvement in the 1998 bombings of the United States embassies in Kenya and Tanzania.  He served on an al-Qaeda logistics team acquiring

---

[4] These opinions also discuss Padilla's specific allegations.  See, e.g., Padilla, 678 F.3d at 761 (emphasis in original) ("During that relevant time frame, the constitutional rights of convicted prisoners and persons subject to ordinary criminal process were, in many respects, clearly established.  But Padilla was not a convicted prisoner or criminal defendant; he was a suspected terrorist designated an enemy combatant and confined to military detention by order of the President."); Padilla, 423 F.3d at 395 (noting that military detention might be necessary to serve a governmental interest in restricting a detainee's "communication with confederates so as to ensure that the detainee does not pose a continuing threat to national security even as he is confined."); Padilla v. Rumsfeld, 764 F. Supp. 2d 787, 805 (D.S.C. 2011) (observing that burdens on a detainee's religious observation might have served "the arguably compelling state interest in obtaining control over a critical subject during his interrogation…[or] the governmental interest in sustained interrogation over multiple hours to obtain the critical information sought.").

components to make a bomb.  Until June 2004, Ghailani avoided capture.  In the interim, of course, the United States formulated enemy combatant protocols.  From June 2004 until September 2006, Ghailani was in CIA custody.  After that, until June 2009, Ghailani was housed at Guantanamo Bay.  Ghailani was detained and treated as an enemy combatant for a total of five years.  Id. at 38-40.

Convicted of one conspiracy count, Ghailani asserted that, while in CIA custody, he was tortured.  Nevertheless, the sentencing court imposed a life sentence.  The Second Circuit affirmed that sentence as substantively reasonable.  Id. at 55.  Here, Padilla stands convicted of an al-Qaeda murder conspiracy.  That offense carries the same maximum as Ghailani's bomb plot and it too is an inchoate offense (Ghailani was acquitted of all substantive offenses).  In this sense, Ghailani is directly on point.  The fact that the East Africa embassy bombings involved completed offenses targeting the United States do not, at least for purposes of calculating Padilla's sentence, make a difference.  See Jayyousi, 657 F.3d at 1118 ("[T]he district court substantively erred in reducing Padilla's sentence based on the fact that Padilla did not personally harm anyone and his crimes did not target the United States….[A] district court may not reduce a sentence of a terrorist because the terrorist committed an inchoate crime.").

### 3.  United States v. Al-Marri

The only other case of an enemy combatant to be prosecuted criminally, United States v. Al-Marri (C.D. Ill., Case No. 09-cr-10030-MMM-JAG), involved another prisoner from the Naval Consolidated Brig.  After six years of military confinement, Al-Marri pleaded guilty to providing material support to al-Qaeda and was sentenced to 80 months (6.7 years) in prison.  Al-Marri was not convicted of conspiracy to murder, as Padilla was, nor was he a career offender, as Padilla is.  After considering almost identical allegations of abuse, the court reduced

Al-Marri's baseline 180 month sentence by a total of 80 months, 71 months as day-for-day credit, something the Eleventh Circuit has ruled impermissible, and a mere 9 months for harsh conditions of confinement.  The court stated at sentencing:

> The last thing that I need to discuss is the conditions of confinement.  I've already indicated that some of them were, if not unique, highly unusual.  Especially the period of time from June of '03 until the late fall of '04 was extremely severe in terms of isolation and other things and I do believe that some adjustment for that is appropriate.  But I will tell you that it's not going to be dramatic and the reason that it isn't is because I have to weigh against the other factors that I've talked about with some serious focus on the fact that you still present a very dangerous risk of future harm.  So I am going to be making an adjustment on your sentence of an additional 9 months.

Al-Marri pleaded guilty to a lesser offense, and thus deserved more generous consideration at sentencing.  For this reason, and because Al-Marri was not a career offender previously convicted of murder conspiracy, Al-Marri's case is distinguishable.  This Court should not rely on it, at least as to the ultimate sentence imposed.  See Jayyousi, 657 F.3d at 1118 (emphasis added) ("On remand, we admonish the district court to avoid imposition of a sentence inconsistent with those of similarly situated defendants.  It should not draw comparison to cases involving defendants who were convicted of less serious offenses, pleaded guilty, or who lacked extensive criminal histories, nor should it draw comparisons to cases where the government sought the imposition of the death penalty.").

**C.  ADX Florence**

Padilla supplements his harsh conditions argument by pointing to his treatment in federal prison.  Specifically, Padilla seeks a further sentencing reduction based on his designation to the Administrative Maximum Prison (ADX) in Florence, Colorado, where he claims to be subjected to an unduly restricted environment.[5]   ADX was constructed to house the most dangerous

---

[5] The Eleventh Circuit in Jayyousi limited its discussion to "pretrial confinement," and Padilla's time at ADX certainly does not qualify as that.  It is unclear whether, and to what extent, this Court factored ADX into

criminals in the United States and, to be sure, it is restrictive.[6] But Padilla's argument is flawed. It makes little sense for Padilla to assert that his sentence should be cut simply because he has been designated to a prison built especially for people like him. By the same logic, prisoners convicted of minor offenses, and thus designated to minimum security facilities, should receive sentencing enhancements.

Much like Padilla's military detention, the conditions at ADX have also been exhaustively litigated. Courts have consistently held that the conditions at ADX do not run afoul of the Due Process Clause, the Equal Protection Clause, or the Cruel and Unusual Punishments Clause. See, e.g., Rezaq v. Nalley, 677 F.3d 1001, 1015 (10th Cir. 2012) ("The conditions at ADX are comparable to those routinely imposed in the administrative segregation setting. We conclude that the conditions in the general population unit at ADX are not extreme as a matter of law.").[7] See also Matthews v. Wiley, 744 F. Supp. 2d 1159, 1172, 1176 (D. Colo. 2010) (citing cases). These cases have held that the conditions at ADX are not so extreme that they implicate a cognizable liberty interest. They also have held that any inmate's placement at ADX is not set in stone, a very important point for present purposes.

Inmates designated to ADX are not necessarily housed there forever. They have opportunities to be placed in less restrictive conditions, and even transferred to other facilities, through compliance with prison rules and programs. In short, ADX prisoners can demonstrate

---

Padilla's sentence. We discuss this issue because the defense argued it the last time around.

[6] See Rezaq v. Nalley, 677 F.3d 1001, 1014 (10th Cir. 2012) ("The government opened ADX to house inmates who, like plaintiffs, pose unusual security and safety concerns. These concerns stem from a uniquely federal penological interest in addressing national security risks by segregating inmates with ties to terrorist organizations. The BOP established that continued placement of these inmates in general population units could compromise prison safety or, given the unique criminal backgrounds of these plaintiffs, national security. We conclude that segregated confinement relates to and furthers the penological interests asserted in this case.").

[7] Rezaq himself was a terrorist, convicted of air piracy for his involvement in the 1985 hijacking of an EgyptAir flight, in which 57 passengers were killed. See United States v. Rezaq, 134 F.3d 1121, 1125-26 (D.C. Cir. 1998) (upholding conviction). The other plaintiffs in the Rezaq civil case against ADX (three more) were all convicted for their involvement in the 1993 bombing of the World Trade Center and related terrorist plots. See United States v. Rahman, 189 F.3d 88, 103 (2nd Cir. 1999) (upholding convictions).

that they have rehabilitated or have the potential to rehabilitate. Padilla assumes that his conditions of confinement at ADX cannot improve, but that is not true. It all depends on him:

> Inmates housed at ADX may improve their conditions of confinement by seeking admission to the Step-Down Program, a 'stratified system of less-restrictive housing' that incentivizes inmates to adhere to the prison's expectations for their conduct. Once admitted to the program, ADX inmates may progress from the general population unit through the Intermediate, Transitional, and Pre-Transfer Units 'with increasing degrees of personal freedom at each stage.' ADX policy states that '[e]very inmate has the opportunity to demonstrate he may be housed in a less-restrictive unit.'

Id. at 1006 (citations omitted). [8]

As this passage from Rezaq suggests, and as reflected by the experience of the convicted terrorists in that case, it is possible not only to loosen restrictions within ADX, but also to transfer out of ADX altogether: "[A]ll of the plaintiffs were admitted to the [Step-Down Program] and later transferred to other prisons. None of the plaintiffs are still housed at ADX." Id. This has profound implications for Padilla's argument for a variance. The conditions of his present confinement, and even his very designation to ADX, are not foreordained for the duration of his sentence. This Court should not cut Padilla's sentence based on where is designated now, if he could have the option to move elsewhere. Again, it all depends on him. Id.[9]

### III Conclusion

For all of the foregoing reasons, the government recommends that Defendant Jose Padilla

---

[8] ADX conducts periodic reviews of each inmate's placement within the prison. See Rezaq, 677 F.3d at 1016 ("[Plaintiffs] were given regular reevaluations of their placement in the form of twice-yearly program reviews. These periodic reviews included procedural protections, including the chance to appeal decisions through an administrative process."). Thus, even if a prisoner does not at first make the Step-Down Program, the prison does not forget about him.

[9] This is consistent with the fact that the Bureau of Prisons decides an inmate's conditions of confinement, and those conditions could change any time. Another example is Padilla's Special Administrative Measures (SAMs), which further restricted his contacts and communications. Padilla argued last time that these too should factor into a sentencing reduction, but the SAMs were allowed to expire on November 22, 2013. Accordingly, this argument is moot.

be sentenced to a term of 30 years' imprisonment.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY


By:  /s/ Brian K. Frazier
      Brian K. Frazier
      Court No. A5500476
      Ricardo A. Del Toro
      Fla. Bar No. 597585
      Assistant United States Attorneys
      99 N.E. 4th Street
      Miami, Florida 33132
      Tel: (305) 961-9000
      Fax: (305) 536-4675

      Bridget Behling
      Trial Attorney, Counter-terrorism Section
      United States Department of Justice
      950 Pennsylvania Avenue, N.W.
      Washington, DC 20530
      Tel: (202) 514-0849
      Fax: (202) 514-8714

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 5, 2014, I electronically filed the foregoing

Government's Re-Sentencing Memorandum with the Clerk of the Court using CM/ECF.


By: <u>/s/ Brian K. Frazier</u>
      Brian K. Frazier
      Assistant United States Attorney